UNITED STATES DISTRICT COURT
DISTRICT OF NEW HAMPSHIRE

| | |
|---|---|
| BETH ANNE M. COLLOPY )<br><br>Plaintiff, )<br><br>v. )<br><br>MARQUIS MANAGEMENT, LLC )<br><br>Defendant. ) | Civil Action No. 1:22-CV-00184-SE |

## DEFENDANT'S MEMORANDUM OF LAW IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT

Pursuant to Rule 56(a) of the Federal Rules of Civil Procedure and LR 56.1, Defendant Marquis Management, LLC ("Defendant" or "Marquis Management") submits this Memorandum of Law in support of its Motion for Summary Judgment as to all counts pled in Plaintiff Beth Anne M. Collopy's ("Plaintiff") Complaint.

## I.   INTRODUCTION

Marquis Management employed Plaintiff for approximately six months from September 2020 to March 2021.  Plaintiff was hired by Marquis Management's then-CIO, Daniel Lieber, who was a prior acquaintance of Plaintiff, for a role in the company's IT Department that Lieber created, but never advertised, and for which he recruited only Plaintiff.  When Lieber was terminated on December 1, 2020, Plaintiff began planning her departure.

On January 14, 2021, Plaintiff sent two emails to Marquis Management's HR Director and CFO in which she alleged that she had been subject to gender discrimination, and been denied a reasonable accommodation for a physical disability that limited her mobility. Specifically, in the first email, entitled "gender discrimination," Plaintiff complained of the following: (1) that her computer network access privileges had been reduced below that of the

men in the IT Department; (2) that her correspondence and files were being monitored; (3) that her requests for IT support were being deferred as unimportant; and (4) that only she was required to provide daily notifications to the IT Department concerning her work location when not working in the office.  In the second email, entitled "mobility accommodations removed," Plaintiff alleged that the company removed the IT office at one of its locations without providing an accessible office for her to use on the building's first floor.  The allegations were unfounded and demonstrably false.  When she sent these emails, Plaintiff knew that she had not been treated differently than male employees in Marquis Management's IT Department, knew the company did not remove or refuse to provide any accommodation, and knew that the company had not denied her access to office space necessary for her to do her job.

A month later, Marquis Management hired a new CIO, who undertook a wholesale review of the company's IT operations.  As a result of that analysis, Plaintiff's position was eliminated in March 2021.  Plaintiff followed with this litigation asserting four retaliation claims under federal and state law (Counts I, II, IV, and V), and a state law claim for wrongful termination (Count III).

Plaintiff's claims should be dismissed because, among other things, she cannot make out a prima facie case for retaliation, and Marquis Management has identified a legitimate, non-retaliatory and non-pretextual reason for Plaintiff's termination.  Accordingly, summary judgment should be entered for Defendant on each of Plaintiff's claims, and this matter should be dismissed.

## II.    STATEMENT OF MATERIAL FACTS

### A.    Plaintiff's Work at Marquis Management

Marquis Management provides HR, payroll, IT, and employment benefits services for various independent construction companies.  *See* Declaration of Attorney Owen R. Graham

("Graham Decl."), Tab C, Moore Dep. Day 1, pp. 30-34.[1]  In August 2020, Marquis

Management's then-CIO, Daniel Lieber, hired Plaintiff for a new position he created within the

company's IT Department called "Senior Technical Support & Network Specialist."  *See*

Complaint, ¶ 8; Declaration of Scott Watkins ("Watkins Decl."), attached as Exhibit 2, Tab A;

Graham Decl., Tab A, Collopy Dep. Day 1, p. 74; *id*., Tab G, Watkins Dep. Day 2, p. 22.  Lieber

and Plaintiff worked together previously. Collopy Dep. Day 1, pp. 26-27, 38, 41.  Lieber

recruited Plaintiff without ever advertising the position.  *See id*., pp. 16-17, 23.  Plaintiff had

modified her resume to fit the job description after she and Lieber discussed it.  *See id*., p. 16; *see*

*also* Watkins Decl., Tab B.  Plaintiff began work on September 1, 2020.  *See* Watkins Decl.,

Tab C.

Plaintiff primarily handled project management-type tasks, working on IT processes,

documentation, and software licenses.  *See* Collopy Dep. Day 1, pp. 42-43; *see also* Graham

Decl. Tab H, Fruhbeis Dep. Day 2, pp. 23-24, 99; Tab I, Santos Dep. p. 45; Collopy Dep. Day 1,

pp. 89-92; Watkins Decl., Tab A.  While she sometimes addressed IT "tickets" or requests for IT

assistance, she delegated or assigned most tickets to other members of the IT Department who

served "help desk" functions assisting end users.  *Id.*

Plaintiff, who has a disability that restricts her ability to walk, Compl. ¶ 12,

acknowledged she never made a request of Marquis Management for an accommodation for her

disability that was not granted.  *See* Collopy Dep. Day 1, pp. 68, 70, 81-82, 103-104.

---

[1] Excerpts of all depositions cited herein are appended as Tabs to the Declaration of Owen Graham, attached as
Exhibit 1.  Initial citations will be formatted as follows: [Tab, Deponent Name, Pin Cite].  Subsequent citations will
be formatted: [Deponent Name, Pin Cite].  As discussed and agreed in the parties' August 19, 2022 Discovery
Conference before the Court, and as indicated in Exhibit 1, Defendant makes reference to excerpts of deposition
testimony recently taken in the matter of *Daniel Lieber v. Marquis Management, LLC, et al*, 1:21-CV-968-JL (the
"Lieber Matter"), currently pending in this Court (Laplante, J.), as well as testimony taken in the instant action.
References to deposition testimony taken in the Lieber Matter are hereinafter denoted as "Day 1," while testimony
taken in the instant action is denoted as "Day 2" for those witnesses who testified in both actions.

Plaintiff worked principally from Marquis Management's offices at One Delaware Drive in Salem, New Hampshire, where other IT employees were located.  *See* Collopy Dep. Day 1, pp. 89-92; Moore Dep. Day 1, pp. 89, 99, 101; Compl. ¶ 12.  In or about October 2020, Plaintiff requested and was granted permission to work from home during inclement weather.  Collopy Dep. Day 1, pp. 103-104; Day 2, p. 33.  All of aspects of her job could be performed remotely. *See* Graham Decl. Tab B, Collopy Dep. Day 2, p. 93.

 In addition to the One Delaware Drive location, Marquis Management also works out of a nearby office building at 40 Lowell Road in Salem.  Prior to Plaintiff's hire, the company maintained a shared IT office on the first floor of 40 Lowell Road. Moore Dep. Day 1, pp. 83-84; Collopy Dep. Day 1, pp. 89-90.  Plaintiff never worked out of the shared IT office, and she never attempted to use the space for any reason until January 2021, as discussed below.   Moore Dep. Day 1, pp. 99, 101; Collopy Dep. Day 1, pp. 89-92.

