# TAB A

DANIEL P. LIEBER

vs

MARQUIS MANAGEMENT

Docket No. 1:21-cv-968-JL

BETH COLLOPY

January 26, 2023



**AVICORE REPORTING**

15 Constitution Drive, Suite 1A · Bedford, NH 03110 · (603) 666-4100
info@avicorereporting.com · www.avicorereporting.com

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW HAMPSHIRE

\* \* \* \* \* \* \* \* \* \* \* \* \*
\*
DANIEL P. LIEBER,                    \*
\*
         Plaintiff,                  \*
\*   Docket No.
v.                                   \*   1:21-cv-968-JL
\*
MARQUIS MANAGEMENT, LLC              \*
and SELECT DEMO SERVICES, LLC,       \*
\*
         Defendants.                 \*
\*
\* \* \* \* \* \* \* \* \* \* \* \*

**CERTIFIED ORIGINAL**

DEPOSITION OF BETH ANNE COLLOPY

Zoom deposition taken by agreement of counsel on

Thursday, January 26, 2023, commencing at 9:31 a.m.


Court Reporter:  (Via Zoom)

Michele M. Allison, LCR, RPR, CRR
LCR #93 (RSA 310-A:161-181)

1    A.   Yes.

2    Q.   Okay.  Can you tell me what it is?

3    A.   It is my resume.

4    Q.   Okay.  Is this the resume that you provided to

5  Mr. Lieber in August of 2020 when you -- when he recruited

6  you for the position at Marquis Management?

7         I can take you all the way to the bottom, if that

8  would be helpful, Ms. Collopy.

9    A.   Yes.  Yes, this is it.

10   Q.   Okay.  And this is the resume that you tweaked --

11  that you told Mr. Lieber you had tweaked for the position,

12  correct?

13   A.   Yes, that is correct.  Every resume --

14   Q.   And --

15   A.   If I can finish?

16   Q.   Sure.

17   A.   Every resume is typically custom to the role that

18  you are applying for.

19   Q.   Mm-hmm.

20   A.   So in that statement, that would be true for the

21  current role that I was in -- I was applying for.

22   Q.   Well, didn't you tell him that you -- didn't you

23  ask him if he wanted you to make any additional revisions to

1  better align your resume with the position?  Did you tell him

2  that?

3       A.   Yes, and I don't believe that is anything unusual.

4  That would be -- that would be applicable in most roles.

5       Q.   So you're telling me that you revise your resume in

6  order to fit the position?

7       A.   You revise your resume so that it calls out the key

8  items for the job posting that you're applying for, yes.

9       Q.   Well, the job here wasn't posted, right?  The job

10  for Marquis Management that you ultimately took wasn't posted

11  with the company, correct?

12       A.   I -- I don't know that it was.

13       Q.   So you don't know one way or the other whether the

14  job was posted?

15       A.   I do not.

16       Q.   Okay.  Well, it's fair to say that Mr. Lieber

17  reached out to you about the position at Marquis Management;

18  isn't that right?

19       A.   Yes, he reached out to me through LinkedIn social

20  media.

21       Q.   All right.  So we were just talking about -- is

22  the -- where is the ISV position listed on your resume,

23  Defendant's Exhibit 91?

```
 1  accustomed to.

 2       Q.   Anything else?

 3       A.   No.

 4       Q.   Did you tell Mr. Lieber you didn't want to do --

 5  you didn't want to work on a help desk?

 6       A.   I don't know that that was -- I don't know that I

 7  said that.  I don't recall.

 8       Q.   So you might have said it, but you don't recall, or

 9  you didn't say it?

10       A.   I don't recall.  I don't recall.

11       Q.   Okay.

12       A.   I've done help desk work for my entire career,

13  so...

14       Q.   You said Mr. Lieber called you.  Do you know why he

15  reached out to you about this position?

16            MS. SHILO:  Objection.

17       Q.   Did he tell you why he was reaching out to you

18  about the position, Ms. Collopy?

19       A.   That he was looking to fill a position, and he knew

20  that I was looking for work.

21       Q.   And how did he -- did he tell you how he knew you

22  were looking for work?

23       A.   I did not ask.  I assumed he saw a social media
```

1  24, 2019, phone call?  I'm trying to connect -- you said you

2  posted a photo from vacation that you were looking for work.

3      A.   Correct.  That post was in 2019.

4      Q.   Okay.  Did you make any other posts on any social

5  media platforms that you were looking for work?

6      A.   I don't believe I did that, no.

7      Q.   Okay.  Were you let go from IBM?  Was your

8  employment terminated, Ms. Collopy?

9      A.   I was laid off as a result of reduction in force.

10      Q.   When were you laid off?

11      A.   October 31st of 2019.

12      Q.   Do you know approximately how many employees were

13  laid off at the same time as you?

14      A.   I do not.

15      Q.   Was it more than five?

16      A.   Absolutely was.

17      Q.   Going back to the -- you said you've seen him more

18  than five times socially.  You gave me an example of a

19  camping trip.  What other occasions have you seen Mr. Lieber

20  socially?

21      A.   My husband and I and his wife and Mr. Lieber, we

22  have gotten together for dinner.

23      Q.   When's the first time you recall doing that?

1        A.    It was sometime last fall.

2        Q.    So prior to you being hired by Marquis Management,

3   had you ever spent any time with Mr. Lieber socially?

4        A.    No.

5        Q.    Okay.  How many occasions have you gotten together

6   for dinner with Mr. Lieber and his...

7        A.    So with my spouse, once.

8        Q.    Okay.

9        A.    I have been to the Liebers' house for dinner.  I

10  have attended events with the Liebers.

11       Q.    What about one-on-one with Mr. Lieber?  How many

12  occasions have you met with Mr. Lieber one-on-one?

13       A.    Probably more than ten.  We would often give blood

14  together.  I don't know that that's considered one-on-one,

15  but...

16       Q.    Okay.  Other than giving blood together, what

17  else -- what other occasions have you met with Mr. Lieber

18  one-on-one or with -- without his spouse or your spouse?

