# TAB B

BETH ANNE COLLOPY

vs

MARQUIS MANAGEMENT

Docket No. 1:22-cv-00184

BETH COLLOPY

June 07, 2023



# AVICORE REPORTING

15 Constitution Drive, Suite 1A · Bedford, NH 03110 · (603) 666-4100
info@avicorereporting.com · www.avicorereporting.com

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW HAMPSHIRE

DOCKET NO.: 1:22-cv-00184

\* \* \* \* \* \* \* \* \* \* \* \* \*

BETH ANNE COLLOPY                           \*

            v.                              \*          CERTIFIED ORIGINAL

MARQUIS MANAGEMENT, LLC                      \*

\* \* \* \* \* \* \* \* \* \* \* \* \*

DEPOSITION OF BETH ANNE COLLOPY

Zoom deposition taken by agreement of counsel on

Wednesday, June 7, 2023, commencing at 11:26 a.m.

Court Reporter (Via Zoom):

Jennifer A. Vaillancourt, LCR

LCR #42 (RSA 310-A:161-181)

1      A.   I do.

2      Q.   And would you have the same position that you

3  currently hold?  Or you don't know?

4      A.   No, I'll have the same position.

5      Q.   I want to switch gears, if we could, and just

6  ask you a couple of questions.

7           I think you testified in the last deposition

8  that you worked with a Mr. Irving Santos and

9  Mr. Tanner; is that right?

10     A.   Yes.

11     Q.   And would you agree that Mr. Santos and

12 Mr. Tanner were two of the longer-term -- tenured

13 employees in the IT Department at Marquis Management?

14     A.   I believe so, yes.

15     Q.   I think you -- we talked in the last

16 deposition that you were -- you were upset when you

17 learned that Mr. Lieber had been terminated; is that

18 right?

19     A.   Yes.

20     Q.   And that you were going to start looking for

21 another job, and that you would be bailing, quote, in a

22 heartbeat, right?

23           MR. MEYER:   Wait.  I thought we had agreed we

1   the documents.

2           MR. MEYER:  Okay.

3           Is that the bottom of the exhibit?

4           MS. ZACCARDELLI:  Yes.

5           MR. MEYER:  Okay.

6   BY MS. ZACCARDELLI:

7       Q.   So Ms. Collopy, I'm showing you documents

8   that you produced in this case which were chats between

9   you and Ms. Lyle.  Do you recall these?

10      A.   I do.

11      Q.   And on December 2 at 2:11 p.m., that was the

12  day after you learned Mr. Lieber was terminated; is

13  that right?

14      A.   Yes.

15      Q.   And you said:  We are planning to discuss

16  business opportunities.

17          Who is the "we"?

18      A.   Assuming that -- the previous chat there, it

19  would be with Daniel Lieber.

20      Q.   Okay.  And you said:  I will bail here in a

21  heartbeat.

22          Is that what you intended to do?

23      A.   It's hard to say at the moment, but --

1    Q.    Well, on December 2, did you tell Erin Lyle

2   that you would bail at Marquis Management in a

3   heartbeat?

4    A.    Yeah.  That's what it says there.

5    Q.    I think you also told Ms. Lyle that you

6   should be deleting Teams Chat data; is that right?

7    A.    No, that is not right.  If we go up, you can

8   see that actually Erin Lyle had deleted the Teams Chat

9   data.

10    Q.    Did you delete Teams Chat data?

11    A.    No, I did not.

12    Q.    But you were discussing deleting Teams Chat

13   data with Erin Lyle; is that right?

14    A.    That is what -- it was stated there, that

15   Erin had just deleted her last Teams message.

16    Q.    And it's your testimony you didn't delete any

17   Teams messaging?

18    A.    That is correct; I did not.

19    Q.    Did you reach out to Mr. Moore about a

20   conversation you claim you overheard on either December

21   3 or 4th of 2020?

22    A.    Yes.

23    Q.    Okay.  And this was after you learned about

1   work from home?

2       A.   We had a conversation about it.

3       Q.   Okay.  And were you already working from home

4   when there was inclement weather?

5       A.   I worked from home on one occasion prior to

6   that day.

7       Q.   And that was when there was inclement

8   weather; is that right?

9       A.   Yes.  In October of '20.

10      Q.   And you had previously requested from

11  Mr. Lieber the ability to work from home in the winter;

12  is that right?

13      A.   During inclement weather, yes.

14      Q.   And did Mr. Moore have any complaints about

15  the idea of you working from home, as you say, to

16  lessen any friction?

17      A.   Not that I recall.

18      Q.   Anything else that you recall about that

19  meeting with Mr. Moore?

20      A.   No, I don't think so.

21      Q.   And Mr. Moore didn't tell you to notify

22  everyone when you were working from home or coming into

23  the office, right?

1      A.   He did request that I notify him and the team

2  of my whereabouts.

3      Q.   If you were coming into the office?

4      A.   Not if I was coming to the office; if I was

5  going to be home.

