# TAB C

DANIEL P. LIEBER

vs

MARQUIS MANAGEMENT

# Docket No. 1:21-cv-968-JL

CHRISTOPHER MOORE

December 12, 2022



AVICORE REPORTING

15 Constitution Drive, Suite 1A • Bedford, NH 03110 • (603) 666-4100
info@avicorereporting.com • www.avicorereporting.com

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW HAMPSHIRE

**CERTIFIED COPY**

```
*   *   *   *   *   *   *   *   *   *   *   *
                                          *
DANIEL P. LIEBER,                         *
                                          *
          Plaintiff,                      *
                                          *   Docket No.
v.                                        *   1:21-cv-968-JL
                                          *
MARQUIS MANAGEMENT, LLC                   *
and SELECT DEMO SERVICES, LLC,            *
                                          *
          Defendants.                     *
                                          *
*   *   *   *   *   *   *   *   *   *   *   *
```

DEPOSITION OF CHRISTOPHER MOORE

Zoom deposition taken by agreement of counsel on

Monday, December 12, 2022, commencing at 9:25 a.m.


Court Reporter:  (Via Zoom)

Michele M. Allison, LCR, RPR, CRR
LCR #93 (RSA 310-A:161-181)

1   at Marquis Management, but not at any of the other companies

2   in the Marquis family of companies?

3        A.   That is correct, yes.

4        Q.   Okay.  So you became the sole controller in the

5   Marquis family of companies.  And when did that happen?

6        A.   I believe that was September of 2018.

7        Q.   Okay.  And so what was the top-level financial

8   position at each of the other companies in the Marquis family

9   of companies from September of 2018 forward?

10       A.   Can you repeat that?

11       Q.   Sure.  What was the top-level financial position --

12   I'm asking for a job title -- for the top-level financial

13   person in each of the companies in the Marquis family of

14   companies from September of 2018 forward?

15       A.   It's confusing.  Are you asking who is the top

16   level at the other --

17       Q.   At each company.  At all the other companies.

18   Other than Marquis Management, LLC, once you became the only

19   controller in the company, what was the title of the

20   top-level financial person in each of the other companies in

21   the Marquis family of companies?

22       A.   Select Demo would have had an accounting manager

23   that was employed by Select Demo.  And I had two accounting

1  managers below me at Marquis Management.

2      Q.   Okay.  But what about at all the other companies?

3  I mean, how many companies are there in the Marquis family of

4  companies?

5          MS. ZACCARDELLI:  Objection to form.

6      A.   During which time frame?

7      Q.   From September of 2018 through today.

8      A.   Well, we've grown significantly since -- during

9  that time period.

10     Q.   Meaning -- meaning, you've added additional

11 companies beyond those which existed in September of 2018?

12     A.   That is correct.

13     Q.   Okay.  So who were the companies that existed in

14 September of 2018?

15     A.   I don't recall the exact dates of when we added

16 companies.

17     Q.   Okay.  What's the total number of -- the names of

18 all the companies that exist as of today, as we sit here

19 today?  Who are the companies in the Marquis family of

20 companies?

21     A.   Are you asking me to name all the companies?

22     Q.   Yes.

23     A.   It's New England Finish Systems of New England.

1  New England Finish Systems.  We have New England Glass and

2  Finishing.  Select Demo Services.  Allan Construction.

3  Specialty Services of New England.  K-Town Disposal.  Marquis

4  Management.  Select Spray Systems.  Select Paint & Finishes.

5  Finish Installation of New England.  Select Tile, Marble &

6  Flooring.  Advanced Exteriors & Glazing of New England.

7  Currently.

8       Q.   Okay.  So for each of those entities that you just

9  described, what's the top-level financial position?  What's

10  the job title for the top-level financial position for each

11  of those companies?

12            MS. ZACCARDELLI:  Objection to form.

13       Q.   Is it accounting manager?

14       A.   That would be me, as the chief financial officer.

15       Q.   Okay.  But you're not the chief financial -- are

16  you the chief financial officer for New England Finish

17  Systems?

18       A.   No.

19       Q.   Okay.  I thought you were the chief financial

20  officer for Marquis Management, LLC.

