# TAB D

# In The Matter Of:

*Beth Anne M. Collopy vs.*
*Marquis Management, LLC*

*Deposition of Christopher F. Moore*
*Vol. I*
*June 14, 2023*

*Connelly Reporting & Video Services, Inc.*
*32 Gault Road*
*Bedford, NH 03110*
*(603) 472-5745*
*Contact: leslie@nhdepositions.com*

Original File Moore 6-14-23.txt
**Min-U-Script® with Word Index**

```
                                            VOLUME: I
                                            PAGES: 1-77

              UNITED STATES DISTRICT COURT
               DISTRICT OF NEW HAMPSHIRE


    * * * * * * * * * * * * * * * * * *

    BETH ANNE M. COLLOPY

    v.                              Civil Action No.
                                    1:22-CV-00184-SE

    MARQUIS MANAGEMENT, LLC

    * * * * * * * * * * * * * * * * * *



            DEPOSITION OF CHRISTOPHER F. MOORE

        This deposition taken using Zoom remote

        videoconferencing technology on Wednesday,

        June 14, 2023, commencing at 9:28 a.m.
```

```
 1         retrieved and searched, and any text messages that
 2         related to Ms. Collopy or any allegations in the
 3         case were produced.  So both phones were imaged,
 4         including the 2021 phone, and they've been turned
 5         all over to you.
 6   Q.    (BY MR. MEYER)  Sir, is that representation
 7         correct, to the best of your understanding?
 8   A.    Yes, it is.
 9   Q.    Sir, did Marquis experience a ransomware attack in
10         late 2020?
11   A.    Yes.
12   Q.    And was it ever determined what was the source of
13         that attack?
14   A.    I'm not exactly sure.
15   Q.    Was any report ever prepared regarding that
16         attack?
17   A.    I'm not sure if a report was prepared or not.
18   Q.    Who would likely -- sir, who would likely know the
19         answer to that question?
20   A.    I don't know.
21   Q.    I understand that a company was contracted by
22         Marquis to address that ransomware attack?
23   A.    Yes.
```

| | | |
|---|---|---|
| 1 | Q. | Do you know the name of that company? |
| 2 | A. | The name was Cynet. |
| 3 | Q. | Can you spell that for the record, please? |
| 4 | A. | C-y-n-e-t. |
| 5 | Q. | Sir, was a demand for ransom or payment ever made |
| 6 | | in conjunction with that attack? |
| 7 | A. | Yes. |
| 8 | Q. | And was any payment or ransom made? |
| 9 | A. | No. |
| 10 | Q. | Was a police report made in conjunction with that |
| 11 | | attack? |
| 12 | A. | I don't know if we did. |
| 13 | Q. | Did that attack do any sort of damage to the IT |
| 14 | | system in place at the time? |
| 15 | A. | They got access to certain sensitive data, |
| 16 | | employee data, but we were able to keep working |
| 17 | | with backup systems. |
| 18 | Q. | Was any data lost? |
| 19 | A. | Not that we discovered, no. |
| 20 | Q. | How long did it take to essentially remediate that |
| 21 | | attack? |
| 22 | | MS. ZACCARDELLI: Objection to the form. |
| 23 | A. | Close to two months. |

**Moore 6/14/23**

24

1   A.   No.  I met Beth Anne formally in early December.
2   Q.   But besides from your contact, did you actually
3        ever observe her performance?
4   A.   No.
5   Q.   Did you ever form an opinion -- excuse me.
6        There's a fire truck going by.
7           Did you -- let me start that question again.
8           Sir, did you ever form an opinion as to the
9        quality of her job performance?
10  A.   No.
11  Q.   Was her job performance ever evaluated, to the
12       best of your knowledge?
13  A.   Not that I know of.
14  Q.   Did you ever receive any compliments regarding her
15       job performance?
16          MS. ZACCARDELLI:  Objection to the form.
17  A.   Not that I can recall.
18  Q.   Sir, did you ever receive any complaints regarding
19       her job performance?
20  A.   Not that I can recall.
21  Q.   To your knowledge, did Ms. Collopy undergo a
22       90-day review?
23  A.   I do not know.

