# TAB F

# In The Matter Of:

*Beth Anne M. Collopy vs.*

*Marquis Management, LLC*

---

*Deposition of Scott R. Watkins*

*Vol. I*

*June 16, 2023*

---

*Connelly Reporting & Video Services, Inc.*

*32 Gault Road*

*Bedford, NH 03110*

*(603) 472-5745*

*Contact: leslie@nhdepositions.com*

Original File Watkins 6-16-23.txt

**Min-U-Script® with Word Index**

                                        VOLUME: I
                                        PAGES: 1-99


                    UNITED STATES DISTRICT COURT
                     DISTRICT OF NEW HAMPSHIRE


    * * * * * * * * * * * * * * * * * *

BETH ANNE M. COLLOPY

v.                                      Civil Action No.
                                        1:22-CV-00184-SE

MARQUIS MANAGEMENT, LLC

    * * * * * * * * * * * * * * * * * *


              DEPOSITION OF SCOTT R. WATKINS

        This deposition was taken using Zoom remote

    videoconferencing technology on Friday, June

    16, 2023, commencing at 10:58 a.m.

**Watkins 6/16/23**

22

| | | |
|---|---|---|
| 1 | | holding that job title has responsibilities in |
| 2 | | regard to the network? |
| 3 | | MS. ZACCARDELLI:  Objection to the form. |
| 4 | A. | I am unsure, as I did not create that job title or |
| 5 | | this job description. |
| 6 | Q. | Well, if you can scroll down to No. 6. |
| 7 | | Does No. 6 state a job duty relating directly |
| 8 | | to network infrastructure? |
| 9 | A. | Yes. |
| 10 | Q. | To your knowledge, was this an accurate |
| 11 | | description of the position for which she was |
| 12 | | hired? |
| 13 | | MS. ZACCARDELLI:  Objection to the form. |
| 14 | A. | I have no idea.  As I told you, my knowledge of IT |
| 15 | | is very limited. |
| 16 | Q. | Well, would Ms. Collopy have, as part of her |
| 17 | | hiring process, received a copy of this job |
| 18 | | description? |
| 19 | A. | I'm not sure.  I don't know. |
| 20 | Q. | You don't know that employees are given their job |
| 21 | | descriptions? |
| 22 | A. | Some employees have received them, other employees |
| 23 | | have not. |

**Watkins 6/16/23**

33

1    Q.   Is that the e-mail you received?  Did you receive

2         that e-mail in January?

3    A.   Sir, I'm sorry.  You keep breaking up.  I don't --

4         I think it's when you lean closer to your

5         microphone.

6    Q.   Did you receive that e-mail on January 14?

7    A.   Yes.

8    Q.   And once you received it, what, if anything, did

9         you do?

10   A.   I believe I responded to Beth Anne.

11   Q.   How did you respond?

12   A.   Through an e-mail.  As you scroll up, you can see

13        that I responded the next morning at 9:06 a.m.

14   Q.   And beyond responding to her, what, if anything,

15        else did you do?

16   A.   I tried to schedule a meeting with her, asked

17        her -- told her I would like to meet on Monday, if

18        possible.

19   Q.   And did you, in fact, meet with her?

20   A.   On Monday, which would have been the 18th, yes, I

21        believe I did.

22   Q.   And tell me what your recollections are of that

23        meeting.

**Watkins 6/16/23**

34

```
 1   A.   I remember meeting with Beth Anne.  I had Nikolina
 2        Gobron with me to take notes, and we went through
 3        each one of Ms. Collopy's concerns.
 4   Q.   Did you notify Mr. Jon Marquis of this complaint?
 5   A.   I don't believe I did, no.
 6   Q.   Did you notify him at any point?
 7   A.   I don't think I discussed it with him.  I believe
 8        I discussed it with Chris Moore, as he sent me the
 9        e-mail.
10   Q.   Do you report to Mr. Moore?
11   A.   Yes, I do.
12   Q.   Following this meeting on the 18th, did you
13        undertake an investigation?
14   A.   Yes.  I looked into Beth Anne's concerns.  As I
15        said, this e-mail was very concerning.
16   Q.   Did anybody aside from yourself assist you with
17        the investigation?
18   A.   I believe, when I spoke to Irving Santos, Chris
19        Moore was with me, as he was head of the -- the de
20        facto head of IT at that time.
21   Q.   As part of your investigation, did you review any
22        records?
23   A.   No, I don't believe I did.
```

**Watkins 6/16/23**

35

1  Q.  Did you interview any witnesses?

2  A.  I spoke to people, correct.

3  Q.  Who did you speak to?

4  A.  Irving Santos, Erin Lyle, and Tina Radigan, whose

5      now last name is Bailey.