In or about November 2020, Marquis undertook a reconfiguration of its offices at 40 Lowell Road. Collopy Dep. Day 1, pp. 96-102, 106-107.  The reconfiguration, prompted by a need for additional offices, included the planned relocation of the shared IT office to the second floor of the building. Moore Dep. Day 1, pp. 89, 93-94; *see also* Collopy Dep. Day 1, p. 100. When she learned of the plan in November 2020, Plaintiff raised the proposed change with Lieber because of its potential impact on the IT Department.  Collopy Dep. Day 1, pp. 89-92, 97. She did not, however, ask Lieber to lodge any complaints regarding the plan.  *Id.*  Lieber discussed the reconfiguration with Marquis Management's CFO, Chris Moore, who informed Lieber that the company had designated an accessible conference space on the first floor of 40 Lowell Road for Plaintiff to use, if needed.  Moore Dep. Day 1, p. 94, 96.

On December 1, 2020, Marquis Management terminated Lieber following long-standing performance deficiencies and due to his unsolicited, unwelcome intrusions into the private business affairs of Marquis Management's owner, Jon Marquis.  *See* Graham Decl. Tab J, Marquis Dep., pp. 20, 27; Moore Dep. Day 1, pp. 61-62, 181.  Marquis Management's CFO, Chris Moore, assumed the position of interim director of the IT Department.  *See* Graham Decl. Tab D, Moore Dep. Day 2, p. 56.  Plaintiff, who had been "exceptionally happy" working with Lieber, was upset when she learned of his termination and immediately began to look for a new job. Collopy Dep. Day 1, pp. 111-113; Day 2, p. 22.  On December 2, 2020, Plaintiff informed one of her colleagues that she and Lieber were planning to discuss business opportunities, and stated that she would "bail here in a heartbeat."  Collopy Dep., Day 2, pp. 25-26.

Three days after Lieber's termination, on December 3, 2020, a Marquis Management Network Engineer, Irving Santos, learned of an ongoing ransomware cyberattack on the company's computer network.  Santos Dep. p. 23.  Working with Marquis' network system host, Santos immediately took action to limit the attack and shut down all company systems.  *Id*., p. 24-26.  Due to the magnitude of the attack, Marquis Management retained a cybersecurity forensic consulting firm.  Santos Dep., p. 24; Moore Dep. Day 2, pp. 13-14.  Plaintiff knew this. Collopy Dep. Day 2, p. 64.  Based on the consulting firm's recommendation, Marquis Management removed administrative access rights for several employees in the IT Department, including Plaintiff and at least three male employees.  Santos Dep., p. 26-27; Moore Dep. Day 2, pp. 32-33, 47.  In early December, 2020, Chris Moore informed Plaintiff that the company was working with its insurer to respond to the cyberattack, and access for all IT employees had been reduced. Collopy Dep. Day 2, p. 62, 64.  Plaintiff knew that, with the exception of the Network

Engineer, all IT employees' access was reduced at the direction of a third-party entity.  Collopy Dep. Day 2, pp. 62, 64, 68.

During the ransomware remediation process, Irving Santos monitored the IT Department's use of the computer network.  Santos Dep., pp. 33-34.  Santos monitored the network activities of the entire IT Department, including Plaintiff, by reviewing activity on their computers.  *See id*., pp. 34, 36.  During the monitoring process, Santos discovered suspicious activity on Plaintiff's computer which indicated she was copying large amounts of company data and extracting it to an external drive.  Santos Dep., pp. 33-35.  Plaintiff had not told anyone at the company that she was copying company data.  Collopy Dep. Day 2, p. 50.  In response this activity, Santos set a retention policy with regard to Plaintiff's Microsoft Teams chat data such that it would not be saved for more than 15 days. Santos Dep., pp. 53-54.

On or about December 4, 2020, perceiving "friction" among the IT Department in the wake of Lieber's termination, Plaintiff asked Chris Moore for permission to work from home, and Moore granted her request.  *See* Collopy Dep., Day 2, p. 33.[2]  Moore subsequently suggested to members of the IT Department that they use a group text message to keep each other informed about where they were working.  *See* Collopy Dep. Day 2, pp. 35, 93-95; *see also* Watkins Decl. Tab F.  At the time, another employee in the IT Department was also working remotely due to a medical issue that Plaintiff was aware of.  *See* Collopy Dep. Day 2, p. 34. Plaintiff acknowledged at her deposition that she understood Moore was trying to get a handle on the IT Department and determine where people were working, and did not take issue with Moore's request.  *Id*.

---

[2] Plaintiff told Lieber a day or so after his termination that she had gone from loving her job to updating her resume and "seeking a new gig." Collopy Dep. Day 1, p. 112.

### B.      Plaintiff's January 14, 2021 Emails

On the evening of January 14, within a span of 32 seconds, Plaintiff sent two emails to Defendant's CFO, Chris Moore, and HR Director, Scott Watkins.  *See* Watkins Decl., Tabs D-E.

In the first email, with a subject line "Mobility Accommodations Removed," Plaintiff alleged she had attempted to meet with another employee at 40 Lowell Road, but the shared IT office on the first floor was no longer available.  *Id*. at Tab D. In the email, Plaintiff stated she needed an accessible location at 40 Lowell Road where she could do "secure work," and asked to be advised how the issue would be "fixed."  *Id*.  Plaintiff apparently was unaware, or had overlooked, that Marquis Management already addressed the issue by designating a first floor conference room at 40 Lowell Road for her to use.  *See* Moore Dep. Day 1, p. 94, 96.

In the second email with the subject line "Gender Discrimination," Plaintiff raised four complaints about IT Department practices and procedures, most relating to the Department's response to the cyberattack.  Notwithstanding the email's subject line, in only one complaint did Plaintiff allege she was being treated differently than men in the Department. The four complaints listed in the email were as follows: (1) that Plaintiff's access to the computer network "has been reduced below that of all the men in the department;" (2) that Plaintiff's "correspondence and files are being monitored in an unusual manner;" (3) that Plaintiff's "requests for support are being deferred as unimportant; and (4) that Plaintiff was being required "to provide daily notification to the team on [her] location" when not working in the office. Watkins Decl., Tab E.