19       A.    We have visited a client on two occasions.  We have

20  attended marketing events and social -- a social event with a

21  vendor.  We have met for coffee, and we have met for lunch.

22       Q.    And when you -- on any of these occasions, when

23  you've met for coffee or lunch, have you talked at all about

1      A.    Somewhere in the fall of 2022.  I believe it was

2  around October.  I had seen her son, and I texted her a

3  picture of him with his friends.

4      Q.    Do you consider Daniel Lieber a close, personal

5  friend?

6      A.    I consider him a friend, yes.

7      Q.    Do you consider him a close friend?

8      A.    How do you define "close"?

9      Q.    Someone you have a close connection with.

10     A.    Yeah, we're friends.  Yeah, I would say he's a

11 close friend, sure.

12     Q.    Okay.  Someone who you had a friendship with that

13 developed unlike any other friendship that you'd ever had?

14     A.    Yeah, that would be accurate.

15     Q.    Have you ever had a romantic relationship with

16 Mr. Lieber?

17     A.    No.

18     Q.    Have you ever made any sexual innuendos to

19 Mr. Lieber?

20     A.    I'm fairly sure we have.  We joke back and forth

21 often.

22     Q.    Have you ever had romantic feelings about

23 Mr. Lieber?

1   LinkedIn about a position at Marquis Management in August of

2   2020?

3       A.   Yes, I do.

4       Q.   And do you recall him telling you that the position

5   he may have available is a senior technical support position?

6       A.   If that's what -- yeah, I don't recall what he --

7   what he stated it was, but yes, if that is what it was titled

8   as.

9       Q.   And if we could just take a look at -- what is it

10  that Mr. Lieber -- after you -- withdrawn.

11          Do you recall how you revised your resume to fit

12  the position that was -- Mr. Lieber was looking to fill?

13      A.   I don't believe I did.  I believe that this resume

14  was my standard resume at the time.

15      Q.   So you don't believe you tweaked your resume to

16  align with the position?

17      A.   No.  I only sent the resume once.

18      Q.   Okay.  And what is it that Mr. -- did you speak to

19  Mr. Lieber about the role?

20      A.   I did.  I spoke to him on the phone, and I also

21  interviewed with Mr. Lieber and two of the technical team

22  members.

23      Q.   And who are the two technical team members that you

1  interviewed with?

2      A.   Matthew Tanner and Irving Santos.

3      Q.   And what is it that Mr. Lieber told you about the

4  position?

5      A.   He told me it was a help desk position where I

6  would be providing technical support for upwards to 1200

7  employees, working as a member of a -- what would become a

8  four-person help desk team.

9           MS. ZACCARDELLI:  Michele, can you read that answer

10  back for me, please.

11           (The record was read as requested.)

12      Q.   How is that description that you just gave,

13  Ms. Collopy, any different from the position that he was

14  telling you about on December 24th, 2019, that you said you

15  did not want?

16      A.   The difference between this role and the one that

17  he approached me about initially was one was a junior

18  position, and the one that we were speaking to here that I

19  was ultimately hired for was a senior position.

20      Q.   Well, what does that mean when you say, "a senior

21  position"?  What is it that he told you about the role being

22  a senior position?

23      A.   There was more responsibilities in this particular

1  role as a senior support individual.  I would be doing

2  project management.  I'd be doing process-type work,

3  documentation work.

4       Q.   When you say process work, you mean developing

5  policies and procedures for the IT group?

6       A.   I don't think it's limited to policies and

7  procedures.  I don't think that was the context around that.

8  That would have been more about documenting how we did the

9  technical support, what systems we used, what network systems

10  we had in place.  That type of documentation.

11       Q.   And what about with respect to project management?

12       A.   I don't understand; is there a question?

13       Q.   Yeah.  Describe -- did he explain to you anything

14  with respect to what you would be doing for project

15  management?

16       A.   Yes, in regards to leading internal initiatives;

17  working with the team to get certain projects completed, but

18  it was from a senior perspective where I would be leading

19  some of those initiatives and working with the other team

20  members.

21       Q.   When you say, "working with the other team

22  members," did Mr. Lieber tell you that you were going to be

23  managing the other team members?

1    Q.   Do you recall reviewing this section of the

2  handbook when you were hired by Marquis Management in August

3  of 2020?

4    A.   Yes, I did read the manual, so yes.

5    Q.   Okay.  And did you understand that if there was a

6  need for any kind of accommodation, that you should speak to

7  the human resources director?

8    A.   I see that here, yes.

9    Q.   Okay.  When you were hired in August of 2020, did

10 you make any request for any accommodation to Mr. Watkins,

11 who was the human resource director at the time that you were

12 hired?

13   A.   I did not.

14   Q.   Today I received a doctor's note from your

15 attorney, from a physician, Sangita Agarwal.  Am I

16 pronouncing that correctly?

17   A.   Yes.

18   Q.   Okay.  Is that your current physician who provides

19 treatment for you related to a medical condition that you

20 have?

21   A.   She's my primary care physician.

22   Q.   She's your primary care physician.  Okay.  And she

23 writes on January 22nd, 2023, that you are a patient of Beth

1    Q.   Okay.  And did you understand that if there was a

2  request or accommodation that you needed, that you should

3  direct that to the human resources director?

4    A.   Yes.

5    Q.   So can you explain to me why it is that you didn't

6  direct your request for accommodation to Mr. -- withdrawn.

7         Can you explain to me why you did not ask

8  Mr. Watkins to install handrails at One Delaware Road?

9    A.   Because I had not talked with Mr. Watkins before I

10  had been hired, and that conversation was had with Mr. Lieber

11  before I was hired.

12    Q.   So tell me about the conversation that you had with

13  Mr. Lieber before you were hired.

14    A.   When he called to tell me that they were offering

15  me the job and that I would receive notification from the HR

16  director of my job -- my job offer, I had asked him if there

17  was any way they could add some railings to that step in the

18  middle of One Delaware; whereas, that's a difficult step for

19  me to climb.