6      Q.   Okay.  And did you take issue with that?

7      A.   At the time, no.

8      Q.   Did you understand that Mr. Moore was trying

9  to get a handle on the IT Department and just wanted to

10  know where people were and where they were working?

11      A.   Yeah, I suppose so.

12      Q.   And did you know that Matthew Tanner had

13  suffered a heart attack?

14      A.   Yeah, I did.

15      Q.   And did you know that he was fully remote?

16      A.   No, I did not know that he was fully remote.

17      Q.   Did you know he was working from home?

18      A.   I did not know his status.

19      Q.   Okay.  One way or the other?

20      A.   Nope.

21      Q.   Did you complain to Mr. Moore about having to

22  give some information to him, the team, about where you

23  might be?

1      A.    At that point, no.

2      Q.    Did Mr. Moore ever tell you that he thought

3   that maybe there was a misunderstanding between you and

4   him about any kind of notification that you needed to

5   provide?

6      A.    Yeah, that would be in January -- the

7   January 25 meeting he stated that.

8      Q.    And what is it that he said in the January 25

9   meeting?

10     A.    That I must have misunderstood the request

11  that I needed to notify him and the team.

12     Q.    Okay.  And wasn't it the case that what

13  Mr. Moore told you was to notify anyone if there was a

14  situation -- he told everyone on the team to notify him

15  if there was a situation when they were not going to be

16  working their regular schedule?

17          MR. MEYER:  Objection.  Foundation.

18  BY MS. ZACCARDELLI:

19     Q.    You can answer, Ms. Collopy.

20     A.    I don't recall him stating that to everyone,

21  no.

22          MS. ZACCARDELLI:  Can you pull up

23  Exhibit 117, Carrie.

1   what fields were changed by that individual.

2       Q.   And do you know if the person who you say

3   made a change had worked on the ticket after you?

4       A.   I do know that they did not.

5       Q.   And how do you know that?

6       A.   Because I closed the ticket the day before.

7       Q.   And what did Mr. Moore, if anything, say when

8   you raised this team integrity issue?

9       A.   I don't know that he actually had much to

10  say, with the exception of he would look into it.

11      Q.   Okay.  And anything else that you recall

12  about the conversation?

13      A.   No.

14      Q.   Are you claiming, Ms. Collopy, in this case

15  that your questioning team integrity is discriminatory?

16      A.   No, that isn't the word that is used or was

17  used.  This is just merely bringing a team integrity

18  issue to management's attention.

19          MS. ZACCARDELLI:  Can you pull up, Carrie,

20  Exhibit 118.

21              (Defendant's Exhibit 118 was shared

22              via Zoom.)

23          MS. ZACCARDELLI:  Mr. Meyer, are you done

1      A.    This was in reference to the conversation

2  where a teammate had changed tickets from my name to

3  someone else's, resulting in assigning these tickets to

4  the other individual.

5      Q.    Okay.  But I'm not clear on that.  Because

6  your e-mail says:  It raises the question of the

7  professional integrity of a system administrator who

8  has access to other vital systems.

9           What do you mean by that?

10     A.    That -- what I mean by that is that the

11 individual who changed these records is also an

12 individual who had access to vital systems; that

13 professional integrity could be questioned, making

14 changes to documents that were not his to change and

15 changing them to someone else.

16     Q.    And is the system administrator you're

17 talking about that Irving Santos?

18     A.    Yes.

19     Q.    So you were questioning Irving Santos'

20 professional integrity to your boss, Christopher Moore;

21 is that right?

22     A.    That would be fair, yes.

23     Q.    And you don't have any understanding of why

1   Mr. Santos, if it happened, might have made any changes

2   to these tickets, right?

3           MR. MEYER:  Objection.

4     A.   No, that's not right.  I did reach out to

5   Mr. Santos prior to having this conversation with

6   Mr. Moore.

7   BY MS. ZACCARDELLI:

8     Q.   And when did you reach out to him?

9     A.   Before I went to Mr. Moore on this.

10     Q.   And did you speak to Mr. Santos about it?

11     A.   No, there was an e-mail thread.

12     Q.   Okay.  And what did you tell Mr. Santos?

13     A.   I asked him why he had changed these tickets

14   from my name to Esdras'.  And his response was that he

15   wanted to make sure that people were getting credit for

16   the issues that they worked.  And in this case, they

17   did not work this.  Mr. Javier did not work these

18   tickets.

19     Q.   Well, did you correct Mr. Santos?

20     A.   No, I did not.

21     Q.   So it's your testimony that Mr. -- you're

22   saying Mr. Santos gave you a reason that was not -- you

23   say not accurate, but you didn't correct him?

1     A.   No, actually, I raised the issue of integrity

2  to management.

3     Q.   Okay.  And again, raising the issue of

4  integrity to management, are you claiming that's

5  discriminatory?

6     A.   No.

7          MS. ZACCARDELLI:  Could we pull up

8  Exhibit 94, Carrie.

9               (Defendant's Exhibit 94 was shared

10              via Zoom.)