21       A.   Yes, Marquis Management.  Accounting is a shared

22  service.  Shared amongst all the companies.

23       Q.   Okay.  And what other shared services do the

1  Marquis family of companies have?

2      A.   Accounting, IT, human resources, payroll,

3  purchasing, and development, and safety.

4      Q.   Okay.  So there aren't -- there aren't human

5  resources people in each of the individual companies in the

6  Marquis family of companies, correct?

7      A.   That is correct, yes.

8      Q.   Okay.  So the only people who hold human resources

9  positions are people employed by Marquis Management, LLC,

10  correct?

11      A.   Correct.

12      Q.   Okay.  And so Scott Watkins is responsible for

13  human resources for each of the companies in the Marquis

14  family of companies, correct?

15          MS. ZACCARDELLI:  Objection to form.  You can

16  answer.

17      A.   That is correct.

18      Q.   Okay.  How many employees are employed by all of

19  the Marquis family of companies that you just recited to us?

20  Like, what's the total number of employees for all those

21  entities?

22      A.   It varies on seasonality.

23      Q.   Okay.  In the construction season, how many

1    employees does the company employ in total?

2        A.    Roughly, 1300.  Roughly.

3        Q.    1300, including every one of those companies?

4    New England Finish, New England Glass, Select Demo, Allan's,

5    Specialty Services, K-Town, for that entire list, the total

6    number of employees is 1300?

7        A.    That's including the fieldworkers, correct.

8        Q.    Okay.  And who works in human resources of Marquis

9    Management?

10       A.    Currently, it's Scott Watkins and Nikolina Gobron.

11       Q.    And is that -- those are the only two people who

12   work in human resources?

13       A.    Nicole Livingston also works in human resources.

14       Q.    Okay.  What's Nicole Livingston's title?

15       A.    I'm not sure of her title.

16       Q.    What's Nikolina's title?

17       A.    I'm not sure of the exact title.

18       Q.    Okay.  And what's Scott Watkins' title?

19       A.    He's the director of human resources.

20       Q.    Okay.  So there's three people involved in human

21   resources for 1300 employees; is that correct?

22       A.    That's correct.

23              MS. ZACCARDELLI:  Objection to form.

1   concerning to you?

2            MS. ZACCARDELLI:  Object to the form.

3       A.   Sure, but we'd come up with a plan for business

4   continuity.

5       Q.   Okay.  So you -- are you telling me that the plan

6   that you came up with started on November 19th, 2020, and

7   went forward from there?

8       A.   No, it did not.  Am I allowed to take a break?

9       Q.   No, not now.  Not now.  We're just going to finish

10  where we're going.

11      A.   Sorry.

12      Q.   So you're telling me that the plan didn't start on

13  November 19th, 2020, for replacing the CIO?

14      A.   No, Mr. Marquis -- Jon Marquis made the decision a

15  couple weeks before, and we tried to have a plan in place

16  to -- how we would replace the CIO of the company.

17      Q.   Wait.  How do you know that he made the decision a

18  couple of weeks before?

19      A.   He called me via telephone.

20      Q.   When did Jon Marquis call you by telephone?

21      A.   It was -- I don't recall.  It was in November.

22      Q.   Did you take notes of your phone call with him?

23      A.   I did not.

1      Q.   Okay.  And what did he tell you during the phone

2   call?

3      A.   All I remember is that he made the decision that he

4   wants to terminate Dan Lieber, and that he was going to come

5   down on November 19th to discuss with the managers.

6      Q.   What did you say?

7      A.   "Okay."

8      Q.   Did he tell you why during the phone call that you

9   say he had with you a couple weeks before November 19th?

10     A.   I don't recall the -- I don't recall the details of

11   the conversation.

12     Q.   Okay.  So I take it at no time did you try to do

13   anything to stand in the way of the termination of Dan

14   Lieber; is that correct?

15     A.   Can you repeat that?

16     Q.   Did you ever do anything to stand in the way of the

17   decision to terminate Dan Lieber?