**Moore 6/14/23**

25

```
 1  Q.  Did Ms. Collopy ever complain to you about her job
 2      duties?
 3          MS. ZACCARDELLI:  Objection to the form.
 4  A.  Not that I'm aware of.
 5  Q.  I'm sorry.  You said not that you're aware of?
 6  A.  Not that I'm aware of, no.  We had a private
 7      conversation and we talked about help desk.
 8  Q.  And -- I'm sorry -- when did that conversation
 9      occur?
10  A.  I believe we had a conversation in early December.
11  Q.  And tell me what -- where did that conversation
12      occur?
13  A.  At 1 Delaware.
14  Q.  In her cubicle, or where at 1 Delaware?
15  A.  In the small conference room.
16  Q.  And what was the -- was there some reason for that
17      conversation?  Was it spontaneous or was it
18      something that was a meeting that was called for,
19      or what was the background and context?
20  A.  It was just after the termination of our CIO, and
21      I planned on meeting with each employee one on
22      one.
23  Q.  And please describe what you can recall of that
```

**Moore 6/14/23**

32

1   Q.   Putting Ms. Collopy aside, has Marquis ever
2        received any other complaint of gender or sex
3        discrimination or harassment?
4            MS. ZACCARDELLI: Objection.
5   Q.   To your knowledge.
6            MS. ZACCARDELLI: Objection to the form.
7   A.   To my knowledge, no.
8   Q.   And in terms of this complaint, what
9        investigation, if any, was done?
10  A.   In regards to this complaint?
11  Q.   Yes.
12  A.   Oh, I know our HR department met with our IT
13       department, specifically the female employees in
14       the IT department, to get their opinion on other
15       employees within the department. An investigation
16       was conducted by HR, and that's what was done.
17  Q.   Do you know if there was any findings based on
18       that investigation?
19  A.   We found there was no -- no gender discrimination.
20  Q.   Was there any finding made based upon
21       Ms. Collopy's access being restricted more than
22       that of other help desk employees?
23           MS. ZACCARDELLI: Objection to the form.

1  A.  I'm not sure if it was more than the other
2      employees.  We gave her access that she needed to
3      do her job.
4  Q.  Was any finding made in regard to her name being
5      removed from completed tickets?
6           MS. ZACCARDELLI:  Objection to the form.
7  A.  I don't know the answer to that.
8  Q.  Did Ms. Collopy allege, to your knowledge, that
9      some Teams data was deleted by the network
10     administrator?
11 A.  Yes, I believe that came up in a discussion.
12 Q.  Okay.  And was any investigation made into that?
13 A.  Yes, I believe HR conducted an investigation.
14 Q.  And was it determined that, in fact, the network
15     administrator had deleted data?
16          MS. ZACCARDELLI:  Objection to the form.
17 A.  I believe so.
18 Q.  Okay.  And what data had he deleted?
19 A.  I'm not sure.  I don't know.
20 Q.  Now, isn't the deletion of data outside of the job
21     duties of a network administrator?
22 A.  I don't know.
23 Q.  What was the rationale of the network

**Moore 6/14/23**

                                                                    39

| | | |
|---|---|---|
| 1 | A. | I don't -- no, I don't think so.  We had adequate |
| 2 | | accommodations for Beth Anne where she could work |
| 3 | | out of our conference room that had everything she |
| 4 | | needed to do her job if she needed to work at 40 |
| 5 | | Lowell. |
| 6 | Q. | So you don't think that she was being sincere in |
| 7 | | raising that concern? |
| 8 | A. | I don't know what her -- if she was being sincere |
| 9 | | or not.  I don't know what she was feeling. |
| 10 | Q. | Now, you said you had adequate -- adequate |
| 11 | | accommodations for her at 40 Lowell after the |
| 12 | | redesign of the facility.  What were those -- what |
| 13 | | was that adequate accommodation? |
| 14 | A. | There was power, monitors, the ability to hook up |
| 15 | | a laptop.  There was telephones.  It was -- there |
| 16 | | was doors so it could be private, if needed. |
| 17 | Q. | And you're referring to a space on the first |
| 18 | | floor, another space? |
| 19 | A. | Yes.  The conference room is on the first floor. |
| 20 | Q. | That conference room was there before the |
| 21 | | redesign? |
| 22 | A. | It's been there since -- |
| 23 | | MS. ZACCARDELLI:  Objection to the form. |