6  Q.  Now, Ms. Collopy worked with three other people at

7      the help desk; is that correct?

8  A.  Than those named, yes.

9  Q.  And all three are male, or were male?

10 A.  Correct.

11 Q.  Did you interview any one of the three of them?

12 A.  I did not.

13 Q.  Was there a reason you decided not to interview

14     them?

15 A.  Because I received the information I need from the

16     other three individuals that confirmed what

17     Ms. Collopy was telling me.

18 Q.  Did you take any notes of your interviews?

19 A.  If I had, I would have turned those over; so

20     unless you received some, I don't believe so.  I

21     can't recall.

22 Q.  In speaking with the witnesses, did you give them

23     any instructions?

**Watkins 6/16/23**

```
 1              MS. ZACCARDELLI:  Objection to form.
 2   A.   I asked them not to repeat these conversations.
 3   Q.   Sir, not to what these instructions?
 4   A.   I did not ask them to repeat any of the
 5        conversations that we had.  It was confidential.
 6   Q.   Did any of these witnesses express animosity
 7        towards Ms. Collopy?
 8   A.   I believe Irving Santos was frustrated, but I
 9        wouldn't call it an animosity, no.  The other two
10        were fine with Ms. Collopy.
11   Q.   And what was -- what was the source of his
12        frustration?
13   A.   Irving had stated that she was downloading big
14        chunks of information from our servers without any
15        authorization.
16   Q.   Did he have any other reason to -- other complaint
17        or criticism of her?
18   A.   I'm sorry.  Can you repeat that?
19   Q.   Did he have any other complaint or criticism
20        regarding her?
21   A.   I believe he said that he didn't believe she was
22        very productive, but I believe that's it.
23   Q.   Now, did you talk to Ms. Collopy about this
```

**Watkins 6/16/23**

38

| | | |
|---|---|---|
| 1 | Q. | All right.  I'd like you to have a chance to |
| 2 | | review this document marked as Exhibit 11. |
| 3 | | THE DEPONENT:  The controls are not really |
| 4 | | working. |
| 5 | A. | Okay. |
| 6 | Q. | All right.  Sir, if you scroll back up to No. 2. |
| 7 | A. | I'm sorry.  What number? |
| 8 | Q. | No. 2.  Now, are these notes of the two meetings |
| 9 | | that you had with Ms. Collopy? |
| 10 | A. | These were notes that Nikolina Gobron took of our |
| 11 | | first meeting, in which she told me about her |
| 12 | | concerns, and the second meeting after I looked |
| 13 | | into her concerns. |
| 14 | Q. | Were these meetings -- were these notes ever |
| 15 | | shared with Ms. Collopy? |
| 16 | A. | I don't believe so. |
| 17 | Q. | To the best of your recollection, are these notes |
| 18 | | accurate in terms of what happened at the |
| 19 | | meetings? |
| 20 | A. | Yes. |
| 21 | Q. | Now, No. 2a, Ms. Collopy complains about lack of |
| 22 | | access, and says she's the only one limited; all |
| 23 | | the other men have no problem with access. |

39

1            Based on your investigation, was that an

2     accurate complaint?

3            MS. ZACCARDELLI:  Objection to form.

4  A.   From what I learned, it was not accurate.

5  Q.   Why was it not accurate?

6  A.   Access was being limited for everyone based on the

7     cyber attack that happened, I believe it was

8     December 4th or 5th.

9  Q.   And what do you base that information on, or that

10    conclusion?

11 A.   I base that off of what Irving Santos said to us

12    when we spoke with him.

13 Q.   Aside from Santos saying that access was reduced

14    for everybody, do you have any other basis for

15    saying -- for reaching that conclusion?

16 A.   I believe that Chris Moore confirmed this with the

17    cyber attack company that we were dealing with.

18 Q.   Is that what Mr. Moore told you?

19 A.   I believe so.  I would have only heard it from

20    either Chris Moore or Irving Santos.