### C.      Marquis Management's Response to Plaintiff's Complaints

Scott Watkins immediately began an investigation into Plaintiff's various complaints, and on January 18, he met with Plaintiff to review the issues raised in her January 14 emails.  *See*

Moore Dep. Day 2, p. 32; Watkins Dep. Day 1, pp. 173-176; Watkins Dep. Day 2, p. 34.  They discussed the following:

- *Office accessibility at 40 Lowell Road*:  Watkins informed Plaintiff, as Moore had informed Lieber, that if Plaintiff needed a secure location to do work at that site, she could use an existing first floor conference room, which could be reserved, and was equipped with power and a table and chairs.  Collopy Dep. Day 1, pp. 135, 139, 158; *see also* Watkins Decl., Tab F; Moore Dep. Day 2, p. 39.  Apparently, Lieber never conveyed this to Plaintiff, but Watkins reinforced it during their meeting.  *See* Collopy Dep. Day 1, pp. 101, 139, 158.  Plaintiff expressed no dissatisfaction with using the conference room and agreed to go review it later that day.  *Id*., pp. 135-136. Plaintiff had no further complaints regarding the facilities or the proposed accommodation and subsequently confirmed this to Watkins.  *See* Collopy Dep. Day 1, p. 135, 139; *see also* Watkins Decl., Tab F.

- *Network access*:  During the January 18 meeting, Plaintiff claimed, wrongly, that she was the only individual in the IT Department whose access rights were limited, despite the fact Moore had previously told her otherwise.  *See* Collopy Dep. Day 2, pp. 62, 64; Watkins Decl. Tab F.  They relatedly discussed the security breach, and the fact it was a ransomware attack. Collopy Dep. Day 2, pp. 69-70. Watkins informed Plaintiff that he would review the issues and follow up with her.  *See id*., p. 61; *see also* Watkins Dep. Day 1, p. 94-95.

- *Monitoring of Plaintiff's documents and computer usage*: Watkins and Plaintiff discussed Plaintiff's allegation that files she created were "monitored" by Santos or otherwise "being accessed by members of [the] team."  Collopy Dep. Day 2, p. 60; Watkins Decl., Tab F. Specifically, she claimed that documents she had previously shared with Lieber had since been accessed by team members. Collopy Dep. Day 2, p. 52.  In the January 18 meeting, Plaintiff

characterized the issue of these so-called "private documents," which she created on the company network, and which were viewed by others, as one of "integrity."  Collopy Dep. Day 2, pp. 71-72; Watkins Dep. Day 2, pp. 39-40; *see also* Watkins Decl., Tab F.  At her later deposition, Plaintiff admitted that she knew Santos had principal responsibility at the company for systems administration, and his act of viewing documents she had created or shared on Marquis' systems was not discriminatory.  *See* Collopy Dep. Day 2, p. 53.  Moreover, she knew that the so-called "monitoring" happened after the cyberattack. *Id*., pp. 49-50.  Plaintiff also acknowledged she had no idea whether or not Santos was monitoring other IT employees' files. *Id*., p, 57.

● *Requests for assistance*: Regarding the reference in Plaintiff's email that her requests for support were being "deferred," Plaintiff complained she had inquired to the team regarding missing Microsoft Teams chat data, but she was not satisfied with the responses she received. *Id*. at pp. 66-67; Watkins Dep. Day 2, p. 45; Watkins Decl., Tab F.  Though Plaintiff included the issue in her January 14 email, this matter likewise had nothing to do with her gender: Plaintiff was frustrated by the fact that Santos—who was then the point person from the company responding to the cyberattack—had not responded more promptly to a ticket she created.  *Id*. Meeting with Watkins, Plaintiff acknowledged that Santos had, in fact, answered her, and said he would look into the issue, and when she asked other members of the Department about it via group chat, two male employees responded.  *See id*.

● *Reporting of work schedule*:  When Plaintiff met Watkins on January 18, she stated she had been working from home for safety reasons due to slippery roads. Watkins Decl., Tab F; *see also* Collopy Dep. Day 2, pp. 57-58.  In the meeting, she complained she was the only individual on the team who had been reporting when she was working from home, and that another IT

Department employee, Matt Tanner, was not coming into the office or providing updates on his work location.  *See* Watkins Decl., Tab F; *see also* Collopy Dep. Day 2, p. 61.  Yet Plaintiff testified that when she made this complaint, she knew Tanner was recovering from a serious medical condition.  Collopy Dep. Day 2, p. 34.  She also understood that Moore, as interim manager of the Department, wanted to know where the team was working.  *Id*.

### D.      Conclusions of Investigation into Plaintiff's Complaints

After meeting with Plaintiff, Watkins undertook an independent investigation of Plaintiff's various complaints that included individually meeting with at least three other employees, including two female members of the IT Department and Santos.  *See* Moore Dep. Day 2, p. 32; *see also* Moore Dep. Day 1, p. 122; Watkins Dep. Day 1, pp. 173-176; Watkins Dep. Day 2, p. 34.  Watkins determined the situation was not a case of gender discrimination, but an issue primarily related to how Santos had determined network access privileges.  Watkins Dep. Day 2, pp. 54-55; *see also* Moore Dep. Day 2, p. 32; Watkins Decl., Tab G.

Watkins discovered that Plaintiff's complaints regarding access restrictions, inappropriate monitoring of files, and support requests being deferred each related back to the December 2020 ransomware cyberattack.  Watkins Dep., Day 2, pp. 34-36, 38-40, 42-44.  He confirmed that the access Plaintiff had complained of was limited for all members of the IT Department as a result of the cyberattack.  *Id*.  He also determined that the other female employees in the IT Department shared none of the concerns Plaintiff had raised, and one indicated Plaintiff's issues were personality-related.  Watkins Dep. Day 1, p. 175-176.  Plaintiff herself admitted in her deposition that she made no effort to engage with *any of* her colleagues after December 3.  Collopy Dep. Day 2, pp. 82-83.

Watkins and Moore had a follow up meeting with Plaintiff on January 25, 2021.  Watkins Dep. Day 1, p. 95.  During the meeting, Plaintiff confirmed that she had no issues accessing the first floor conference room at 40 Lowell Road, and that her complaint regarding the purported removal of an accommodation was resolved.  Watkins Decl., Tab F.

Regarding Plaintiff's complaint that her access to company systems had been limited improperly, Watkins determined the complaint was not accurate, and he (again) informed Plaintiff that access rights for all IT employees had been limited due to the cyberattack.  Watkins Decl., Tab F; *see also* Watkins Dep. Day 2, pp. 36, 39; Collop Dep. Day 2, p. 62.  As to the complaint of Plaintiff's files being monitored, Watkins explained to Plaintiff that other employees' files were being monitored as well.  Collopy Dep. Day 2, p. 80; *see also* Watkins Decl., Tab F.

The follow-up discussion also concerned the cybersecurity breach, and what access to systems Plaintiff had.  *Id.*  Moore confirmed they would be changing certain access after the meeting following further consultation with the incoming director of the IT Department, Michael Fruhbeis, to provide access rights tailored to employees' respective duties and responsibilities. Moore Dep., Day 2, pp. 54, 73; Collopy Dep., Day 2, p. 76.  Plaintiff took no issue with this and understood it comported with cybersecurity principles to limit employees' access rights to systems they need to use.  Collopy Dep. Day 2, p. 77.