20    Q.   Okay.  So you directed that request to Mr. Lieber?

21    A.   Yeah.  That was before I was hired, correct.

22    Q.   Okay.  Did you ever direct that request to

23  Mr. Watkins?

1    Q.   Was there anything in your job description that

2  described you as being responsible for assigning or managing

3  help desk tickets?

4    A.   No, I don't believe so.

5    Q.   Was there anything in your job description that

6  talked about you managing any of the other member -- you say

7  the junior members of the help desk team?

8    A.   Without having the job description in front of me,

9  I don't recall if there was anything specifically about a

10  management piece of this.

11           MS. ZACCARDELLI:  Let me bring back up Exhibit 76.

12           (Exhibit 76 shared via Zoom.)

13    Q.   I'm showing you what's been marked as Defendant's

14  Exhibit 76, Ms. Collopy.  Is this a document you're familiar

15  with?

16    A.   Yes, it is.

17    Q.   Okay.  And is this the position that you were hired

18  for by the company in August of 2020?

19    A.   Yes.

20    Q.   Okay.  Do you want to -- I could scroll down.  Just

21  tell me, you know, if you need to --

22           (Automated voice.)

23           (Clarification by court reporter.)

1      A.    I believe that org chart was provided from Attorney

2  Burns and team through my attorney.

3      Q.    Okay.  Did you understand it was your

4  responsibility to notify Mr. Watkins of any need for an

5  accommodation that you might seek?

6      A.    Yes.

7      Q.    Okay.  And we can agree that you did not bring to

8  Mr. Watkins' attention the need for any handrails at One

9  Delaware Road; is that right?

10     A.    That is correct.  That was handled through my

11  manager at the time.

12          MS. ZACCARDELLI:  Can you pull up Exhibit 36 for

13  me, please.

14          (Exhibit 36 marked and shared via Zoom.)

15     Q.    Ms. Collopy, I'm showing you what's been marked as

16  Defendant's Exhibit 36.  Oops.  Is this a document that's

17  familiar to you?

18     A.    Yes, it is.

19     Q.    Okay.  Is this a document that you reviewed in

20  preparation for your deposition?

21     A.    No, I did not.

22     Q.    Is this a doc -- is this a posting that you made on

23  Facebook regarding the installation of handrails at One

1  Delaware Drive?

2      A.   Yes, it is.

3      Q.   And is this consistent with how you felt by the

4  fact that the company took those steps to install the

5  handrails at One Delaware Drive?

6      A.   At that time, yes.

7      Q.   And is this a picture of what was installed at One

8  Delaware Drive for you to navigate the step?

9      A.   Yes, it was.

10     Q.   Did you have any issues with the actual

11  installation in terms of their safety or efficacy?

12     A.   No, I had no concerns outside of the fact it took

13  a little while to get them, but I could manage.

14     Q.   Right, but you -- you told me earlier that you knew

15  that it was being worked on --

16     A.   Mm-hmm.

17     Q.   -- and that Mr. Lieber told you that, right?

18     A.   I had asked on a couple of occasions, and I knew

19  that they were on a list.

20     Q.   If you asked on a couple of occasions Mr. Lieber

21  and you knew they were on a list, why didn't you -- did you

22  see any reason to go to Mr. Watkins to make an inquiry to him

23  about the handrails?

1    desk ticket issue?

2         A.    I had been to 40 Lowell at least three times.

3         Q.    Three times?

4         A.    I believe so.

5         Q.    Okay.  And when -- you went three times to address

6    help desk ticket issues or something else, or both?

7         A.    I believe it was to meet with other individuals.

8         Q.    Okay.  Can you -- can you tell me -- can you

9    describe for me what you recall?

10         A.    Well, I was there one time and met with the

11   receptionist.  I believe -- trying to think of her name.

12   Mary Lee, I think.

13              Another time I had gone to see the IT office with

14   Mr. Lieber, and that was in my early stages of my employment.

15              And I don't recall --

16         Q.    When you say you went to the IT office with

17   Mr. Lieber, are you saying that there was an office located

18   at 40 Lowell Road that you went to look at?

19         A.    Well, yeah, we actually had to stop there to have a

20   conversation with one of the other teammates, who was at the

21   IT office.

22         Q.    Okay.  So is it your understanding that the

23   office -- the IT office at 40 Lowell Road existed prior to

1    the start of your employment?

2         A.    Yes.

3         Q.    Okay.  So the office wasn't put there for you; is

4    that right?

5         A.    Yes, that is correct.  It was not put there for me.

6    It was existing.

7         Q.    Okay.  So you -- so one instance when you went to

8    look at the IT office.  One time when you went to meet with

9    the receptionist.  And what's the third occasion?

10        A.    I'm not -- I'm not sure if that was in a -- to meet

11   with Randy Scott, but actually, I think that was after

12   Mr. Lieber's termination.

13        Q.    Okay.  So -- and what was the circumstance that you

14   were meeting with the receptionist, Mary Lee, at 40 Lowell

15   Road?

16        A.    I believe she had some issues that were -- needed

17   to be troubleshot in person.  I think it had to do with a

18   printer.

19        Q.    And where was the printer located?

20        A.    I believe she had a printer in her area, in her

21   office near the lobby.

22        Q.    So you didn't use the 40 Lowell -- you didn't use

23   the IT office to address the issue that she had with her

1 printer; is that right?

2     A.   In that case, that would be correct, because the

3 printer would have been near her office.

4     Q.   Did she have a cubicle or an office or a desk?

5 What was her configuration at 40 Lowell Road?

6     A.   I would describe that more as a cubicle, but it was

7 really just an area of the building.  When you first walked

8 in, she was to the right.

9     Q.   Okay.  Was it -- was it corded off in any way?

10     A.   I believe she had a reception wall or a desk like

11 a reception area, but I -- I can't recall.  I don't remember.