11         MS. ZACCARDELLI:  Tell me when you're done,

12  Ms. Collopy.

13         THE WITNESS:  I'm done.

14  BY MS. ZACCARDELLI:

15     Q.   Okay.  Defendant's 94, did you communicate

16  with Mr. Lieber over LinkedIn?

17     A.   Yes, that's what you're seeing here.

18     Q.   Okay.  Did you use LinkedIn to engage in

19  private chats with Mr. Lieber?

20     A.   I don't necessarily know it was targeted,

21  private chats.  As you can see here, I was providing

22  him with job opportunities that I had seen, as well.

23     Q.   Okay.  Well, I guess what I meant, and maybe

1  And at which point I had found it was, for myself, time

2  to bring this to management's attention, while I was

3  bringing the other issue to management's attention, at

4  the same time.

5      Q.   Okay.  And you say that:  Discrimination has

6  been consistent by all men in the department since

7  December 11, 2020.

8          Do you see that?

9      A.   I do see that.

10     Q.   Is there something that happened on

11  December 11, 2020?

12     A.   That was when -- yes.  That was when I

13  noticed that work that I had performed, tickets were

14  being changed from my name to other individuals'.  I

15  also had circumstances where members of the team would

16  not even converse with me in the office.  I was finding

17  that my files were being monitored by other members of

18  the team.  Documents were being accessed.  And

19  ownership of my documents were assumed by one of my

20  team members.  It's a combination of a number of items

21  that had occurred during this time frame.

22     Q.   And again, this activity that you claim was

23  occurring happened after the ransomware attack; is that

1   right?

2        A.   It was around the time of the ransomware --

3   yes.

4        Q.   And it was also around the time when you

5   started removing files from Marquis Management to a

6   thumb drive, correct?

7        A.   No, that is not correct.

8        Q.   Didn't you -- go ahead.

9        A.   I was making backup copies to work from home

10  so I had access to the data that I would need, should I

11  not be able to connect to the office.

12       Q.   Which you did not disclose to anyone at the

13  company, correct?

14       A.   That would be correct, yes.

15       Q.   And what did -- did Mr. -- withdrawn.

16            What -- you said there were tickets that were

17  changed.  Other than the example that you say occurred,

18  that you gave earlier today, are there any other

19  examples of tickets that you say were changed?

20       A.   There were a total of, I believe, eleven that

21  were changed at that time frame.

22       Q.   And what -- out of the eleven, what is it

23  that was changed on those tickets?

1  all eleven of them as examples in follow-up to

2  Mr. Watkins.

3      Q.   Okay.  But as you sit here today, you think

4  there are eleven tickets that there was changes to?

5      A.   Correct.

6      Q.   Okay.  And then you also said that there

7  were -- someone was not conversing with you in the

8  office?

9      A.   Yeah.  That was pretty consistent, where most

10  of the men did not talk to me at all.

11      Q.   Okay.  And what about -- you said you -- you

12  filed -- files were monitored.  What -- what is it that

13  you claim about files being monitored?

14      A.   I could see that documents that I had

15  authored were accessed by members of my team.  There

16  were documents that were shared with my previous

17  manager and were not public documents for others to

18  review.  Just based on the manner of the documents that

19  were shared, they were not shared with anyone other

20  than Mr. Lieber.

21      Q.   But you had a problem with other team members

22  at the company looking at documents that you had worked

23  on?

1    A.    For these particular documents, yes.  Because

2  they would have been shared documents through

3  Microsoft Teams with another individual; they weren't

4  documents that anyone can just randomly open.

5    Q.    You understand that Irving Santos was the

6  system administrator at Marquis and was responsible for

7  and reported to Mr. Moore after December of 2020; isn't

8  that right?

9    A.    As did I.

10    Q.    Did you understand that Mr. Santos was the

11  system administrator for Marquis Management?

12    A.    Actually, we were all system administrators

13  for Marquis Management.

14    Q.    Did Mr. Santos have principal responsibility

15  at the company for systems administration?

16    A.    From a network perspective, yes.

17    Q.    And are you complaining that Mr. Santos

18  shouldn't have been looking at documents that had been

19  created or shared on the system between you and

20  Mr. Lieber?

21    A.    Yes.  Absolutely.

22    Q.    And you're claiming that's discriminatory?

23    A.    Not necessarily that one action.  All of

1      A.   I know what I was able to see in terms of

2  what was being looked at for myself.  I had other

3  individuals that I had asked in the IT Department to

4  see if they, too, had documents that were being

5  reviewed by Irving Santos, and that individual stated

6  she had not.

7      Q.   Oh, who is that?

8      A.   That would have been Erin Lyle.

9      Q.   Okay.  So you sent this e-mail to Mr. Moore

10  and Mr. Watkins.  And did Mr. Moore and Mr. Watkins --

11  did Mr. Watkins respond?

12      A.   I don't -- no, I actually believe he did

13  respond to this e-mail, yes.

14      Q.   Okay.

15           MS. ZACCARDELLI:  Could we scroll up, Carrie,

16  please.  Keep going a little bit.  Okay.  Right there.