18     A.   I did not, no.

19     Q.   And why didn't you?

20     A.   The decision had been made by Jon Marquis, and that

21   was the decision that he made.

22     Q.   Did you care whether or not the decision to

23   terminate Dan Lieber was unlawful or lawful?

1    A.    Correct.

2    Q.    Okay.  Which is actually, really, a three-month

3  period of time.  So sometime within three months of Dan's

4  termination, he told you that Beth Anne had difficulty

5  walking on stairs, correct?

6    A.    At some point during that time, yes.

7    Q.    Okay.  Was there a particular reason that he came

8  to you and told you that she had difficulty walking on

9  stairs?

10    A.    This would have came up when we were discussing the

11  IT office at 40 Lowell.  It was --

12    Q.    Okay.  You and Dan were?

13    A.    Dan and I discussed having an IT presence at 40

14  Lowell Road, yes.

15    Q.    Okay.  So tell me everything you remember about the

16  discussion between you and Dan about having an IT office at

17  40 Lowell Road.

18    A.    I asked Dan that it would be -- I think it would be

19  a good idea to just have some help desk support at 40 Lowell,

20  just for, you know, simple things.  People's monitors, you

21  know, crash out, or they need replacement parts or just, you

22  know, day-to-day things.  I think it would be nice to have

23  somebody -- you know, help desk support at 40 Lowell, if

1   there was room to have them.

2        Q.   Okay.  And what did Dan say?

3        A.   Dan thought -- Dan agreed.

4        Q.   Wasn't there already an IT -- a small IT office on

5   the first floor of 40 Lowell Road by the fall of 2020?

6        A.   I'm not sure if we ever had -- ever had an IT

7   office there.

8        Q.   Okay.  So you're telling me that it was your idea

9   to have an IT office at 40 Lowell Road?

10       A.   Yes.

11       Q.   Okay.  And so that -- so then what -- why did a

12  discussion of the IT office at 40 Lowell Road cause Dan to

13  talk to you about Beth Anne Collopy having difficulty with

14  stairs?

15       A.   Because the -- the IT office was located on the

16  first floor, and operations made a decision that we would

17  hire a new PM for a new position that needed that office, and

18  that the IT office would have to be moved, and the suggestion

19  was that it be moved to the second floor.

20       Q.   And did Dan come and speak with you when he learned

21  that the plan was to move IT to the second floor?

22       A.   I believe he called me at some point.

23       Q.   Okay.  And what did he say when he called you?

1   IT office at 40 Lowell Road even though you were the one that

2   thought that there should be an IT office/help desk at 40

3   Lowell Road?

4        A.   There wasn't -- there was no space for it.

5        Q.   You mean no space for it on the first floor?

6        A.   Correct.

7        Q.   Okay.  So if Beth Anne Collopy had to go to 40

8   Lowell Road to give help desk assistance, what would she do?

9        A.   Beth Anne would not need to go to 40 Lowell to give

10  anyone assistance.

11       Q.   So IT never -- no one from IT ever went into 40

12  Lowell Road again after the decision was made that there

13  would no longer be an IT office at 40 Lowell Road?

14            MS. ZACCARDELLI:  Objection to form.

15       A.   IT did come over to 40 Lowell.

16       Q.   So you're telling me that IT came over, but not

17  Beth Anne Collopy?

18       A.   To my knowledge, yes.

19       Q.   Well, why is that?  Why did some people from IT go

20  to 40 Lowell Road, but Beth Anne Collopy did not?

21       A.   IT would come over to 40 Lowell if something needed

22  to be fixed or replaced.

23       Q.   But you're telling me that Beth Anne Collopy

1   to manager of help desk?

2        A.   I would have given Dan the discretion to do that,

3   but again, I didn't know Beth Anne.  He would have had to run

4   that decision by me.

5        Q.   Okay.  Looking at paragraph 21, did you know that

6   Beth Anne Collopy wore leg braces?

7        A.   I don't recall, no.

8        Q.   Did you know that she could not walk up or down

9   stairs safely beyond a single stair with handrails?