| | | |
|---|---|---|
| 1 | A. | Again, we were just going through a pretty bad |
| 2 | | cyber attack, and we just didn't know the source. |
| 3 | Q. | Just going to no. 2 above, is my understanding |
| 4 | | from that that her access was still being |
| 5 | | restricted as of that date, but that the plan was |
| 6 | | to restrict it -- to fix it as of the 25th? |
| 7 | A. | Yes.  We brought her access up to where it should |
| 8 | | be to effectively do her job. |
| 9 | Q. | Was there ever any explanation given as to why her |
| 10 | | access was reduced to the point that she couldn't |
| 11 | | effectively do her job? |
| 12 | | MS. ZACCARDELLI:  Objection to the form of |
| 13 | | the question. |
| 14 | A. | I don't know the answer to that. |
| 15 | Q. | Going, sir, to no. 7 -- a little further down -- |
| 16 | | now, in terms of the "a" about "Irving admitted he |
| 17 | | deleted it without going into details of why," and |
| 18 | | that was what Mr. Watkins said? |
| 19 | | MS. ZACCARDELLI:  Objection to the form. |
| 20 | A. | These aren't my notes, so... |
| 21 | Q. | I'm asking about your recollection. |
| 22 | A. | I'm not sure exactly who said it. |
| 23 | Q. | Did you ever discuss with Irving yourself why the |

```
 1        discussion at the meeting about how Ms. Collopy
 2        was going to be able to work in the future with
 3        the help team?
 4   A.   I just don't recall that part of the conversation.
 5   Q.   Is there anything of significance that occurred
 6        during this meeting of 1/25/2021 that you can
 7        recollect that's not contained in these notes?
 8   A.   No, not that I can recall.
 9   Q.   Was a --
10             MR. MEYER:  You can remove that from the
11        screen.  Thank, you Megan.
12   Q.   Mr. Moore, was a replacement hired for Mr. Lieber?
13   A.   I'm sorry.  You said was a replacement hired?
14   Q.   Hired, yes.
15   A.   Hired?
16   Q.   Yes, to replace Mr.  Lieber.  Mr. Lieber, I think,
17        was terminated, correct?
18   A.   That is correct.
19   Q.   And was somebody hired to replace him in his
20        position?
21   A.   Yes.
22   Q.   And who was that person?
23   A.   Michael Fruhbeis.
```

```
 1  Q.   And when was Mr. Fruhbeis hired?
 2  A.   His first day on the job was February 22.
 3  Q.   And did Mr. Fruhbeis have a family relationship
 4       with any other manager at Marquis?
 5  A.   Yes.
 6  Q.   And what was that relationship and with whom?
 7  A.   He's the brother-in-law of Mr. Watkins.
 8  Q.   Was there any gap between the date he was actually
 9       hired and the date he began work?
10            MS. ZACCARDELLI:  Objection to the form.
11  A.   We offered him the job, and he needed to put in a
12       two- or a three-week notice with his current
13       employer at the time.  I'm not sure exactly the
14       gap.
15  Q.   So you would -- he would have been offered the job
16       several weeks before February 22?
17  A.   Yes, at least two.
18  Q.   Were you involved in the hiring process for him?
19  A.   Yes, I was.
20  Q.   And prior to his hire, did you have any
21       conversation with him regarding Ms. Collopy and/or
22       any of the complaints that she made?
23  A.   No.  No, I did not.
```

```
 1  Q.   Upon his hire, did you have any conversations with
 2       him, starting on February 22, about -- regarding
 3       Ms. Collopy?
 4  A.   Can you repeat that?  I didn't get the first part.
 5  Q.   After Mr. Fruhbeis began his employment, did you
 6       have any conversations, discussions, or other form
 7       of communication with him about Ms. Collopy?  And
 8       for the moment I'm limiting it to up until the
 9       time that he made the decision to terminate her.
10       Up until that time did you have any conversations
11       or communications with him about her?
12  A.   No.  We let -- I let Mike do what he needed to do.
13  Q.   Did you let him know that Ms. Collopy had made a
14       gender discrimination complaint?
15  A.   I did not, no.
16  Q.   Did you let him know that she made an integrity
17       complaint?
18  A.   No.
19  Q.   Did you let him know that she made an
20       accessibility complaint?
21  A.   No.
22  Q.   Did you let him know that Mr. Santos had been
23       issued a written warning?
```