21 Q.   Drawing your attention, sir, to No. 3, in which

22    she complains about having her documents reviewed

23    by Matt and Irving, did you investigate that

**Watkins 6/16/23**

1            allegation?

2     A.    I did.

3     Q.    And what did you determine?

4     A.    So when she had mentioned to me that it was an

5            integrity issue, she never told me about tickets

6            being changed, but told me that it was an

7            integrity issue because Matt and Irving were

8            viewing the documents that she had on the system.

9            So, as you see here, under "a" she says, "It is an

10           integrity problem."

11                So I believe earlier I misspoke when I said

12           that I confirmed that her tickets were being

13           changed.  I don't think I learned about that until

14           these depositions.  She did say that they were

15           accessing her files or documents.  I confirmed

16           that that did occur.

17    Q.    How did you determine that did occur?

18    A.    Because I spoke to both Irving -- I'm going to say

19           I spoke to Irving.  I'm not quite sure if I spoke

20           to Matt about that.  According to Beth Anne, Matt

21           had only accessed them on December 2 and had never

22           done it again.  I also didn't see it as a problem.

23    Q.    You didn't see it as a problem, him accessing her

**Watkins 6/16/23**

1    A.    Okay.

2    Q.    My question is:  Did you investigate that

3          allegation?

4    A.    I did speak to, I believe, Erin Lyle about this,

5          and she said that everyone was on edge due to Dan

6          leaving and also the cyber attack; so, yes, there

7          was some disconnect within the department.

8    Q.    But was Ms. Lyle a member of the help team?

9                MS. ZACCARDELLI:  Objection to the form.

10   A.    She was a member of the IT department.

11   Q.    Was she a member of the help desk team?

12   A.    No.

13   Q.    Did you ask anybody on the help desk team about

14         this allegation?

15   A.    I do not recall.

16   Q.    Address your attention now to No. 5 --

17   A.    Okay.

18   Q.    -- with the heading "Requests for help not

19         answered."

20             Did you investigate that allegation?

21   A.    Yes.

22   Q.    How did you investigate it?

23   A.    I believe she was speaking about Irving Santos,

**Watkins 6/16/23**

43

1          and so I spoke to him along with Chris Moore.

2    Q.    What's your basis for saying that she was talking

3          about Mr. Santos?

4    A.    Because she was saying that Irving was not

5          responding to her.  If you see under c, No. II,

6          Irving said, "I'll get to it.  I'm busy and can't

7          troubleshoot your chat now."

8              I believe she was talking about her Teams

9          meeting chats.

10   Q.    It says, "Her requests for help are marked as

11         unimportant and there is no sense of urgency on

12         anything she asks."

13             So you said you spoke to Mr. Santos about

14         that?

15   A.    Those are her words and not mine.

16   Q.    I know, but that's what she complained about,

17         right?

18             MS. ZACCARDELLI:  Objection to form.

19   A.    She complained about requests about her Microsoft

20         Teams chats, correct.

21   Q.    No.  I'm not -- it says, "All her requests for

22         help (tickets) are marked as unimportant and there

23         is no sense of urgency on anything she asks."

**Watkins 6/16/23**

44

```
1            That's 5a.  Is that an accurate statement of
2       her complaint on that subject?
3   A.  I believe she put in tickets to Irving Santos
4       about her Teams chats, as I've already answered.
5            MS. ZACCARDELLI:  I'm sorry.  I'm sorry.
6       Mr. Meyer, let him answer your question.  He's
7       answering your question.  Please don't interrupt
8       the witness until he finishes answering the
9       question.
10           MR. MEYER:  He definitely was not answering
11      the question, but I certainly --
12           MS. ZACCARDELLI:  He is answering the
13      question.  He's absolutely answering the question.
14      He's explaining to you what "a" is related to.
15  Q.  (BY MR. MEYER)  Sir, do you know what Microsoft
16      Team is?
17  A.  Yes.
18  Q.  What is it?
19  A.  It is a way for people to video conference, and I
20      believe it came to my attention that there is a
21      chat option on there or a texting type of, part of
22      it.
23  Q.  Does Microsoft Team include anything regarding
```