With respect to Plaintiff's allegation that Moore had unfairly required her to provide notifications of her work location or schedule, Moore told Plaintiff he had only suggested that the entire team use a group text message for such communications, so the group knew who to expect in the office.  Collopy Dep. Day 2, pp. 76-77; 92-93, 95; *see also* Watkins Tab F. Plaintiff knew about the group text and knew Moore had been added to it.  *Id.*  Before sending her

January 14 email, however, Plaintiff had never sought clarification on the suggestion, and in the January 25 meeting, Moore informed her the matter was simply a misunderstanding.  *Id*.; *see also* p. 35.

Plaintiff reasserted her allegations of an "integrity issue" with the team, and characterized both Santos' review of files she had created and the deletion of chat data as integrity issues.[3]  To Plaintiff, integrity was not a discriminatory matter, but a question of professionalism.  Collopy Dep. Day 2, pp. 38, 42, 72; *see also* Watkins Decl., Tab F.

Watkins requested that Plaintiff tell him and Moore if any further issues arose, as the company had taken measures to respond and was taking her allegations seriously.  Watkins Decl., Tab F; *see also* Watkins Dep. Day 2, p. 88.  The next day, Moore checked in with Plaintiff via text message to ensure she had all the access they had discussed.  *See* Watkins Decl., Tab H; *see also* Collopy Dep. Day 2, pp. 77-78.  Plaintiff was given most of the software access rights she had prior to the cyberattack, with limited exceptions.  *Id*.  Thereafter, Plaintiff had no problems with access to systems.  Collopy Dep. Day 2, p. 79.  She did not notice anyone else viewing files she had created, and did not issue any further complaints regarding that or any other issue.  *Id*., pp. 79-80.  Watkins understood the matters to be resolved.  Watkins Dep., Day 2, p. 75.

### E.    New IT Department Leadership Evaluates Department; Plaintiff's Position is Eliminated During Reorganization

In late-February 2021, Michael Fruhbeis was hired as Marquis Management's new Vice President of Technology.  Moore Dep. Day 2, pp. 50-51; Fruhbeis Dep. Day 2, p. 15.  Prior to starting, neither Moore, Watkins, nor Santos informed him of any issues related to Plaintiff.

---

[3] Plaintiff specified at her deposition that she <u>did not</u> see the issue of "team integrity" as one involving discrimination.  *See* Collopy Dep. Day 2, p. 38.

Fruhbeis Dep. Day 2, pp. 20-21.  Neither Moore nor Watkins told Fruhbeis that Plaintiff made complaints regarding alleged gender discrimination, accessibility or accommodations, or the "integrity" of IT Department staff.  Moore Dep. Day 2, pp. 51-53; Watkins Dep. Day 2, pp. 51, 67-68.

Fruhbeis immediately commenced a detailed evaluation of the IT Department, holding multiple meetings with employees both individually and as a group to review the Department's structure, staffing and responsibilities.  Fruhbeis Dep. Day 2, pp. 42, 60, 70.  The forward-looking process started from a "clean slate" and took two weeks.  *Id*., pp. 40, 60; *see also* Watkins Decl., Tab I.  During his evaluation of the Department, Fruhbeis met with Plaintiff multiple times, and reviewed her job duties and responsibilities, which she provided verbally and in writing.  Fruhbeis Dep. Day 2, p. 39; *see also* pp. 107-108; Collopy Dep. Day 1, pp. 151-152; 154-156.  He also reviewed Plaintiff's and other IT employees' qualifications and projects.  *See* Fruhbeis Dep. Day 2, pp. 39, 90, 106-107.

In a one-on-one meeting, Plaintiff told Fruhbeis she wanted to work from home during inclement weather, and Fruhbeis was amenable.  Collopy Dep. Day 1, p. 104; Fruhbeis Dep. Day 2, pp. 73-74.  Fruhbeis believed she also wanted to work from home because of communication problems with the entire team, which he described as dysfunctional; he noted in his deposition that no one would greet each other in the office.  Fruhbeis Dep. Day 2, pp. 73-74.  Plaintiff and Fruhbeis discussed the availability of a conference room on the first floor of 40 Lowell Road, which Plaintiff could use as an accessible, secure location at that office.  Collopy Dep. Day 1, pp. 157-158. Plaintiff had no complaints regarding any of these accommodations.  Fruhbeis Dep. Day 2, p. 51.  According to Plaintiff, their meeting went well.  Collopy Dep. Day 1, p. 158. Plaintiff confirmed in her deposition that in this meeting, she and Fruhbeis discussed working

from home; she had no issue with any proposed accommodation, and she did not think that Fruhbeis did anything discriminatory. *See* Collopy Dep. Day 1, pp. 104, 157-158; Day 2, p. 92. She further testified that she and Fruhbeis discussed reorganizing the IT Department, including additional roles that may be needed. Collopy Dep. Day 1, p. 155.

After spending weeks evaluating the IT Department, Fruhbeis made the decision to eliminate the position of Senior Technical Support & Network Specialist and create two new positions. *See* Watkins Decl., Tab I; *see also* Fruhbeis Dep., Day 1, pp. 129-130, Day 2, p. 106-107. Fruhbeis believed Plaintiff lacked the technical background to succeed in either position, and recommended they be filled from outside the organization. *Id*.; *see also* Fruhbeis Dep. Day 2, pp. 50, 94, 100, 102, 106. After reviewing the projects Plaintiff was working on, Fruhbeis determined the majority were completed, or were being worked on by others, while other projects could be reassigned or canceled. *See id*., pp. 100, 104, 106-107; *see also* Fruhbeis Dep. Day 1, pp. 158-160. It was difficult for Fruhbeis to understand exactly what Plaintiff's role was, as she handled processes and procedures, managed licenses, and primarily delegated ticket-related tasks. Fruhbeis Dep. Day 2, pp. 23-24, 104. He determined the Department would be better off if it were reorganized with these structural changes to the positions. *Id.; see also* pp. 105-107; Graham Decl. Tab G, Fruhbeis Dep. Day 1, pp. 132.

In addition to the fundamental problems with Plaintiff's role within the organization, Fruhbeis also noted there was a high level of tension and negativity when Plaintiff was on projects or working with team members, which led to delays and inefficiencies; Plaintiff had stated that she felt certain responsibilities were beneath her, and she refused to learn most help desk functions. *See* Watkins Decl., Tab I; *see also* Fruhbeis Dep. Day 1, p. 97-98; *see also* Day 2, p. 50. He believed Plaintiff's handling of licenses and vendors led the company to spend

money unnecessarily, and he took over those functions as a result.  Fruhbeis Dep. Day 2, pp. 104-106; Day 1, pp. 54-55; 158-160.  *See* Watkins Decl., Tab I.