12 Yeah.

13     Q.   Okay.  And the other instance that you recall,

14 again, prior to Mr. Lieber's termination, was to take a look

15 at the office that was located at 40 Lowell Road; is that

16 right?

17     A.   Well, it was to -- one, to show me where it was,

18 but we also had discussion with another IT employee that --

19 help desk employee that was there.

20     Q.   Did you -- were you ever assigned to sit in the

21 office at 40 Lowell Road between the time that you were hired

22 in August of 2020 and Mr. Lieber's termination on

23 December 1st, 2020?

1      A.   I was the backup for all individuals that would

2  work at that location.

3      Q.   Did you ever go and sit in the IT help desk

4  office -- in the IT office at 40 Lowell Road between August

5  2020 and Mr. Lieber's termination of December 1st, 2020?

6      A.   Did I sit?  No, I did not.

7      Q.   And other than the instance with the printer, can

8  you identify one instance between August of 2020 and

9  December 1st, 2020, when you either addressed an issue -- a

10  help desk ticket issue -- well, withdrawn.

11          Was the issue with the printer, did that come in

12  through the help desk?

13      A.   I believe it was.  I was actually with Mr. Lieber.

14      Q.   Why were you with Mr. Lieber to address an issue

15  with a printer?

16      A.   Because we had to go to another -- we had to go to

17  40 -- we went to Hampshire Road, and we stopped here on the

18  way back.

19      Q.   Hampshire Road is another location where another

20  company is located; is that correct?

21      A.   That is correct.

22      Q.   And what company -- why were you at Hampshire Road?

23      A.   At this particular visit, I believe I was being

1    A.   Yes.  I saw a ticket come in that had a floor plan

2  that no longer listed the IT office on the first floor.

3    Q.   All right.  Did you have any conversations with

4  Mr. Lieber about that?

5    A.   I did have conversations with Mr. Lieber.  He was

6  unaware of the fact of the reconfiguration and that the IT

7  office was being moved to the second floor.

8    Q.   And when did you have that conversation with

9  Mr. Lieber?

10    A.   Somewhere around the 23rd of November of 2020.  It

11  was a ticket that was opened in the November time frame.

12    Q.   Did you speak to anyone else about the fact that

13  you saw a ticket, which listed -- that the office at 40

14  Lowell Road would no longer be on the first floor?

15    A.   I'm not sure that I did, beyond my direct

16  supervisor.

17    Q.   Okay.  And what did you -- just what did you tell

18  Mr. Lieber exactly or to your recollection?

19    A.   I believe I asked him if he was aware that the IT

20  office was being moved, because I had seen a floor plan that

21  no longer listed the IT office on the first floor.

22    Q.   And he didn't tell you that he had seen a floor

23  plan that showed that the IT office was being moved?

1        A.    I didn't ask if he had seen the floor plan.  I was

2   unaware whether he saw it or he did not.  That's why I

3   brought it to his attention.

4        Q.    And what did he tell you, if anything?

5        A.    I don't recall what he said.  I'm not entirely sure

6   if he -- he didn't state that he saw the floor plan, so I

7   don't know what he saw or what he knew.

8        Q.    Well, did he -- did he direct you to speak to Scott

9   Watkins about any -- well, withdrawn.

10            Did you have any issues or concerns with the fact

11   that the office, that there was going -- that there was a

12   reconfiguration of space at 40 Lowell Road?

13        A.    At this point, I did not get -- I did not get

14   involved outside of telling my direct manager that there

15   looked to be some changes coming that we weren't aware of, or

16   at least I wasn't aware of.

17        Q.    Okay.  And what, if anything, did -- what did

18   Mr. Lieber, if anything, say to you about that?

19        A.    I believe at that point, he was going to look into

20   it, and I wasn't involved in any of the discussions beyond

21   that with him and whoever else he spoke to, so...

22        Q.    So he didn't tell you to speak to anyone about the

23   reconfiguration of 40 Lowell Road?

1    A.   No, because I think at this point, I was just

2    bringing it to his attention.  I didn't have any details.  I

3    handed it to my manager to get them.

4    Q.   Okay.  Did Mr. Lieber come back to you with any

5    further information about the space at 40 Lowell Road and the

6    reconfiguration of the space?

7    A.   I believe he came back, and I saw an email he was

8    drafting, but I was not copied on the email, regarding the

9    needs to have an office on the first floor.  I don't know who

10   that email went to, as I've not seen that email.

11   Q.   Well, how is it that you saw an email that

12   Mr. Lieber was drafting?

13   A.   Because he called me to his office and asked me to

14   read it before he sent it.  He wanted to make sure he was

15   representing my concerns and my needs appropriately.

16   Q.   And who is it that he sent this email to?

17   A.   I don't have the knowledge of that.

18   Q.   So you're in the office with Mr. Lieber.

19   Mr. Lieber calls you over, and what do you recall the email

20   saying?

21   A.   I believe it had to do with my need to have an

22   office on the first floor and that I couldn't get to the

23   second floor.  I don't have the email.  I don't recall

1  exactly what it said, so I don't know the specifics or recall

2  the details.

3      Q.   So up until this point, Ms. Collopy, you had not

4  asked Mr. Lieber to bring this concern to anyone; is that

5  right?

6      A.   I don't know that it was something that I needed to

7  bring up at this point.  I was merely advising him that they

8  were moving the office.  That was up to him, from the

9  management perspective, to find out where it would be moved

10  to and have those discussions.

11     Q.   Well, did he tell you why he wanted you to review

12  an email that he was sending related to the reconfiguration

13  of the office space at 40 Lowell Road?

14     A.   Yeah, moving an office to the second floor that was

15  inaccessible to an employee, I think that is the main reason

16  why he called me in.

17     Q.   Did he tell you whether he received any response to

18  an email that -- to this email that he sent?

19     A.   I don't recall what the response was or if he came

20  back to me on that response.

21     Q.   Did he tell you he sent an email about the -- I'm

22  sorry.  Something happened.