17  Stop.

18  BY MS. ZACCARDELLI:

19      Q.   So Ms. Collopy, is it fair to stay that

20  Mr. Watkins responded to you on January 15, 2021 at

21  9:06 a.m.?

22      A.   That is the time that's stated here, yes.

23      Q.   Well, do you have any reason to doubt that?

1    Q.   Okay.  Oh, and just going back to this

2  point -- question.  You said that you asked Erin Lyle

3  if anyone in the IT Department had monitored her work;

4  is that right?

5    A.   I believe I asked her if she had noticed

6  anyone opening and reviewing her files.

7    Q.   Okay.  Did you ask any of the -- your -- the

8  people who you worked with, Esdras or Evgenii or

9  Matt Tanner, did you ask any of them whether anyone had

10  been opening their files?

11    A.   I don't know that I did.

12    Q.   So the only person that you recollect asking

13  is Erin Lyle; is that right?

14    A.   Yes, that is right.

15    Q.   So you would have no idea whether or not

16  Mr. Santos was monitoring other files, other IT

17  employees' files?

18    A.   No, I don't.

19    Q.   Okay.  And going back to Exhibit 82, you said

20  that -- at the top that -- you said:  Hi, Scott.  Let's

21  plan on meeting on Monday morning.  Weather permitting,

22  that is.  Slippery conditions tend to keep me home, but

23  I can definitely be there, even if it's a bit later on.

1           Is that right?

2      A.    That's what it says.

3      Q.    So you're telling him that it was slippery

4  conditions that might keep you home, but that you would

5  meet with him on Monday morning?

6      A.    Yeah.

7      Q.    Okay.  And then did you meet with him on

8  Monday morning?

9      A.    No, I believe we actually met on -- I believe

10  we met on the 18th.

11      Q.    Okay.  Let's go to the top.

12           So I'm looking at an e-mail from you to

13  Mr. Watkins on January 18; is that right?

14      A.    That looks right, yes.

15      Q.    And January 18 was a Monday; is that right?

16      A.    I believe -- yes.  Since I say, "Have a great

17  weekend!" on the Friday, yes.

18      Q.    Okay.  So you met with Mr. Watkins in person;

19  is that right?

20      A.    I did.

21      Q.    And was there anyone else in attendance at

22  the meeting?

23      A.    Yes, there was.

1      Q.    And who was there?

2      A.    Nikolina Gobron.

3      Q.    And did you have any issues with Mr. Watkins

4   and his responsiveness to set a meeting with you to

5   talk about these issues that you were raising in

6   Exhibit 82?

7      A.    I don't believe so.

8      Q.    Did you -- were you taking notes at the

9   meeting?

10     A.    I believe I took some notes.

11     Q.    And did you take notes -- handwritten notes,

12  or Rocketbook notes, or both?

13     A.    Likely, I would have taken handwritten notes

14  in a Rocketbook and possibly wrote some notes following

15  the meeting later in the day.

16     Q.    So would you have taken two sets of notes?

17     A.    Sure.  One would have been as we were

18  discussing certain items.  And following that meeting

19  would have been the result of what we discussed in more

20  detail.

21     Q.    Had you already met with a lawyer at this

22  point?

23     A.    I believe I had, yes.

1     Q.   And who is it you met with?

2     A.   I testified to this back in January.  That I

3   met with Mr. Meyer, Attorney Meyer, and also prior to

4   retaining Mr. Meyer, I had spoken to Attorney Burns.

5     Q.   Okay.  And tell me what you recall about the

6   meeting that you had with Mr. Watkins and Ms. Gobron.

7     A.   So this would have been the first of the two

8   meetings we had.  This meeting, we discussed each of

9   the items that were covered in both of the e-mails I

10  had sent, one for accommodations and the second one for

11  gender discrimination.  We discussed each of the items

12  that I had called out in the gender e-mail.  And we

13  discussed resolution or the circumstances behind it.

14  We weren't at resolution at that point.  We were

15  discussing what had taken place and what additional

16  follow-up I could provide Mr. Watkins in support of

17  what I was raising.

18    Q.   Okay.  And what is it that you talked

19  about -- I mean specifically, what is your recollection

20  of what you raised in the meeting with Mr. Watkins?

21    A.   We discussed each of the items that I called

22  out, which was the document -- my documents being

23  accessed by members of my team, we talked about

1  unauthorized ownership of my documents, we talked about

2  my having to report to Mr. Moore and the rest of the

3  team my whereabouts.  And I believe there may have been

4  something else, but I can't recall what the other item

5  was.

6        Q.   Okay.  Did you talk about at all the --

7  your -- your claim here that your access was reduced?

8        A.   Yes.  That's the other item.  Thank you.

9        Q.   Okay.  And after you met with -- what did

10 Mr. Moore say, if anything?

11       A.   I was not talking to Mr. Moore at this time.

12       Q.   I'm sorry.  Withdrawn.  Mr. Watkins.

13            What did Mr. Watkins say at the conclusion of

14 the meeting, if anything?