10       A.   Only after I learned that from Dan.

11       Q.   Okay.  So you were aware, because Dan Lieber told

12   you, correct?

13       A.   Correct.

14       Q.   Okay.  And then paragraph 22 says:  On or about

15   November 23rd, 2020, Dan Lieber's immediate supervisor, Chris

16   Moore, and Ryan Dogil, planning director for Select Demo,

17   stated that the IT support services area for 40 Lowell Road

18   would be moved to a second-floor cubicle space from the

19   existing very first -- small first floor secure and

20   accessible office.

21            Is that true?

22            MS. ZACCARDELLI:  Objection to form.

23       A.   Yeah, I don't recall saying -- yes, we did say that

1  we were going to move it to the second floor.

2      Q.   Okay.  And is it true that there's no elevator at

3  40 Lowell Road?

4      A.   That is correct.

5      Q.   Okay.  Is it true that you proposed that as an

6  accommodation, Beth Anne Collopy could use a shared

7  conference room on the first floor of the office at 40 Lowell

8  Road, or be prohibited from entering the building?

9          MS. ZACCARDELLI:  Objection to the form.

10     A.   I did not prohibit her from entering the building,

11 but as a reasonable accommodation, I said if she needed to

12 have a private conversation, she could use the conference

13 room on the first floor.

14     Q.   Okay.  And did Dan Lieber have a discussion with

15 you that day as described here at paragraph 24?

16         MS. ZACCARDELLI:  Well, you should let the witness

17 read the entire paragraph.

18     Q.   Go ahead, Mr. Moore.

19     A.   Paragraph 24?  Is that what you want me to read?

20     Q.   Yes.  And it goes onto the next page.  I might have

21 to scroll down a little bit at the end, so let me know when

22 you've read it.

23     A.   Thank you.  (Witness peruses document.)  You can

1  power or an accessible monitor or keyboard, physical network

2  access, phone setup, secure work area, private work area, or

3  technical supplies.

4          Are those issues that Dan raised to you?

5      A.   Yes.

6      Q.   And what did you say in response?

7      A.   I said, Dan, that's not true.  It has all of that,

8  in that room.

9      Q.   I'm sorry, you're telling me that the conference

10  room that you were proposing that Beth Anne use did have

11  accessible power; is that what you told him?

12     A.   Yes.

13     Q.   And you told him that it did have an accessible

14  monitor and keyboard?

15     A.   I'm not sure of all the specifics that he brought

16  up.  I know I told him that it was -- it had everything that

17  someone would need to conduct a meeting.

18     Q.   Okay.  Did you know if it had things that a

19  disabled employee would need to do work in that room?

20     A.   I'm not sure I understand the question, sorry.

21     Q.   Okay.  You didn't know one way or the other whether

22  or not it had equipment that was suitable for a disabled

23  employee; is that correct?

1     A.   It was more, we were just trying to get to know

2  each other, background is.  You know, she did bring up the

3  ADA, some of the ADA stuff.  And, you know, I told her that

4  it's okay for her to work remotely if she needs to work

5  remotely, and that she can have private conversations -- if

6  she needs to have private meetings, they can be conducted at

7  One Delaware, where she doesn't have to go to 40 Lowell.

8     Q.   Wait, I'm sorry, why was there a discussion about

9  her working remotely?

10    A.   She had asked me.

11    Q.   And why did she ask you to work remotely?

12         MS. ZACCARDELLI:  Objection to form.

13         THE WITNESS:  I can answer?

14    Q.   Yes.

15         MS. ZACCARDELLI:  You can answer, yep.

16    A.   It was in the winter, and she said because of icy

17  conditions, it's hard for her to get around, and that she

18  made an agreement with Dan that if the weather was poor, that

19  she'd be able to work remotely.  And I said that's fine.