**Moore 6/14/23**

53

```
 1  A.   I don't believe so, no.
 2  Q.   Did -- to your knowledge, did anybody advise
 3       Mr. Fruhbeis of any one of those facts?
 4  A.   I don't believe so, no.
 5  Q.   Was there any discussion with Mr. Fruhbeis before
 6       he was hired or before he started work about the
 7       functioning of the help desk?
 8            MS. ZACCARDELLI:  Objection.
 9  Q.   To your knowledge.
10            MS. ZACCARDELLI:  Objection to the form.
11  A.   I spoke with Mike a few times before he came on
12       board as a consultant.
13  Q.   And you said, "Came on board as a consultant."
14       Was he employed as a consultant prior to
15       February 22?
16  A.   No.
17  Q.   Did he ever work as a consultant as opposed to an
18       employee?
19  A.   No.
20  Q.   So when you had several conversations with him
21       about the functioning of the help desk, what time
22       frame are we talking about?
23            MS. ZACCARDELLI:  Objection to the form of
```

```
 1          the question.  That's not what he said.
 2               You can answer Mr. Moore.
 3   A.     I'm sorry.  Can you repeat that?
 4               MR. MEYER:  Megan, could you read it back,
 5          please.
 6               (Requested testimony read.)
 7   A.     I'm not sure of the exact time frame.
 8   Q.     Well, would those conversations have occurred
 9          before or after February 22 or before and after?
10               MS. ZACCARDELLI:  Objection to the form.
11   A.     They would have been before February 22.
12   Q.     And tell me what you can recall of the substance
13          of those conversations.
14   A.     All I can recall is Mike advising us on the
15          different roles people should have to do their
16          job.
17   Q.     And what did he say about those different roles?
18   A.     I'm not sure.  He gave a list of certain roles
19          that I didn't completely understand.
20   Q.     Was that list a written list, or was that
21          something that he just gave you orally?
22   A.     I'm not sure.
23               MR. MEYER:  Okay.  I would note for the
```

1   A.   Other times there would be another person.
2   Q.   And who was that other person?
3   A.   Mr. Watkins.
4   Q.   And tell me what you recall of the conversations
5        you and Mr. Watkins had with Mr. Fruhbeis about
6        the help desk.
7   A.   About the help desk, I have no -- I don't recall
8        any specific conversations about the help desk
9        with Mr. Watkins.
10  Q.   Well, until February 22, you were in charge of the
11       help desk, correct?
12            MS. ZACCARDELLI:   Objection to the form.
13  A.   That is correct.
14  Q.   Okay.  And to your observation, up until that time
15       frame, during the time that you were in charge of
16       the help desk, how well was it functioning?
17  A.   You're saying during the time I was in charge of
18       the help desk?
19  Q.   Correct.
20  A.   It seemed to be going okay.  We were still in the
21       middle of a cyber attack, and we were without a
22       CIO.  So our main goal was just to make sure that
23       people's -- people's needs were addressed.  Given

1  A.  I'm not sure.  We restored everyone's access to
2      where it should be.
3              (Reporter interjects.)
4              MS. ZACCARDELLI:  "Restored."  Go ahead,
5      Chris.
6  A.  We restored people's access to where they should
7      be.
8  Q.  Did you -- did he -- at any point after this, the
9      receipt of this warning, did he talk to you about
10     monitoring employees?
11 A.  I don't recall specifics, the specifics that
12     Irving and I had.  I said we had many
13     conversations during this time.
14 Q.  Right.  But putting aside specifics, did he come
15     back to you at any point after this and ask for
16     authority or permission to monitor other
17     employees?
18 A.  We wanted to make sure that he was monitoring the
19     two other help desk employees as well.
20 Q.  Did he ever come back to you after this and say,
21     "I want permission," or something along those
22     lines, "to monitor person X or person Y"?
23 A.  I don't recall.