**Watkins 6/16/23**

45

```
1        tickets?  Did you send help tickets through
2        Microsoft Team?
3   A.   No, but you would send in a ticket if you had an
4        issue with Microsoft Team.
5   Q.   Right.  But when she says, 5a, "All her requests
6        for help (tickets) are marked as unimportant," do
7        you interpret that to mean the complaint about
8        deletion of Microsoft Team and nothing else?
9             MS. ZACCARDELLI:  Objection to form.
10  Q.   Is that your interpretation?
11  A.   I believe she's saying the requests that she put
12       in for help through issuing a ticket to Irving
13       Santos was marked as "no urgency" by Irving
14       Santos, and she was frustrated by that.
15  Q.   And what did Mr. Santos -- what was Mr. Santos'
16       response to that?
17  A.   Mr. Santos said that he was dealing with a cyber
18       attack, as he was our point person with the
19       companies that we were using to remediate it, so
20       could not get to that.
21  Q.   Now, you had earlier referenced deleted files on
22       Microsoft Team.  What, if any, files were deleted
23       on Microsoft Team?
```

**Watkins 6/16/23**

51

1    Q.   Sir, if you could go down under the second

2         meeting, 1/25/21.

3              THE DEPONENT:  I no longer have control.

4                (Reporter interjects.)

5    A.   Okay.

6    Q.   Sir, while you were conducting this investigation,

7         did you discuss it with Mr. Fruhbeis?

8    A.   I don't believe so.  I believe the only thing that

9         we spoke to Mr. Fruhbeis about was access for

10        certain roles without getting into the reasoning

11        why we were asking.

12   Q.   Did Mr. Fruhbeis --

13             MS. ZACCARDELLI:  I can't hear you.  I

14        cannot hear you, Jon.

15   Q.   Had Mr. Fruhbeis been hired at that point by

16        Marquis?

17   A.   I can't remember the date of his offer letter.  I

18        believe so.

19   Q.   Tell me, as best you can recall, what the

20        conversation you had with him, what you said and

21        what he said.

22   A.   I don't know past the generality that we spoke

23        about access for individuals during the cyber

**Watkins 6/16/23**

54

1          MS. ZACCARDELLI:  Objection to form.

2    A.   I believe so, yes.

3    Q.   Did you do anything to follow up or investigate

4         this data?

5    A.   I believe this is where Chris and I spoke with

6         Irving Santos.

7    Q.   Did you show him this e-mail?

8    A.   Did I show who?

9    Q.   Mr. Santos.

10   A.   No.

11   Q.   Aside from talking to Mr. Santos about it, did you

12        do any other type of investigation of this

13        particular information?

14   A.   I don't believe anything else was needed, as

15        Mr. Santos confirmed that he had.

16          MR. MEYER:  Megan, can you please put

17        Exhibit 10 on the screen.

18            (Document screen-shared.)

19   Q.   Sir, if you could scroll down to your e-mail on

20        the bottom of the page.  Have you had a chance to

21        read that e-mail, sir?

22   A.   Yes.

23   Q.   Now, it says at that point -- there's an apparent

**Watkins 6/16/23**

1        parentheses in the first sentence, which says,

2        "Still digging deeper into all of the facts."

3              What were you doing to investigate at that

4        point?

5   A.   I can't remember the timeline of my investigation

6        but I'm sure I was finishing up.

7   Q.   You say, "I do believe there is an issue with how

8        access privileges have been determined by Irving."

9              What was the issue in your mind?

10  A.   I believe Irving restricted members within the IT

11       department without seeking authorization from

12       Chris to do so based on recommendations by the

13       cyber mitigation team we had contracted with.

14  Q.   Sir, was Irving aware that Ms. Collopy alleged

15       that she was -- he was excessively restricting her

16       access?

17              MS. ZACCARDELLI:  Objection to the form.

18  A.   I don't understand your question.

19  Q.   Was Irving -- did you notify Irving that

20       Ms. Collopy was alleging that he was restricting

21       her access and monitoring her private

22       communication?