On March 8, 2021, Fruhbeis decided to eliminate Plaintiff's position.  *Id.; see also* Watkins Dep. Day 2, p. 91-92.  Plaintiff was terminated on March 15, 2021. Collopy Dep. Day 1, p. 166-167. The position was permanently eliminated, and aside from hiring an intern, the company has not hired any additional IT staff.  *See* Fruhbeis Dep. Day 2, p. 112.  Regarding the positions Fruhbeis decided to create, he communicated with two former colleagues who he believed would be appropriate for the roles, including a female colleague who he sought to hire in a managerial position, but neither one ultimately joined the company.  Fruhbeis Dep. Day 2, pp. 111-112.  After further consideration, Fruhbeis decided not to fill the positions. *Id*.

## III.    SUMMARY JUDGMENT STANDARD

"The purpose of summary judgment is to enable a court 'to pierce the boilerplate of the pleadings and assay the parties' proof in order to determine whether trial is actually required.'" *Amatucci v. Chase*, No. 17-cv-237, 2018 WL 10878064, at *1 (D.N.H. Dec. 26, 2018). Summary judgment is appropriate if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Pina v. Children's Place*, 740 F.3d 785, 795 (1st Cir. 2014).  The court draws reasonable inferences in plaintiff's favor, but it will not "draw *unreasonable* inferences or credit bald assertions, empty conclusions, or rank conjecture."  *Brandt v. Fitzpatrick*, 957 F.3d 67, 74-75 (1st Cir. 2020) (emphasis in original).  "Even in employment discrimination cases where elusive concepts such as motive or intent are at issue, summary judgment is appropriate if the non-moving party rests merely upon conclusory allegations, improbable inferences, and unsupported speculation."  *Id.*

15

## IV.    ARGUMENT

### A.    Plaintiff's State and Federal Retaliation Claims (Counts I, II, IV & V) Fail.

Plaintiff has asserted four retaliation claims under state and federal law – retaliation in violation of RSA 354-A (Count I), whistleblower retaliation in violation of RSA 275-E (Count II), ADA retaliation in violation of 42 U.S.C. § 12203 (Count IV), and Title IV retaliation in violation of 42 U.S.C. § 2000(e)(3) (Count V).  Each of these claims is analyzed under the familiar *McDonnell-Douglas* burden shifting framework.  *See Isaacs v. Dartmouth-Hitchcock Medical Center*, 2014 WL 1572559 at *9-10 (D.N.H. Apr. 18, 2014) (with regard to ADA retaliation claims); *Rolfs v. Home Depot U.S.A., Inc.*, 971 F.Supp.2d 197, 214 (D.N.H. 2013) (with regard to Title VII and RSA 354-A claims).[4]

The initial burden under *McDonnell-Douglas* is on Plaintiff to make out a prima facie case.  *Rolfs*, 971 F.Supp.2d at 214.  "If a plaintiff makes this showing the burden swings to the defendant 'to articulate a legitimate, non-retaliatory reason for its employment decision.'"  *Id.*  Assuming defendant does so, "the burden travels once more back to the plaintiff to show that the reason is pretext and that retaliatory animus was the real motivating factor."  *Id.*

Here, Plaintiff's retaliation claims cannot make it past the first step of the analysis; Plaintiff cannot make out a prima facie case.  However, even were Plaintiff able to mount this initial hurdle, the uncontroverted facts establish that Defendant's termination decision was for legitimate, non-retaliatory reasons.  Accordingly, Defendant is entitled to summary judgment on Counts I, II, IV & V.

---

[4] New Hampshire courts apply the federal law framework in analyzing retaliation claims under both RSA 354-A and RSA 275-E.  *See E.D. Swett, Inc. v. Briscoe*, 124 N.H. 404, 408 (1983) (applying federal McDonnell-Douglas burden shifting paradigm in analyzing claim of racial discrimination under Chapter 354-A); *Rolfs v. Home Depot USA, Inc.,* 971 F.Supp.2d 197, 213-214 (D. N.H. 2013) (applying Title VII analysis to retaliation claims under both Title VII and RSA 354-A); *see also In re Seacoast Fire Equipment Co*., 146 N.H. 605, 608 (2001) (applying federal standard for retaliation claims under Title VII in claim under RSA chapter 275–E).

1.      <u>Plaintiff Fails to Establish a Prima Facie Case of Retaliation.</u>

The same prima facie elements apply to each of Plaintiff's retaliation claims: "that the plaintiff engaged in an activity that is protected by the statute; that the plaintiff suffered an adverse employment action; and a causal link between the protected activity and the adverse employment action." *Rivera-Colon v. Mills*, 635 F.3d 9, 12 (1st Cir. 2011) (with regard to Title VII claims); *see also Colon-Fontanez v. Municipality of San Juan*, 660 F.3d 17, 36 (1st Cir. 2011) (applying same standard to ADA retaliation claim); *supra*, n.6 (collecting authorities demonstrating that New Hampshire applies federal framework to RSA 354-A and 275-E claims). The undisputed factual record does not permit a finding in Plaintiff's favor on at least two of these elements.

a.      *Plaintiff did not engage in any protected activity.*

"Protected activity" for purposes of Title VII retaliation claims "refers to action taken to protest or oppose statutorily prohibited discrimination." *Fantini v. Salem State Coll.*, 557 F.3d 22, 32 (1st Cir. 2009) (internal quotation marks omitted); *see also* 42 U.S.C. § 2000e-3(a).  The ADA's antiretaliation provision is substantially similar to the retaliation prohibition in Title VII, and "it is appropriate to apply the framework used in analyzing retaliation claims under Title VII in analyzing a claim of retaliation under the ADA." *Sarno v. Douglas Elliman-Gibbons & Ives*, Inc., 183 F.3d 155, 159 (2d Cir. 1999).  Conduct is only protected if the employee has a "good faith, reasonable belief that the underlying challenged actions of the employer violated the law." *Morales-Cruz v. University of Puerto Rico*, 676 F.3d 220, 226 (1st Cir. 2012) (quoting *Fantini, supra*, 557 F.3d 22, 32 (1st Cir. 2009)); *see also Johnson v. Whole Foods Market Group, Inc.*, 2023 WL 2188438, *14 (D. Me. 2023) (applying *Fantini* and requirement of good faith, reasonable belief to an ADA retaliation claim premised on an accommodation request); *Sarno,*

17

*supra*, 183 F.3d at 159 (similarly applying requirement of "good faith, reasonable belief that the underlying challenged actions of the employer violated" the ADA).