23            Did he tell you that he sent an email about the

1   space -- the IT office at 40 Lowell Road?

2       A.   I saw what was drafted.  I do not know if he came

3   back and said he sent it, but I do see -- I did see that he

4   was drafting an email.

5       Q.   Okay.  Did he come back to you and tell you

6   anything about whether he got a response to an -- to any

7   email that he sent regarding the IT office at 40 Lowell Road?

8       A.   I don't recall if I heard what response he got.

9       Q.   Well, did Mr. Lieber convey anything to you about

10  the response he received related to the reconfiguration of 40

11  Lowell Road offices?

12      A.   I don't recall him coming back and telling me those

13  details.

14      Q.   Did he tell you, for example, that he was told that

15  the IT office was needed for a new employee that was being

16  hired by one of the companies that worked out of 40 Lowell

17  Road?

18      A.   No, I did not hear that from him.

19      Q.   Did he tell you that you -- that -- to the extent

20  that you needed to use an office at 40 Lowell Road, that you

21  could use the conference room on the first floor at that

22  location?

23      A.   I don't recall having that discussion with

1   Mr. Lieber.  I did have it later with Mr. Watkins, but I

2   don't recall having it at that time with Mr. Lieber.

3        Q.   So Mr. Lieber never conveyed to you that what had

4   been proposed as an alternate arrangement for you -- if you

5   needed to use the space at 40 Lowell Road was to utilize a

6   conference room at 40 Lowell Road?  He never told you that?

7        A.   I don't recall that.

8        Q.   Could you take a -- could you please read -- can

9   you take a look at paragraph 23 for me, please.

10       A.   (Witness peruses document.)

11       Q.   Ms. Collopy, did Mr. Lieber tell you that he had a

12   conversation with Mr. Christopher Moore about IT support

13   services at 40 Lowell Road?

14       A.   I don't recall if there was a separate conversation

15   about Mr. Moore.

16       Q.   Did he tell you that Mr. Moore proposed as an

17   accommodation that you could use a conference room on the

18   first floor at 40 Lowell Road?

19       A.   I don't recall having a discussion with Mr. Lieber

20   like that, but I do see it here in paragraph 23.

21       Q.   Well, I'm asking you, do you have any recollection

22   of Mr. Lieber telling you about what Mr. Moore had -- any

23   proposal by anyone at Marquis related to the use of a shared

1    conference room in or around November 23rd, 2020?

2        A.    I don't recall.

3        Q.    Did Mr. Lieber tell you that if -- that to use the

4    conference room -- that the conference room at 40 Lowell Road

5    would be made available to you if you needed to use -- use it

6    for IT support services?  Did he tell you that?

7        A.    No, I don't recall that.

8        Q.    At this point in time in November of 2020, what did

9    you -- did you have any understanding about anything having

10   to do with 40 Lowell Road prior to Mr. Lieber's termination?

11       A.    I did not.

12       Q.    Okay.  Did Mr. Lieber tell you that he objected to

13   the use of the conference room at -- on the first floor at 40

14   Lowell Road?  Did he tell you that?

15       A.    I don't recall that conversation -- a conversation

16   with Mr. Lieber about the outcome --

17       Q.    Okay.

18       A.    -- on those discussions.

19       Q.    Do you recall whether Mr. Lieber encouraged you at

20   this point to speak to Mr. Watkins about the IT office space

21   at 40 Lowell Road?

22       A.    No, I don't recall.

23       Q.    And up through the point of the date of

1  Mr. Lieber's termination, you had no conversations with

2  anyone at Marquis about the reconfiguration of 40 Lowell Road

3  other than Dan Lieber; is that right?

4      A.    I don't believe I had any conversation with anyone

5  else about this reconfiguration besides Dan Lieber, correct.

6      Q.    Did you ever make a request to work from home

7  during the wintertime if there was inclement weather?

8      A.    Yes, I did.

9      Q.    And who did you make that request to?

10     A.    My manager, Daniel Lieber.

11     Q.    And was that request honored?

12     A.    The one time that I used it in October of 2020?

13  Yes.

14     Q.    Did you make that request to anyone else at the

15  company at Marquis Management?

16     A.    I believe I had those discussions with Mr. Moore

17  and Mr. Fruhbeis in 2021.

18     Q.    So --

19     A.    The conversation with Mr. Moore was in 2020.

20     Q.    So you believe you had a conversation with

21  Mr. Moore about working from home when the weather was

22  inclement or bad, that you be permitted to work from home?

23     A.    Correct.  That was in conjunction to my working

1    from home after December.

2        Q.   And did Mr. Moore have any -- did he object to you

3    being able to work from home during the times when the

4    weather was problematic, inclement; there was inclement

5    weather?

6        A.   He did not appear so, to have a problem.

7        Q.   And you said Mr. Fruhbeis -- you raised it with

8    Mr. Michael Fruhbeis?

9        A.   Yeah, I believe in an initial conversation with him

10   in the March time frame as to inclement weather and slippery

11   conditions being an issue for me.

12       Q.   And what did Mr. -- and was that when Mr. Fruhbeis

13   was your -- was your supervisor?

14       A.   He began being my supervisor in February of 2021,

15   so yes, it would be when I was meeting with him as my direct

16   manager.

17       Q.   Okay.  And did you have -- and what was

18   Mr. Fruhbeis's response when you indicated that you wanted to

19   work from home from time to time when there was inclement

20   weather?

21       A.   I don't think -- I don't recall him having any

22   concern with that.

23       Q.   Going back to the -- the space at 40 Lowell Road.

1  specifics for each of the individuals that were listed in the

2  ticket.  It was not specifically about the IT office.

3     Q.   Okay.  And did Mr. Dogil express any negativity

4  towards you about the -- you asking questions about the move?

5     A.   No, I don't believe so.  I was seek -- I was

6  seeking clarity on the request for the individuals, so...

7     Q.   Okay.  Had you ever -- up through Mr. Lieber's

8  termination date of December 1st, 2020, had you ever made a

9  request to use a conference room at 40 Lowell Road that was

10 not honored?