15       A.   I believe at this meeting, there were items

16 that he was going to look into.  I believe we talked

17 about the security breach.  But I don't recall if this

18 was when we talked about reduced access and monitoring

19 of my files.  I believe that was the 25th.  So I think

20 this one was the initial fact-gathering discussion, and

21 it wasn't until the following week did we actually

22 discuss what was found.

23       Q.   I'm sorry.  Are you saying that you didn't

1  discuss with him in the meeting on the 18th that you

2  said your access was reduced or that your files were

3  being monitored?

4      A.   No, that's not what I said.

5      Q.   Okay.

6      A.   We did discuss it.  But there were no action

7  items that he was able to respond to at that time

8  without my providing the data to him.

9      Q.   Okay.  Didn't he say he was going to have to

10 look into it?

11     A.   He did.

12     Q.   Okay.  And didn't he tell you -- and when you

13 met with him again, he came back to you with what he

14 had found as a result of these issues that you had

15 raised; is that right?

16     A.   That is correct.

17     Q.   Okay.  And did he tell you that everyone's

18 access had been reduced after the cyberattack?

19     A.   Yes.

20     Q.   And isn't it the case that Mr. Moore had

21 already told you that people in the IT Department's

22 access had been reduced consistent with what their

23 responsibilities were at the time?

1    A.   Yeah, I don't know what that has to do with

2  January because we were past the cyberattack at that

3  point.

4    Q.   Well, I didn't ask you that question,

5  Ms. Collopy.  I asked you, did Mr. Moore convey to you

6  that access had been reduced based on what the

7  insurance company had informed them?

8    A.   I believe that was in early December.

9    Q.   And isn't it also the case that you

10 understood that the company had consulted with

11 cybersecurity professionals after the cyberattack?

12   A.   I don't know the names, so no, I cannot state

13 that I know the name of the company.  I do know they

14 were working with some third-party entity.

15   Q.   Okay.  So after -- and then the monitoring of

16 files.  What is it that you were raising with respect

17 to the monitoring of files?

18   A.   The fact that members of my team were opening

19 documents that I had created that they had no right to

20 access.

21   Q.   And who is it that you're claiming was

22 opening documents?

23   A.   That would be Matthew Tanner and

1   would want to review files that you had created?

2       A.   I do not know.

3       Q.   When did you start downloading Marquis data

4   onto your personal thumb drive?

5       A.   I would have created backup copies somewhere

6   around the end of December when I was more actively

7   engaged in project work at home.

8       Q.   How many gigabytes of information did you

9   remove from the system?

10      A.   I did not remove anything from the system;

11  the data was still on the system.  These are backup

12  copies.  I don't know the amount of data in terms of

13  the quantity or the --

14      Q.   So you have no idea how many gigabytes you

15  removed?

16      A.   I don't.

17      Q.   Okay.  In Exhibit 82, you also say your

18  requests for support are being deferred.  What is that

19  about?

20      A.   I had requested help from the team members

21  regarding missing Microsoft Teams data that had been

22  removed from my account.  And I asked if others had

23  experienced the same problem.  And then logged a ticket

1   to have that request reviewed by -- at this point, it

2   would have been Mr. Santos.  Because he would have been

3   the only one who had access to Microsoft to do further

4   investigation.

5        Q.   Okay.  And what did -- did Mr. Santos respond

6   to your ticket?

7        A.   He did days later.  Said that he doesn't have

8   time to look into my chat issue and he'll look at it at

9   some point.

10       Q.   Okay.  And who did you say you spoke to about

11  this in your team?

12       A.   I asked the members of my team through the

13  group team chat.  So it would have been Matt Tanner,

14  Evgenii, Esdras, and --

15       Q.   Okay.  Was Erin on your team?

16       A.   Erin was a member of the IT Department.  But

17  she was the only manager that we had within IT, so she

18  was essentially an active member, associate member, if

19  you will, of that group.

20       Q.   Okay.  And did anyone respond to you

21  regarding your chat?

22       A.   I believe the other men, so Esdras and

23  Evgenii, I believe, were the only two that responded.

1   They said that they weren't missing chat data.

2        Q.   Erin didn't respond?

3        A.   I don't believe she did.

4        Q.   Okay.

5        A.   I don't know.

6        Q.   Did -- when -- did Mr. Moore tell you that

7   only Irving Santos had certain access to data, at the

8   instruction of the insurance company?

9        A.   Yeah.  At some point I had heard that, yes.

10       Q.   Okay.  Anything else that you recall about

11  the meeting that you had with Mr. Watkins on

12  January 18?

13       A.   No.  Not off the top of my head, I don't.

14       Q.   I just wanted to make sure I understand your

15  testimony.  Are you saying that other IT members could

16  view tickets that you had opened?

17       A.   Yeah, that is correct.

18       Q.   And is it the case that in a call-tracking

19  system, you could also see who had tickets open?