20    Q.   Okay.  But did you discuss with her her request --

21  her request or Dan's request for reasonable accommodation

22  with regard to where the IT office was located at 40 Lowell

23  Road?

1  Mr. Moore and Mr. Watkins were aware that Mr. Lieber had

2  previously requested reasonable ADA accommodation for Beth

3  Anne Collopy at One Delaware Drive, which were provided in

4  early October 2020; specifically, dual handrails on either

5  side of a single step raised landing in the middle of the

6  building.

7           Did you recall that request for reasonable

8  accommodation with regard to the One Delaware Drive property?

9      A.   That request wasn't made through me.  I know that

10  it was done.  It was completed.

11      Q.   Did you know that -- did you know from Scott

12  Watkins that the request had been made?

13      A.   I'm not sure how I found out.

14      Q.   Okay.  But you knew that one was granted, correct?

15      A.   Correct.

16      Q.   Paragraph 27 says that you told Dan that Beth Anne

17  was not responsible for performing any work at 40 Lowell

18  Road.  Is that true?

19      A.   In not that harsh of words, yes.

20      Q.   So you did say that to Dan, and then did Dan

21  respond that what you had said was untrue?

22      A.   I believe we had a discussion about it.  I don't

23  know if "untrue" was the word.

1    Q.    And what was done about the issues that she raised?

2    Did you -- did the company ever investigate her allegations?

3    A.    Yes, it did.  We did.

4    Q.    Who investigated the allegations?

5    A.    Scott Watkins.

6    Q.    So Scott Watkins was the investigator.  Did he

7    write up a report after he finished his investigation?

8    A.    I believe so, yes.

9    Q.    He wrote a written report and gave -- and did he

10   give you a written report?

11   A.    I don't recall reading it.

12   Q.    Did he meet with you and tell you what the

13   conclusions were that he had reached after doing his

14   investigation into Beth Anne's claim of gender discrimination

15   and sexual harassment?

16        MS. ZACCARDELLI:  Objection to the form.

17   A.    Scott and I spoke about it after.

18   Q.    And what did Scott tell you that his conclusions

19   were?

20   A.    All I can -- I remember him just saying that he met

21   with the two other females in the IT department, and that

22   neither one of them feel like they're being discriminated

23   against.  That's all I can remember.

1  talking about like --

2       A.   March, April --

3       Q.   -- right before or around the time of COVID?

4       A.   It would have been March or April of 2020.

5       Q.   Okay.  And where did that meeting take place?

6       A.   That was in Dan's office.

7       Q.   Okay.  In what building?

8       A.   One Delaware.

9       Q.   Okay.  And tell me about that meeting.  What

10  happened at that meeting?

11      A.   I just recall telling Dan that I'm tired of getting

12  complaints about him and that, once again, he needs to be

13  more customer service oriented and be part of the team, and I

14  don't want to get any more -- any more complaints about him.

15      Q.   What did Dan say?

16      A.   I don't recall the specifics.  I think he just

17  said --

18      Q.   Did he say anything?

19      A.   Not that I recall.

20      Q.   So you said to him you were tired of getting

21  complaints about him.  You didn't want any more complaints

22  about him.  You wanted him to be more customer service

23  oriented.  And Dan literally said nothing in response?

1    gone?

2        A.    She said that she -- she doesn't think that Dan is

3    qualified for that role, and that's all I can remember.

4        Q.    Didn't she tell you the meeting had gone well?

5        A.    I don't recall.

6        Q.    So you don't believe she told you that the meeting

7    had gone well?

8        A.    I just said I don't recall if she said the meeting

9    went well.

10       Q.    Okay.  And then what was the next thing that

11   happened with respect to either Melissa Marquis or Dan Lieber

12   after she met with him on November 6th?

13       A.    Can you rephrase that question?

14       Q.    Sure.  What happened -- what happened with respect

15   to Dan Lieber or Melissa Marquis after their meeting on the

16   6th?

17       A.    That's when -- around the time Jon Marquis called

18   me to say, he once again asked about my exit plan.  And he

19   told me that he wants to terminate Dan Lieber.

20       Q.    What did you say?

21       A.    "Okay.  Let me work with Scott."

22       Q.    Okay.  And when you told him that you -- "let me

23   work with Scott," what did that mean?  It meant you went and