23  A.   I don't believe I told Irving that it was coming

**Watkins 6/16/23**

```
 1        Fruhbeis?
 2   A.   I was part of the interview process.  I sent him
 3        the offer letter.  I let him know that the
 4        position was available through my sister.  That's
 5        about it.
 6   Q.   Aside from your involvement, what else occurred as
 7        part of the hiring process?
 8   A.   We posted the position.  We interviewed I believe
 9        it was three or four different candidates.  I set
10        up interviews with both the IT team, as well as
11        the senior managers, including myself and Chris
12        Moore.
13   Q.   Did you brief him about the position?  Did you
14        brief him about the position before he was hired?
15   A.   I believe I sent him the job description.
16   Q.   Did you discuss with him before he was hired any
17        issues with the help desk?
18   A.   No.
19   Q.   Did you -- after he was hired, did you advise him
20        that there were issues or concerns with the help
21        desk?
22   A.   No.
23   Q.   Did you advise him that Mr. Santos had recently
```

**Watkins 6/16/23**

68

```
 1        received a written warning?
 2   A.   No.
 3   Q.   Was your -- the fact that you didn't give him any
 4        of this information, was that intentional?
 5   A.   Yes.
 6             MS. ZACCARDELLI:   Objection to the form.
 7   Q.   What was your -- what was the reason behind your
 8        omission?
 9   A.   Mike Fruhbeis had requested, and even if he
10        hadn't, it's common practice for me to not tell a
11        manager coming in any kind of issues or concerns
12        because we believe that they can -- they should
13        form their own opinion on the team and the
14        department.
15   Q.   Did you ever convey to him any concerns about the
16        potential for retaliation?
17   A.   Ever?
18   Q.   Ever.
19   A.   Yes.
20   Q.   Okay.  And when did you discuss with him the issue
21        of retaliation?
22   A.   I believe once Beth Anne Collopy had gone and
23        brought it up with Mike Fruhbeis in a meeting.
```

**Watkins 6/16/23**

70

1        brought to my attention before.  And I believe

2        Mike told me that he had asked if it was still

3        continuing.  And I don't believe it had been.  I

4        believe that she was happy.  Ms. Collopy had

5        expressed to me that she was very happy with the

6        hiring of Mike Fruhbeis.

7   Q.   Wait.  Ms. Collopy expressed to you that she was

8        very happy?

9   A.   With the hiring of Mike Fruhbeis.

10   Q.   Right.  But did she ever express to you that the

11        problems in the help team were not continuing?

12           MS. ZACCARDELLI:  Objection to the form.

13   A.   We had asked her if there was any kind of

14        continuation, to let us know immediately; and

15        since we didn't hear from her, we believed that

16        everything was okay.

17   Q.   When you asked her that, was that at that meeting

18        on the 21st?

19   A.   Yes.

20           MS. ZACCARDELLI:  Objection to the form.

21   Q.   I'm sorry.  The meeting on the 25th.

22         So that's what Mr. Fruhbeis said to you.

23        What did you say to him?

**Watkins 6/16/23**

71

| | | |
|---|---|---|
| 1 | A. | I asked him if there was any new concerns that I |
| 2 | | should know about, and what did -- how did he |
| 3 | | respond.  He told me he responded that if there |
| 4 | | were any kind of issues, that she should go to me |
| 5 | | directly. |
| 6 | Q. | And you told him that she already had? |
| 7 | A. | Well, I had told him that this had happened in |
| 8 | | January and, again, reiterate to her if there was |
| 9 | | any new concerns, I needed to know right away so I |
| 10 | | could address them.  Again, I'm paraphrasing here. |
| 11 | Q. | Did the issue of retaliation come up in your |
| 12 | | conversation with Mr. Fruhbeis? |
| 13 | A. | No. |
| 14 | Q. | When you hired Mr. Fruhbeis, did you or anybody |
| 15 | | else ask him to reorganize the department? |
| 16 | A. | No.  Well, not that I'm aware of.  I did not. |
| 17 | Q. | How did you find out about his plan to terminate |
| 18 | | Ms. Collopy? |
| 19 | | MS. ZACCARDELLI:  Objection to form. |
| 20 | A. | I believe he told me that he was evaluating the |
| 21 | | department and didn't believe that he had the |
| 22 | | right people in the right positions. |
| 23 | Q. | Was he more specific than that? |

**Watkins 6/16/23**

1   Q.   But how did he know what her earlier concerns

2       were?

3   A.   Well, again, I'm paraphrasing.  I'm sure he

4       discussed what the concerns were, and I asked him

5       if there was anything new other than that, as we

6       had discussed that and had resolved that in

7       January.

8   Q.   Resolved that in January?

9   A.   We had resolved her concerns.

10   Q.   Is there any documentation from you or her her

11       concerns were resolved?