Objective reasonableness is evaluated from the perspective of a reasonable, similarly-situated person, and a plaintiff's belief "is not reasonable simply because he or she complains of something that appears to be discrimination in some form." *Kelly v. Howard I. Shapiro & Associates Consulting Engineers, P.C.*, 716 F.3d 10, 15 (2d Cir. 2013). "[M]ere subjective good faith belief is insufficient[;] the belief must be reasonable and characterized by *objective* good faith." *Id.* at 16 (emphasis in original).  Not every complaint is protected, and one cannot establish a prima facie case of retaliation in a gender discrimination case where there is "no semblance of gender-oriented motivation in the events" that are the subject of a complaint. *Id*. at 15.  In assessing the reasonableness of a plaintiff's belief, the court will examine the totality of the circumstances.  *Semmler v. County of Monroe*, 35 F.Supp.3d 379, 385 (W.D.N.Y. 2014) (granting motion for summary judgment on Title VII retaliation claim where plaintiff failed to establish that she engaged in protected activity because, in totality of the circumstances, no reasonable person could have believed the complained-of incident constituted unlawful sexual harassment).  Where the conduct that forms the basis for a complaint is unarguably gender-neutral, a plaintiff cannot have an "objectively reasonable foundation for a retaliation action." *Morales-Cruz v. Univ. of Puerto Rico*, 676 F.3d 220, 226 (1st Cir. 2012).  Viewed through this lens, Plaintiff did not engage in protected conduct with respect to either her Title VII or ADA claims, or her related state law claims.

Plaintiff herself admits that none of the acts she complained of in her January 14 email— or in later meetings with Moore and Watkins—were tied to her gender or any protected characteristic, and her own testimony regarding the events underpinning the complaints

demonstrates she had no good faith, reasonable belief that the actions violated the law. *See Kelly, supra,* 716 F.3d at 15 (affirming Motion to Dismiss where nothing in plaintiff's complaint indicated "her sex, in one way or another, played a substantial role" in the challenged behavior); *see also Semmler, supra*, 35 F.Supp. 3d 379, 386 (where "Plaintiff testified at her deposition that she did not believe that [her coworker's] actions were based on Plaintiff's gender," Plaintiff could not have had a reasonable good faith belief that she was complaining of a violation of Title VII's prohibition on gender-based discrimination). Here, like the plaintiff in *Semmler*, Plaintiff had no reasonable good faith basis to believe she was complaining of conduct prohibited by Title VII or related state law when she testified that the complained-of conduct was not, in fact, gender-based, but concerned "integrity." *See* Collopy Dep. Day 2, pp. 40-42, 53, 69, 71-72. As to the other actions underlying Plaintiff's January 14 complaint of alleged gender discrimination, Plaintiff either knew she was not being treated differently from other employees because of her gender, or she had no good faith basis for such a belief. *See, e.g.*, Collopy Dep. Day 2, p. 64, 69.

For example, Plaintiff knew the IT Department was addressing a ransomware cyberattack in December, 2020, and Moore informed Plaintiff in early December (when she complained about restrictions on her administrative access rights) that all IT team members' access had been reduced at the direction of cybersecurity experts, with the sole exception being the company's Network Engineer. Collopy Dep. Day 2, p. 64. Plaintiff complained about so-called "professional integrity" regarding a coworker changing ownership of IT ticket items she had opened, and admitted in her deposition that action was not discriminatory; she also lacked understanding of how the ticketing system even functioned, and did not know if the Network Engineer, Santos, was monitoring or viewing any other employees' files. *Id*., pp. 40-42, 69; *see also* Fruhbeis Dep. Day 2, p. 89. Plaintiff described many of her problems with her coworkers as

stemming from "integrity issues," including accessing and viewing of files she created as questions of integrity, meaning "with respect to IT, how you handle yourself in terms of the role that you have," as opposed to any violation of law. Collopy Dep. Day 2 pp. 71-72.

Plaintiff knew that Santos had principal responsibility for systems administration, and admitted that his act of viewing files she had created on a company server was not discriminatory.[5]  *Id*., pp. 53.

While Plaintiff alleged in one of her January 14 emails that her "requests for support"[6] to other team members were being "deferred," she testified that *Santos,* in fact, responded that he would look into the specific issue she had raised, and further two other male team members responded to her question, while female members did not, and these actions took place during the company's response to the cyberattack.  *Id*. at p. 67-68.  Not only would a reasonable person not have believed that these actions constituted gender discrimination, but Plaintiff herself admitted as such.  As a result, she could not have had a good faith, reasonable belief that Defendant engaged in an employment practice prohibited by Title VII.  *See, e.g., Semmler, supra*, 35 F.Supp.3d at 385.

Likewise, Plaintiff alleged that she was being unfairly required to report to the team regarding her work schedule, as no other team members were issuing daily reports of their whereabouts.  She had no good faith basis to complain when she knew that another team member was recovering from a serious medical condition, and knew her interim manager was attempting to get a handle on where IT Department employees were working.  Collopy Dep. Day 2, p. 34.

---

[5] Plaintiff was also aware, as of January 14, 2021, that she had been creating large backup copies of Defendant's proprietary data and loading the copies onto a personal thumb drive immediately following a cyberattack on the company.  *Id*., pp. 66-67. One may draw the reasonable inference that Plaintiff knew or should have known the Network Engineer would detect this and investigate it (as he did).

[6] Though Plaintiff's January 14 email alleges her "requests" for support were being deferred, she only offered one example: her inquiry regarding "missing" Microsoft Teams chat data.  Collopy Dep., Day 2, p. 67.

She did not take issue with the request at the time, and made no effort to clarify what Moore meant when he suggested employees use a group text message to communicate their work locations. *Id*. She was quickly informed the matter was a misunderstanding. *Id*. at 35. Under the totality of the circumstances, no reasonable person could have believed Plaintiff was being discriminated against on the basis of her gender. *See Semmler*, supra, 35 F.Supp.3d at 385.

Lastly, Plaintiff was aware that the shared office space at 40 Lowell Road was not an accommodation for her, as it existed prior to the start of her employment and was not installed for her. Collopy Dep. Day 1, pp. 89-90. She knew she had never used the space before complaining, on January 14, that an "accommodation" had been "removed." *Id*., pp. 90-91. She admitted in her deposition that she had never been refused an accommodation she requested, and no accommodations were, in fact, removed. Plaintiff either did not know of, or had never inquired about using, an alternative space that she could have used on the first floor of 40 Lowell Road. "[T]he ADA's reasonable accommodation requirement does not apply unless triggered by a request by an employee," but Plaintiff never made such a request regarding the shared space at 40 Lowell Road. *See Reed v. LePage Bakeries, Inc*., 244 F.3d 254, 261 (1st Cir. 2001). Under the totality of the circumstances, Plaintiff could not have had a good, reasonable faith belief that she was complaining of a violation of the ADA. *See Sarno, supra*, 183 F.3d at 159. A reasonable, similarly-situated individual would not have viewed the removal of a shared office space—one she had never used and was admittedly not an accommodation—as a violation of the ADA. *See Kelly, supra*, 716 F.3d at 15.