11    A.   I don't know that I've ever requested a conference

12 room at 40 Lowell Road.

13    Q.   Did you understand that there was a reservation

14 system at 40 -- with respect to conference room use at 40

15 Lowell Road?

16    A.   I believe there were systems that were available.

17 I don't know if they were used.  I recall seeing a sign-up

18 sheet on the outside of the door.  I don't know if that was

19 the system that was used or if they were using an online

20 system.  I'd never booked anything, so I couldn't say for

21 certain what was right, what was wrong, and whether or not

22 things were honored.

23    Q.   Well, did you ever -- were you ever told by

1  Mr. Lieber that if you wanted to use -- if you needed to

2  access -- if you needed to provide IT support services at 40

3  Lowell Road, that you should reserve a -- you could reserve a

4  conference room at 40 Lowell Road?  Did he tell you that?

5       A.   No, I've never had that conversation with him.

6            MS. ZACCARDELLI:  Would this be a good time to just

7  take a half-hour lunch break?

8            MR. MEYER:  Yeah, I think that's fine.  I just

9  ordered some food to be brought in.  I'm not sure if it's

10 ready yet, but hopefully it is.  And if we need more time, I

11 can let you know.

12           MS. ZACCARDELLI:  That's fine.  I just think this

13 is a good point to stop before I turn to something else,

14 but...

15           MR. MEYER:  Can you give me a guesstimate as to how

16 long you expect the deposition to last in the afternoon?

17           MS. ZACCARDELLI:  A couple more hours, maybe.

18 Maybe two.

19           MR. MEYER:  Okay.  Fair enough.  So it's now 12:35.

20 If we -- want to come back at 1:05, and if we need more time,

21 I'll send out an email to you, Lisa.  Is that okay?

22           MS. ZACCARDELLI:  Yeah, very good.  That works

23 fine.  Thank you.

1      Q.   Anything else that you recall about the meeting

2   with Mr. Moore?

3      A.   I don't recall anything else.  I know, you know,

4   the meeting was specifically around Daniel's termination, and

5   I was needed to complete, you know, and help in the interim

6   while they were looking for a new manager.

7      Q.   Okay.  Did you have any other conversations on

8   December 1st other than the one in the parking lot with

9   Mr. Lieber?

10      A.   I believe I touched base with him after work to see

11   how he was doing.

12      Q.   Anything else?

13      A.   I talked to him -- actually, he texted me after he

14   left the office parking lot and asked me to bring out his

15   jacket, because he had left it on the door behind his -- had

16   left it on the hook on the door behind his office.

17      Q.   And did you have any -- do you recall what you

18   spoke about with him then?

19      A.   No, because it was a very brief conversation.  I

20   brought him his jacket.  I told him that I would contact him

21   later, and I went back to work.

22      Q.   And did you text him later that day?

23      A.   I'm probably sure I did.

1      Q.   Did you tell Mr. Lieber that day or the following

2  day that you -- your attitude to the company had changed?

3      A.   Yeah, I believe I probably did.

4      Q.   Did you tell him that you went from loving your job

5  to updating your resume and seeking a new gig?

6      A.   That would be accurate.

7      Q.   So the day after Mr. Lieber was terminated, you

8  decided you wanted to leave the company?

9      A.   I don't know if it was leaving the company or --

10  updating your resume doesn't mean you're leaving the company,

11  but...

12      Q.   Well, what about saying you're seeking a new gig?

13  Does that mean leaving the company?

14      A.   It has the potential to, but it doesn't necessarily

15  mean that everybody who looks for work finds work or leaves

16  the company that they're in.

17      Q.   Well, what did you mean, Ms. Collopy, when you

18  said, I went from loving my job to updating my resume and

19  seeking a new gig, on December 2nd, 2020, to Mr. Lieber?

20      A.   Exactly what it sounds like, that I --

21      Q.   And you were going to start looking for a new job?

22      A.   I was upset --

23           MR. MEYER:  Wait, wait, wait.  Let -- again, we're

1  getting, I think, both -- please let the witness finish her

2  answer.

3       A.   I was upset.  I stated that I was gonna be -- I did

4  love my job.  The previous three months had been the best

5  employment I've had in a number of years.  I was

6  exceptionally happy with what I was doing and who I was doing

7  it with and the team that I was working with.

8            So things had changed very rapidly upon

9  Mr. Lieber's termination; that it was less than a 12-hour

10  turnaround, and things that had been put in place for months

11  ceased to exist from that point forward.

12      Q.   Well, explain to me what happened on the morning

13  of December 2nd that made you go from loving your job to

14  updating your resume and seeking a new gig.

15      A.   Well, I will say that the fact that I was working

16  for Mr. Lieber, I liked working for him.  I liked working for

17  the people we were working with.  I found that as of

18  December 2nd, my teammates began to a point where they were

19  complaining to Mr. Moore that they didn't like the fact that

20  I was being directed to guide the team the way that

21  Mr. Lieber had asked me to do.

22            And so going from loving my job to looking for a

23  new gig isn't anything out of the ordinary, I don't think.

1    Q.   Okay.  All right.  And what did you tell

2  Mr. Watkins, if anything, about the situation regarding 40

3  Lowell Road?

4    A.   I believe we talked about the interactions I had

5  with Randy for the meeting.  Mr. Watkins asked me what we

6  were talking about.  I advised him about the project that we

7  had put on hold.

8        Mr. Watkins at this point -- because he had already

9  had my email, he asked if I could use the conference room

10  going forward for meetings if I needed to access -- or have

11  meetings at 40 Lowell.

12    Q.   Did you tell -- did Mr. Watkins tell you that

13  that -- your use of the conference -- that Mr. Moore and

14  Mr. Lieber had communicated about you being able to use the

15  conference room back in November of 2020?

16    A.   I don't recall if he stated that they, Mr. Lieber

17  and Mr. Moore, had communication on it.