20       A.   That's correct.

21       Q.   So you were able to view other tickets' work?

22  I'm sorry.  Withdrawn.  That's a bad question.

23            You were able to see, by virtue of the

1  call-tracking system, other employees who were working

2  on other tickets; is that right?

3      A.   If I went looking for them, sure.

4      Q.   Okay.  Do you know, for example, if

5  Mr. Santos ever viewed any tickets that Matthew Tanner

6  had open?

7      A.   I can't say for sure.

8      Q.   So you have no idea whether Mr. Santos was

9  looking at tickets that another team member, as you

10 say, had open or were working on; is that right?

11     A.   I didn't pay much attention in terms of what

12 other people were doing.  I was looking -- I was more

13 focused on what people were doing with my data.  That's

14 all.

15     Q.   Okay.  But my question to you is, when you

16 were sending this e-mail on January 14, you had no idea

17 as to whether or not Mr. Santos was monitoring other

18 tickets or looking at tickets of other people in the

19 IT Department; is that right?

20     A.   I don't know.  But I wasn't focused on other

21 individuals; I was focused on myself.

22     Q.   Right.

23          Did you discuss the security breach at all

1  with Mr. Watkins on January 18?

2      A.   I believe we did.  I think we touched on it.

3      Q.   And what is it that you spoke to him about

4  about that?

5      A.   That, I believe he had mentioned that there

6  was ransomware associated with it.  Something to do

7  with some ransom request for some inordinate amount of

8  money.  At that point, I wasn't even aware that it was

9  ransomware versus a cybersecurity attack.

10     Q.   Did you have any issues with how Mr. Watkins

11 handled the January 18 meeting?

12     A.   No, I didn't have any issues with Mr. Watkins

13 at that point, no.  Not at all.

14     Q.   Well, did you have any issues with

15 Mr. Watkins at all?

16     A.   None personally, no.

17     Q.   Give me one second.

18          Did you have a follow-up -- you had a

19 follow-up meeting with Mr. Watkins; is that right?

20     A.   Yes.

21     Q.   And what do you recall about the follow-up

22 meeting?

23     A.   It was Mr. Watkins, also in attendance was

1   Mrs. Gobron, and also Mr. Moore.

2        Q.   And were you upset that Mr. Moore was in

3   attendance?

4        A.   No, I don't think so.

5        Q.   And did you understand that he was attending

6   the meeting because he was supervising the

7   IT Department at this time?

8        A.   I suppose.  But I didn't give it any thought.

9   I didn't think anything regarding him being there.

10       Q.   Okay.  And did you frame the issues that you

11  were having with the IT Department as integrity issues?

12       A.   I don't necessarily know that that was

13  integrity issues at that point.  Previous discussions

14  with Mr. Watkins -- I'm sorry.  Take that back.

15  Mr. Moore, it was discussed about integrity.

16       Q.   Well, did you ever frame the issues that you

17  were having with other team members in your meetings

18  with Mr. Watkins as you thought it was an issue of

19  integrity?

20       A.   That may have come up.  That may have come

21  up.

22       Q.   And why did that come up?

23       A.   I believe we were discussing what -- you

1    know, the accessing of other people's files.  And

2    monitoring other teammates' files would be perceived as

3    an integrity issue.

4         Q.    An was that because of your experience at

5    IBM?

6         A.    It would be my career in IT.

7         Q.    And when you say "integrity," what do you

8    mean by that?  Like I'm just trying to get a sense of

9    when you use that word, what is it that you mean?

10        A.    "Integrity" is, with respect to IT, how you

11   handle yourself in terms of the role that you have.

12   Because you have access to certain individuals' files

13   doesn't necessarily mean you should access those files

14   without authorization.

15        Q.    Okay.

16        A.    So questioning integrity, if that were

17   something that somebody was doing, that certainly could

18   be an integrity question.

19        Q.    And did you say in that January 25 meeting

20   that you thought there was a serious integrity issue

21   with the team?

22        A.    Potentially, yes.

23        Q.    Okay.  And did you also tell Mr. Watkins that

1  likely, they would be, yes.

2       Q.   Well, it was your opinion, Ms. Collopy, that

3  he should be terminated because of what you view as him

4  deleting MS Teams data, right?  That was your opinion?

5       A.   I'm entitled to my opinions.  So yes.

6       Q.   Okay.  What else was discussed?

7       A.   The fact, at that point, that I -- that's

8  when I was told that I misunderstood that I needed to

9  notify Mr. Moore about my whereabouts and that I could

10  use the group chat in text messaging with the team to

11  communicate that information.

12       Q.   Okay.  Anything else?

13       A.   I believe we talked about why I had lesser

14  access.  And again, we talked more about the

15  cybersecurity breach.  And at which point, this

16  discussion was my access would be elevated following

17  the meeting that I had with Mr. Moore and Mr. Watkins

18  and Mrs. Gobron.

19       Q.   And did anyone tell you that they were going

20  to consult with Mr. Fruhbeis about what access that you

21  should have in connection with your responsibilities

22  and duties?

23       A.   Yes.  At that point, I believe that was

1   spoken to.