12   A.   I don't believe so.

13   Q.   She complained of gender discrimination, correct?

14             MS. ZACCARDELLI:  Objection to the form.

15   Q.   Did she complain of gender discrimination?

16   A.   At what time?

17   Q.   When you met with her in January.

18   A.   Yes.

19   Q.   Okay.  And did you make a determination as to

20       whether gender discrimination had occurred?

21             MS. ZACCARDELLI:  Objection to the form.

22   A.   In my e-mail to her it stated that I do not

23       believe that there was any type of gender

**Watkins 6/16/23**

86

1    Q.   She complained to you in the January meeting about

2         how other team members treated her; is that

3         correct?

4             MS. ZACCARDELLI:  Objection to the form of

5         the question.

6    A.   I'm sorry.  There's a lot of feedback coming from

7         you when you lean forward.

8    Q.   Did she complain to you at your meeting with

9         him -- at your meeting with her about how other

10        team members treated her?

11            MS. ZACCARDELLI:  Objection to the form.

12    A.   Which meeting?

13    Q.   The meeting on January 18.

14    A.   Yes.

15    Q.   Okay.  And in your mind was that problem resolved?

16    A.   Not on January 18 it was not, but when we spoke on

17        January 25, yes.

18    Q.   On January 25 that meeting -- that issue was

19        resolved?

20    A.   I believe so, yes.

21            MR. MEYER:  Can you please put Exhibit 11

22        back on the screen.

23           (Document screen-shared.)

**Watkins 6/16/23**

88

1          problems with her?  Why don't they want to help or

2          work with me?

3                In your opinion is that a statement by her,

4          as paraphrased, of resolution?

5                MS. ZACCARDELLI:  Objection to the form.

6     A.   These are questions.  I can't recall the answers

7          that were given to her.

8     Q.   Are those questions consistent with her saying the

9          problems had been resolved?

10               MS. ZACCARDELLI:  Objection to the form.

11    A.   No, but me saying that "Measures were taken.  The

12         problem was taken seriously.  If everything else

13         comes up, inform us right away."

14               She did not.  So -- so, to my belief, nothing

15         else came up.

16    Q.   What measures were taken to improve her

17         relationship with other members of the team?

18               MS. ZACCARDELLI:  Objection to the form.

19    A.   I don't know.  She was told she could work from

20         home if she'd like to.  She did not want to engage

21         with the other members of that department.

22               MR. MEYER:  Put on the screen Exhibit 16.

23               (Document screen-shared.)

91

1       position as contrasted to eliminating the position

2       of one of the other members of the help desk team?

3              MS. ZACCARDELLI:  Objection to the form.

4       Objection to the form.

5   A.  The only rationale I have is what you see here in

6       this document.  You would have to ask Mike

7       Fruhbeis.

8   Q.  So you yourself don't know what the rationale was?

9              MS. ZACCARDELLI:  Objection to the form.

10  A.  I'm saying all I know is what's on this document.

11  Q.  Does this document state what the rationale is for

12      eliminating her position as compared to one of the

13      three others?

14  A.  Yes.

15  Q.  What is that rationale?

16  A.  "Beth Anne does not have the skill set needed to

17      perform either of the newly created positions that

18      are needed for the success of the IT department.

19      There is also a high level of tension and

20      negativity when Beth Anne is on a project or

21      working with team members.  This causes delays,

22      inefficiencies within the team and creates morale

23      issues.  She also feels that certain

**Watkins 6/16/23**

92

1        responsibilities are beneath her and refuses to

2        learn most help desk functions like device setup

3        and configuration, device deployment and

4        troubleshooting tickets."

5              He also goes on further to give a summary, if

6        you'd like me to read that as well.

7    Q.   So your only understanding is what you just read?

8    A.   I told you we relied on the vice president of

9        technology to go and make decisions based off his

10       department.

11   Q.   Did Ms. Collopy ever tell you -- did Ms. Collopy

12       ever tell you --

13   A.   As I would a project manager, if the president of

14       New England Finish told me that that person wasn't

15       qualified for that role.

16   Q.   Well, as HR manager, don't you have some role in

17       terms of qualifications?  Isn't that part of your

18       job, to evaluate qualifications?

19   A.   No.  It's the hiring manager's job.

20   Q.   Well, getting back to your conversation with

21       Mr. Fruhbeis, was anything else said other than

22       what you've already stated?

23   A.   Not that I recall.