In each of the instances described above, Plaintiff's communications to or with Marquis Management supervisors failed to "provide adequate specificity to alert the employer that [she was], in fact, complaining about conduct proscribed by Title VII" or the ADA. *See Rolfs, supra*,

21

971 F.Supp.2d at 215 (explaining standard for determining what qualifies as protected activity); *see also Manoharan v. Columbia Univ. Coll. of Physicians & Surgeons*, 842 F.2d 590, 594 (2d Cir. 1988) (upholding trial court's dismissal of Title VII retaliation claim where employee complained that minority applicants should be given greater consideration in the hiring process, but not that the employer had discriminated against particular individuals or engaged in discriminatory practices). Despite the labels on Plaintiff's January 14 emails, her complaints neither pointed out discrimination against particular individuals nor discriminatory practices by Marquis Management. The antidiscrimination laws "do[ ] not create a general civility code for the workplace." *Ahern v. Shinseki,* 629 F.3d 49, 59 (1st Cir. 2010).

In sum, because Plaintiff's comments failed to identify any proscribed conduct based upon gender, disability, or any protected characteristic, and because Plaintiff did not have a good faith, reasonable belief that the underlying challenged actions violated the law, Plaintiff has failed to identify "protected conduct" sufficient to state a prima facie case under the ADA, Title VII, or her related state law claims.

> b.     *Plaintiff cannot show a causal link between any alleged protected activity and her termination.*

For each of Plaintiff's retaliation claims, but-for causation is required between the alleged protective activity and the adverse action. *Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 360 (2013) ("a plaintiff making a retaliation claim under § 2000e–3(a) must establish that his or her protected activity was a but-for cause of the alleged adverse action by the employer."); *see also Colon-Fontanez*, 660 F.3d at 36 (same with regard to ADA claim). "In other words, the adverse action must have been taken for the *purpose* of retaliating." *Randlett v. Shalala*, 118 F.3d 857, 862 (1st Cir. 1997); *see also Ponte v. Steelcase Inc*., 741 F.3d 310, 322 (1st Cir. 2014) (despite two-month period between protected activity and termination, no reasonable factfinder

could find existence of causal nexus between the two).  Here, there is no evidence in the summary judgment record that Fruhbeis acted *for the purpose of* retaliating, and Plaintiff's own testimony suggests the opposite: she had very limited interactions with him, and admitted she "cannot state that he was doing anything discriminatory."  Collopy Dep. Day 2 at 92.  Accordingly, any such complaints she may have made in January, even if disclosed to Fruhbeis in March, could not have been a factor – much less the but-for cause – of Plaintiff's termination.

Defendant's former CIO created the position of Senior Technical Support and Network Specialist and hired Plaintiff to fill the role.  Upon his hire, Fruhbeis – starting from a "clean slate" – conducted a detailed evaluation of the IT Department which led him to believe it should be reorganized.  As a result of his evaluation, he determined that Plaintiff's position should be eliminated.  There were no other positions or roles available at the Company fitting Plaintiff's qualifications at that time, and Plaintiff lacked certain technical skills for two new positions Fruhbeis considered creating.  As addressed more fully below, the decision to reorganize the IT Department is a legitimate, nondiscriminatory reason for Plaintiff's termination.  *See, e.g., Smith v. F.W. Morse & Co., Inc.,* 76 F.3d 413, 422 (1st Cir. 1996) (affirming summary judgment for employer who eliminated plaintiff's position while on maternity leave, noting "[t]here is little doubt that an employer, consistent with its business judgment, may eliminate positions […] without violating Title VII even though those positions are held by members of protected groups").  Nothing in the summary judgment record reflects that, instead, the reorganization was made in retaliation for Plaintiff's raising complaints to Watkins or Moore in January.  Fruhbeis was not involved in addressing any of Plaintiff's prior complaints or responding to them.

Fruhbeis did not consult with Watkins or Moore regarding their investigation of Plaintiff's prior complaint of gender discrimination before making his decision to reorganize the

Department and eliminate Plaintiff's position.  Though Plaintiff disclosed some of the issues she

had raised in January while he was evaluating the IT Department, Plaintiff can point to no

evidence that suggests, or from which one can infer, that Fruhbeis restructured the IT

Department *because* Plaintiff disclosed those issues.  Plaintiff believed her meeting with

Fruhbeis went well, and Fruhbeis, for his part, believed the matters Plaintiff raised were resolved

when he recommended (to Watkins and Moore) that he eliminate Plaintiff's position.

       2.     <u>Defendant Had a Legitimate, Non-Retaliatory Motivation for Termination.</u>

      Even if Plaintiff established a prima facie case of retaliation, which she cannot,

Defendant had legitimate, nondiscriminatory, non-retaliatory reasons for Plaintiff's termination:

the elimination of her position.  *See, e.g., Echevarria v. AstraZeneca Pharm. LP*, 856 F.3d 119,

134 (1st Cir. 2017) (position elimination constitutes legitimate, nondiscriminatory reason for

termination); *Smith, supra,* 76 F.3d at 422 (same); *see also Erazo-Vazquez v. State Industrial

Products Corp.*, 2021 WL 3910248, *13 (D. P.R. 2021) (collecting cases for proposition that

organizational restructuring constitutes legitimate, nondiscriminatory basis for termination).  An

employer may exercise its business judgment to eliminate positions as part of a company

reorganization without violating Title VII, even if the individuals in those positions have

engaged in protected activity.  *See Smith, supra*, 76 F.3d at 422. "[I]nsofar as Title VII is

concerned, an employer can hire or fire one employee instead of another for any reason, fair or

unfair, provided that the employer's choice is not driven by  […] gender […] or some other

protected characteristic." *Id.*; *see also Dunn v. Trustees of Boston University,* 761 F.3d 63, 71

(1st Cir. 2014) (elimination of Plaintiff's position and consolidation of duties with another

constituted legitimate, nondiscriminatory basis for termination under analogous Massachusetts

state law); *Soto v. Corp. of Presiding Bishop of Church of Jesus Christ of Latter-Day Saints*, 73

F. Supp. 2d 116, 128 (D.P.R. 1999) (reorganization of organization resulting in elimination of plaintiff's position and creation of new position held legitimate, nondiscriminatory reason for discharge); *Varela Teron v. Banco Santander de Puerto Rico,* 257 F.Supp.2d 454, 462 (D.P.R. 2003) (elimination of single position due to reorganization rendering position redundant). Simply put, the elimination of a position is a defense in Title VII cases. *Smith, supra*, at 422. "It is not a court's role to second-guess the business decisions of an employer." *LeBlanc v. Great American Ins. Co*., 6 F.3d 836, 846 (1st Cir. 1993).