18    Q.   Did you -- did you have any issue with using the

19  conference room at 40 Lowell Road, or did you -- withdrawn.

20        Did you express any dissatisfaction with using the

21  conference room at 40 Lowell Road?

22    A.   Not at -- no, not at this meeting.

23    Q.   Okay.

1      A.   I did not -- I wasn't entirely sure which

2  conference room it was.  I said that I would check it out at

3  a later date.

4      Q.   Anything else you recall that you spoke about with

5  Mr. Watkins related to IT services at 40 Lowell Road?

6      A.   No, I don't recall anything else.  Not during this

7  mobility discussion, no.

8      Q.   Did you take a picture of Mr. Scott?

9      A.   Yes, I did.

10     Q.   Who directed you to take a picture of Mr. Scott?

11     A.   No one directed me to take a picture.

12     Q.   Did you tell Mr. Scott that you were taking a

13  picture of him at 40 Lowell Road?

14     A.   No, I don't believe I did.

15     Q.   So you -- he didn't give you approval to take his

16  picture?

17     A.   No, I didn't -- I didn't ask for approval.

18     Q.   Did you share a copy of your picture that you took

19  of Mr. Scott with Mr. Watkins?

20     A.   I don't believe so.

21     Q.   Why -- why wouldn't you share a copy of the picture

22  that you took of Mr. Scott with Mr. Watkins when you met with

23  him on January 18th?

1  January as to what the plan was or what was stated to be the

2  plan.

3      Q.   Okay.  So explain to me what Mr. Watkins told you

4  in your meeting on January 25th -- well, withdrawn.

5           Was it Mr. Watkins who spoke at that meeting on

6  January 25th?

7      A.   I believe both Mr. Watkins and Mr. Moore spoke

8  during that meeting.

9      Q.   Okay.  And what did Mr. Watkins say about the 40 --

10  about IT -- you providing IT services at 40 Lowell Road?

11      A.   That I could continue to use the conference room,

12  if I needed a secure location, at 40 Lowell Road, which is --

13      Q.   Did you have any objection to that?

14      A.   I had not used it at that point, so I did not.

15      Q.   Okay.  Did you talk at all about the fact that it

16  had a reservation system?

17      A.   I don't believe we had dialogue on how to book the

18  conference room.

19      Q.   Anything else about 40 Lowell Road?

20      A.   Not that I can think of.

21      Q.   You -- you said that you had -- you didn't have any

22  issues at that point.  Is there another occasion where you

23  booked or tried to use the conference room for IT support

1      Q.   No, no, no.  Sorry.  Did you have a meeting with

2   the team that's reflected in Defendant's Exhibit 83?

3      A.   Yes, I did.

4      Q.   Okay.  What do you recall about that meeting?

5      A.   That meeting was our first meeting as a team with

6   Mike.  He was inter -- you know, teaching us a little bit

7   about himself, what he expected of the team, how he was

8   planning to evaluate the team over a 90-day period, and get

9   an understanding of what we all do at Marquis.

10      Q.   Did you say anything at that meeting?

11      A.   I'm sure I did.

12      Q.   Well, do you recall what you said?

13      A.   Oh, offhand, I don't recall.  I do know I took some

14   notes, but I don't recall what those notes were as of right

15   this second.

16      Q.   Did you have any issues or any complaints about

17   anything that Mr. Fruhbeis said in the meeting on February

18   25th?

19      A.   No, I don't believe I did.

20      Q.   Was it consistent with what you had heard during

21   the interview process?

22      A.   Yeah, I liked him.

23      Q.   Did you separately have -- where did you sit in the

1    meeting?

2         A.    Where did I sit?

3         Q.    Yes.  Do you recall where you sat during the

4    meeting?

5         A.    Yeah, I do remember.  I sat --

6         Q.    Where --

7         A.    I -- Mr. Fruhbeis sat on the end of the table.  I

8    sat to the left.

9         Q.    After the meeting with Mr. Fruhbeis, did you have

10   any one-on-one with him?

11        A.    I had -- in passing, when we were leaving, I asked

12   for time to have a conversation with him.

13        Q.    Okay.

14        A.    And he said he would be scheduling meetings with

15   all the team.

16        Q.    Did you tell Mr. Lieber that you were meeting with

17   Mr. Fruhbeis in February of 2021?

18        A.    I'm not sure I had a conversation about the

19   meeting.

20        Q.    Well, did you -- did you tell him anything about

21   the decision to hire Mr. Fruhbeis?

22        A.    I'm sure at some point we had a conversation that

23   there was a replacement for him.

1  earlier text that Erin and I had, making a joke about going

2  there.

3          So yeah, in fact, it -- yeah, it is very likely

4  that if he were to land somewhere else, that the likelihood

5  is that, you know, we would probably go to work with him.

6      Q.   And did Mr. Lieber tell you that he would hire you?

7      A.   No.  Nothing is guaranteed.

8      Q.   Tell me about your meeting -- you said -- you did

9  have at some point a separate meeting with Mr. Fruhbeis; is

10 that right?

11     A.   That is correct.

12     Q.   And where did you take that meeting?

13     A.   I believe we had that meeting in the conference

14 room at One Delaware.

15     Q.   Okay.

16     A.   The small conference room.

17     Q.   And what do you recall about the meeting that you

18 had with Mr. Fruhbeis at One Delaware?

19     A.   Well, what I recall about that meeting is that we

20 covered a lot of detail in that meeting.  We discussed the

21 issues amongst the -- the contention among the team, and that

22 I was hoping that he would help to improve those working

23 relations.

1          We talked about the projects and things that I was

2   working on.  We talked about additional roles that would --

3   may be needed for Marquis in terms of someone to manage the

4   help desk, as well as additional network support.  We talked

5   about bringing in interns.

6          Q.   Did you tell Mr. Fruhbeis that you thought you were

7   going to be promoted to manager, to a management position,

8   over Mr. Santos, Mr. Tanner, Evgenii, Esdras?  Did you tell

9   him that?