2        Q.   Did you have any problem with that?

3        A.   No, I shouldn't.  Because he's going to be

4   the new manager.  So why would I have an issue with

5   that.

6        Q.   So you were informed that they were going to

7   be consulting with Mr. Fruhbeis; is that right?

8        A.   Yes, I was.

9        Q.   Okay.  And do you agree from a cybersecurity

10  standpoint, it makes sense for you just to only have

11  access rights to the systems they need to use?

12       A.   In most cases, yes.

13       Q.   Was your -- what access, if any, were you

14  given after the January 25 meeting?

15       A.   I believe I was given most of the rights that

16  I had prior to December, with the exception of

17  Exchange, which is an e-mail system.  Admin.  And I

18  believe there might have been one or two rights that I

19  didn't have that I had before.

20       Q.   Okay.  That you did not have before?

21       A.   That I had before, that I did not get.

22       Q.   Okay.  And when you say "rights to the e-mail

23  Exchange," you're saying you couldn't go in to

1  everyone's e-mail; is that right?

2      A.    No, that is not what I'm saying.  I did not

3  have access to administer the Exchange server --

4      Q.    Okay.

5      A.    -- to actually give people rights to their

6  individual mail files or manage mail-files access.

7      Q.    Okay.  And were you given access to license

8  administration?

9      A.    I believe at that point, that may have been

10  one I had to circle back to Mr. Moore for.  There was

11  one or two that I did not have following the 25th or

12  26th -- the 25th meeting that I had to get.  We had a

13  text exchange on that.

14     Q.    Okay.  Did you review that text exchange in

15  preparation for your deposition today?

16     A.    I did not.

17     Q.    Did he tell you that it was an oversight and

18  he fixed it after your text conversation?

19     A.    I believe that's what the text message said,

20  yup.

21     Q.    And did you tell him that you appreciated

22  that?

23     A.    I believe I did.

1       Q.   Okay.  And did you have any problems or

2   issues with access to those systems after this

3   exchange?

4       A.   I believe Mr. Moore gave me back most of the

5   privileges that I had.  So yeah, no, I don't believe I

6   had problems at that point.  There were still some

7   aspects of administration that I could not do.

8       Q.   And after this date, did you have any

9   concerns about any files that you say you created that

10  were viewed by others?

11      A.   I still had concerns that they were -- my

12  files were being viewed.  So I don't know that that

13  went away just because we had a meeting.

14      Q.   Well, I'm asking you, Ms. Collopy, did you

15  raise any concerns?

16      A.   I had not noticed at that point if there was

17  continued viewing of my files.  So had I noticed that,

18  I would have raised it.  So no, I did not.

19      Q.   Okay.  And the reason you didn't raise it is

20  because you didn't notice that any files were being

21  viewed by others; is that right?

22      A.   At that point in time, that is correct.

23      Q.   Well, I'm asking you after your January 25

1  meeting with Mr. Watkins and Mr. Moore, had that issue

2  been resolved?

3      A.   I don't know if it was resolved.  All I do

4  know is that I did not notice anyone viewing my files

5  at that point.

6      Q.   And up until the date of your termination,

7  did you notice anyone viewing your files?

8      A.   I don't believe I spent much time looking at

9  it.  Because under good-faith effort with management, I

10  believed the issue wouldn't continue.

11      Q.   Did Mr. Watkins in the January 25 meeting

12  tell you that other -- other persons' files were being

13  monitored after the cyberattack and not just yours?

14      A.   I believe that is what he had said.

15      Q.   Okay.  And did Mr. Watkins tell you that

16  there would be an administrative account set up when

17  Mr. Fruhbeis came on board?

18      A.   I know the account was set up.  I don't know

19  if we had dialogue on that.  I don't recall having

20  dialogue on it.  But I did get an account.

21      Q.   You got an account after Mr. Fruhbeis joined;

22  is that right?

23      A.   I think we got the account before

1   minutes?

2          MR. MEYER:  Sounds good.  Thank you.

3          MS. ZACCARDELLI:  Okay.  Great.  Thank you.

4          (Recess taken.)

5   BY MS. ZACCARDELLI:

6      Q.   Just a couple more questions, Ms. Collopy.

7          When you went into the office -- withdrawn.

8          Did you interact or try to speak to any of

9   your colleagues when you went into the office?

10      A.   Initially, yes.  So following the

11   conversation with Evgenii and Esdras and Mr. Moore, I

12   did attempt to make communication with them.  But I was

13   getting less communication from them, that I ultimately

14   just came in and did my work.  Interacted with them as

15   needed, but it wasn't beyond -- anything more friendly.

16   Like we weren't doing lunch like we used to.

17      Q.   Did you have a conversation with Mr. Moore,

18   Esdras, and Evgenii together?

19      A.   No.  After their conversation.

20      Q.   Oh, I see.  Okay.

21          So you stopped trying to engage them?

22      A.   Yeah.  There was no interaction.  They were

23   not engaging to anything that would be perceived as

1   positive.  So I didn't put much more effort into it.  I

2   did what I needed to.  I did my work.  And interacted

3   as we need to.  But it wasn't from a friendly

4   perspective, like we had done in the past.