Here, Fruhbeis conducted a thorough, two-week evaluation of the IT Department after he started his employment in February, 2022.  From a "clean slate," he reviewed his new employees' job descriptions and ongoing projects, conducting meetings and soliciting written summaries. As a result of his comprehensive evaluation, he determined Plaintiff's position was not needed and could be eliminated.  Fruhbeis then eliminated Plaintiff's position and terminated her on March 15, 2022.  Fruhbeis determined that many projects Plaintiff claimed to be working on were, in fact, completed, and re-allocated the other projects Plaintiff was working on.  He intended to create two new positions, but ultimately never did.  To this day, other than hiring a college intern, Defendant has not hired any additional staff for its IT Department.

Plaintiff cannot show this reason was pretextual, and thus Plaintiff's retaliation claims fail. *See Planadeball v. Wyndham Vacation Resorts, Inc*., 793 F.3d 169, 179 (1st Cir. 2015); *see also LeBlanc, supra*, 6 F.3d at 845 (elimination of position in ADEA case "plainly" constitutes legitimate nondiscriminatory reason for termination).  To defeat summary judgment in a retaliation case, a plaintiff must "point to some evidence of retaliation by a pertinent decisionmaker." *Planadeball, supra at 179*. "For a plaintiff to 'impugn the veracity' of the employer's proffered reason is insufficient." *Ponte v. Steelcase Inc.*, 741 F.3d 310, 323 (1st Cir.

2014).  Rather, a plaintiff must put forth "specific facts" demonstrating "that the employer's reason for termination was a 'sham' intended to cover up the employer's true motive" of discrimination.  *Id.* (citing *Mesnick v. Gen. Elec. Co.,* 950 F.2d 816, 824 (1st Cir.1991)).

Nothing about these facts demonstrates or suggests the existence of pretext.  Fruhbeis alone decided to eliminate Plaintiff's position.  Plaintiff had very limited interaction with him and admitted he was not "doing anything discriminatory."  Collopy Dep. Day 2 at 92.  Plaintiff participated in the evaluation of the Department, and even discussed the reorganization with Fruhbeis. *See* Collopy Dep. Day 1, p. 155.  Accordingly, she cannot point to any evidence in the summary judgment record indicating this was not a legitimate business decision, but instead a "sham" to cover up a true motive of discrimination *on Fruhbeis's part*. *See Mesnick, supra*, 950 F.2d at 824. Plaintiff's position existed for approximately six months.  It was the most recently-created position in the Department, and it was removed following a re-evaluation by new management.  Taken together, these facts strongly suggest that discrimination was *not* a factor in plaintiff's discharge.  Because Defendant has put forth legitimate, nondiscriminatory and nonretaliatory reasons for Plaintiff's termination, and Plaintiff cannot demonstrate that the reasons were pretext masking discriminatory animus, Plaintiff's claims should be dismissed.

### B.      Plaintiff's Wrongful Termination Claim (Count III) Fails.

Plaintiff's wrongful termination claim (Count III) alleges she was terminated wrongfully because she acted in support of public policy by complaining about sex and disability discrimination.  Compl., ¶ 53.  To successfully assert a claim for wrongful discharge under New Hampshire law, a plaintiff must establish that: (1) the discharge was "motivated by bad faith, retaliation or malice," and (2) the plaintiff "was discharged 'for performing an act that public policy would encourage or for refusing to do something that public policy would condemn.'" *Leeds v. BAE Sys.*, 165 N.H. 376, 379 (2013) (quotations eliminated); *Short v. Sch. Admin. Unit*

*No. 16*, 136 N.H. 76, 84 (1992) (emphases added).  Ultimately, a plaintiff must demonstrate that the reasons cited by defendant as the basis for the discharge decision are a pretext masking some illicit motivation—but only if plaintiff can first prove causation.  *See Rowe vs. Liberty Mut. Grp., Inc.*, 2013 WL 6384805, *16 (D.N.H. Dec. 6, 2013) (stating elements of prima facie case of wrongful termination).  For the reasons stated above, the undisputed facts in this case do not permit a finding of causation; thus, Plaintiff's wrongful termination claim fails.

Additionally, Plaintiff cannot demonstrate that her discharge was "motivated by bad faith, retaliation, or malice."  *Leeds, supra*, 165 N.H. at 379. Bad faith, which is the equivalent of malice under New Hampshire law, *see Antonis v. Electronics for Imaging*, 2008 WL 5083937, *8 (D.N.H. Nov. 25, 2008), may be established "where (i) an employee is discharged for pursuing policies condoned by the employer, (ii) the record does not support the stated reason for the discharge, or (iii) disparate treatment was administered to a similarly situated employee." *Straughn v. Delta Airlines*, 250 F.3d 23, 44 (1st Cir. 2001).  "[M]ere temporal proximity" between the employee's act and subsequent termination is not sufficient to demonstrate bad faith. *Id.* at 45.  And "[i]t is not bad faith to terminate an employee for legitimate business reasons." *Antonis*, *supra*, at *8. Plaintiff cannot demonstrate beyond mere speculation that Fruhbeis acted maliciously toward her, or that her termination is otherwise unsupported by the record. Indeed, their interactions were "very limited," and she could not state that Fruhbeis was "doing anything discriminatory."  Collopy Dep. Day 2 at 92.

Because Plaintiff cannot demonstrate either of the two essential elements of her wrongful termination claim, it should be dismissed.

**V.      CONCLUSION**

For all of the foregoing reasons, Defendant Marquis Management, LLC respectfully

requests that the Court grant summary judgment in its favor as to all counts plead in Plaintiff's

Complaint.

MARQUIS MANAGEMENT, LLC

By its attorneys,

Dated: July 18, 2023                    /s/ *Owen R. Graham*
                                        Christopher H.M. Carter (Bar No. 12452)
                                        Owen R. Graham (Bar No. 266701)
                                        Hinckley Allen
                                        650 Elm Street, Suite 500
                                        Manchester, NH 03101
                                        Tel: (603) 225-4334
                                        ccarter@hinckleyallen.com
                                        ograham@hinckleyallen.com

                                        /s/ *Lisa A. Zaccardelli*
                                        Lisa A. Zaccardelli (*Admitted Pro Hac Vice*)
                                        Hinckley Allen
                                        20 Church Street
                                        Hartford, Connecticut 06103-1221
                                        Tel: (860) 331-2764
                                        lzaccardelli@hinckleyallen.com

**CERTIFICATE OF SERVICE**

I hereby certify that on the above date I caused a copy of the foregoing document to be
served upon all counsel of record through the Court's ECF system.

                                        /s/ *Owen R. Graham*
                                        Owen R. Graham

#63948091

28