10         A.   I don't believe I used those exact words.  I

11   believe I filled -- I advised him as to what the -- the

12   earlier discussions were with Mr. Lieber in terms of bringing

13   in an -- opening an additional position for an IT manager,

14   and that I was interested in that job, but I don't believe I

15   said that I was -- would be picked over the other men.  But

16   we did have a conversation about that role.

17         Q.   So I just want to make sure I understand your

18   testimony, Ms. Collopy.  Did you tell Mr. Fruhbeis that

19   Mr. Lieber had told you that you could expect to be promoted

20   six to nine months after your hire to a newly created

21   position of manager of the help desk?

22              MS. SHILO:  Objection.

23         Q.   Did you tell him that?

1     A.    I don't know if I used those words that you stated

2   in the question the way you did.  I know we did have

3   conversation about the potential position that was being

4   discussed, but nothing was guaranteed that I was the person

5   that was going to get that job.  That much I know for sure.

6     Q.    Did you tell Mr. Fruhbeis that you -- while

7   Mr. Lieber was there, that you had been given the

8   responsibility to assign help desk tickets to other people in

9   the IT department --

10          MS. SHILO:  Objection.

11    Q.    -- that he told you to do that?

12          MS. SHILO:  Objection.

13    A.    I'm sure we talked about the role that I was

14  playing in terms of the assignment of the work.

15    Q.    Did you express to Mr. Lieber -- no, sorry.

16  Withdrawn.

17          Did you express to Mr. Fruhbeis that you didn't

18  like doing the actual help desk work and you wanted -- you

19  felt that you should be in a management role?

20    A.    I don't think I used those terms, but as --

21    Q.    What did you say?

22    A.    I don't recall what I said, but I don't think I

23  used those terms.

1          I believe that the conversation was had, is that I

2   was -- I was moving and wanting more of a management

3   opportunity, and I don't recall saying that I didn't want to

4   do the help desk work.

5      Q.   Did you -- I think you testified earlier today that

6   you told Mr. Fruhbeis that you were allowed to work from home

7   when there is inclement weather; is that right?

8      A.   Yes, I believe so.

9      Q.   And did Mr. Fruhbeis have any problem with that?

10     A.   Not that he expressed.

11     Q.   Did you tell Mr. Fruhbeis anything about the 40

12  Lowell Road office reconfiguration?

13     A.   Yes, we talked about that briefly.  We talked about

14  the move of the IT office slated to go to the second floor

15  and that there was no accessible place for me to do work.

16          I did state that I was instructed in January to use

17  the conference room, and he asked, is that the big conference

18  room with the pool table?  And I said yes.  That was the

19  office.  That was the conference room.

20     Q.   Where was the pool table located in the conference

21  room?

22     A.   To the left of the conference room table, next to

23  the refrigerator and everything else that's in that room.

1  That room being a conference room, it's got a lot of other

2  items in there as well.

3      Q.   But it had a table, right?

4      A.   Yeah, it had a table.

5      Q.   And it had chairs, right?

6      A.   Yeah, it had chairs.

7      Q.   And it had power equipment, right?

8      A.   Yeah.

9           MS. SHILO:  Objection.

10     Q.   It had equipment that you could hook up a laptop or

11 a monitor, right?

12     A.   Yeah, there was power in that room.  Whether it was

13 accessible, easily accessible, becomes a question.  But yes,

14 there was power in that room.

15     Q.   How did you end the meeting with Mr. Fruhbeis?

16     A.   I'm not sure how we ended the meeting, but I

17 believe the meeting -- at least my impression of it, the

18 meeting went well.

19     Q.   Did he ask to review your resume?

20     A.   No, he did not.

21     Q.   Did you tell him about your experience at IBM

22 before coming to Marquis?

23     A.   I'm not entirely sure we talked at that depth of

1      A.   No, I don't believe so.

2           MS. ZACCARDELLI:  You can take this down.

3      Q.   After you presented the list of projects that

4  Mr. Fruhbeis had asked you for, did you have any other

5  communications with him about the work that you were

6  performing for Marquis?

7      A.   No, I was terminated the day that I gave him that

8  list.

9      Q.   I'm sorry?

10     A.   No, I was terminated the day I gave him that list.

11     Q.   So you were terminated on March 11th?

12     A.   No, we were discussing it on March 15th.  So I

13  stand corrected.  I sent it to him on March 11th.  On March

14  15th is when we were meeting to discuss it, and I was

15  terminated.

16     Q.   Okay.  And were you brought in -- were you brought

17  into a meeting with Mr. Fruhbeis at One Delaware Drive?

18     A.   I was.

19     Q.   And did Mr. Fruhbeis tell you that your position

20  was being eliminated?

21     A.   Yes, he told me that the company was undergoing a

22  reorganization.

23     Q.   Did you say anything at the meeting?

1    A.    No, I didn't say a whole lot, with the exception of

2   when Mr. Watkins -- oh, I asked why exactly I was being

3   terminated, and when Mr. Watkins suggested I have an attorney

4   review the separation agreement, I told him I would be doing

5   that.

6    Q.    Did Mr. Fruhbeis say that the company was being --

7   the company was undergoing a reorganization or the

8   department?

9    A.    I don't recall the term he used.  He told me I

10  was -- there was a reorg.

11        MS. ZACCARDELLI:  Can you pull up Exhibit 96 for

12  me, please.

13        (Exhibit 96 marked and shared via Zoom.)

14   Q.    Ms. Collopy, I'm showing you what's been marked as

15  Defendant's 96.  This was a document that was produced by you

16  in your case.  Can you explain to me what this is?

17   A.    Yes.  This was a text message that I had with

18  Mr. Lieber after hearing information from Erin Lyle that she

19  had spoken to Mr. Watkins and Mr. Moore.

20   Q.    Why were you telling Mr. Lieber about your

21  conversation with Erin Lyle?

22   A.    Because we're friends.

23   Q.    Well, what is it that caused you to -- did you text