5       Q.   Okay.  So -- so -- so you didn't make any

6   effort to engage them; you would come in and do your

7   work; and you're saying they didn't make any effort to

8   engage you either; is that right?

9       A.   Yes, that's right.

10      Q.   Okay.

11           MS. ZACCARDELLI:  Can we go back to

12   Exhibit 82, please.

13           (Defendant's Exhibit 82 shared via Zoom.)

14   BY MS. ZACCARDELLI:

15      Q.   Ms. Collopy, I'm trying to see, where is it

16   in your e-mail to Mr. Moore and Mr. Watkins that you

17   bring up this ticket being -- this ticket issue, things

18   being changed in your tickets; is that referenced here

19   in Exhibit 82?

20      A.   No, it is not in this one.  This was in --

21   the tickets that were being changed were in December.

22   That was the beginning of these other items that I

23   noticed.

1  daily updates, that would be the other situation where

2  Mr. Moore was part of that.

3      Q.   Okay.  But Mr. Moore told you it was a

4  misunderstanding, right?

5      A.   Yeah.  In January.

6      Q.   And are you claiming that -- anything about

7  whether Mr. Fruhbeis was discriminatory to you; that he

8  engaged in any gender discrimination?

9      A.   I only had very limited interactions with

10  Mr. Fruhbeis, so I cannot state that he was doing

11  anything discriminatory.  I had very few interactions

12  with him.

13      Q.   And have you ever raised or made any

14  complaint to Mr. Moore that you thought you shouldn't

15  have to -- again, I'm taking from what you're telling

16  me -- that you shouldn't have to report to the team

17  about when you might be in the office; did you ever

18  raise that to Mr. Moore prior to bringing it up in a

19  meeting that you had with Mr. Watkins?

20      A.   No, I did not.

21      Q.   Okay.  Did Mr. Moore tell you in the

22  January 25 meeting that it was -- that he never asked

23  you to write an e-mail to everyone, and that it was a

1  suggestion to everyone on the team so that people knew

2  who was and was not in the office; did he tell you that

3  in the meeting in -- January 25?

4       A.   In -- January 25, yes.

5       Q.   And at that point, you were principally

6  working from home, right?

7       A.   In January, yes.

8       Q.   And isn't it the case that a group text was

9  set up?

10      A.   There was a group text.

11      Q.   And the group text was between you and Esdras

12  and Evgenii and Mr. Tanner; is that right?

13      A.   I believe Mr. Santos was on that text, as

14  well.

15      Q.   Okay.  So everyone was on the group text

16  about when -- if or when they, he or she, might be in

17  or out of the office, right?

18      A.   Not everyone used it in that manner.

19      Q.   But that's what the group text was set up

20  for, correct?

21      A.   Not specifically for that.  It was to be able

22  to have communication as a group.

23      Q.   Okay.

1        A.    In addition, we also had a Teams --

2   Microsoft Teams group chat where we would also

3   communicate.

4        Q.    Okay.  And did you use the Microsoft

5   Teams chat to communicate with the other members of

6   your team?

7        A.    I did.

8              MS. ZACCARDELLI:  Give me one minute, please.

9              (Recess taken.)

10  BY MS. ZACCARDELLI:

11       Q.    And was Chris Moore also on that group chat?

12             I'm sorry.  Withdrawn.

13             Was Mr. Moore also on the group text?

14       A.    I believe he was on the group text.  He was

15  not on the Microsoft Teams chat, I do not believe.

16       Q.    Okay.  And that's because Mr. Moore had taken

17  over responsibility on an interim basis after

18  Mr. Lieber was terminated and before Mr. Fruhbeis had

19  come on board; is that right?

20       A.    Yeah, he was just never added to the group.

21       Q.    Well, when you say "he was never added to the

22  group," what do you mean by that?

23       A.    The Microsoft Teams chat capability is based

 1   on individuals being added to that discussion.

 2        Q.   Oh.

 3        A.   He was never added.

 4        Q.   No.  I understand that.  I'm asking about the

 5   group text.  He was on the group text, correct?

 6        A.   Yes.  Yes.

 7        Q.   And he was put on the group text because he

 8   had taken over on an interim basis the responsibility

 9   for the IT group, right?

10        A.   That would be safe to assume, yes.

11        Q.   Okay.

12        A.   That was created by a team member.

13             MS. ZACCARDELLI:  Give me one moment, please.

14             (Recess taken.)

15   BY MS. ZACCARDELLI:

16        Q.   Just one other question, Ms. Collopy.  Did

17   you tell Mr. Watkins that -- in the meeting that --

18   what was specific about Evgenii was not about it being

19   gender discrimination but that he was rude to you?

20        A.   Yes.  That was the follow-up to that

21   discussion, yes.  And he was rude to other women.

22        Q.   And that you told Mr. Watkins that your

23   complaint about Evgenii was not related to gender