# TAB H

# In The Matter Of:

*Beth Anne M. Collopy vs.*
*Marquis Management, LLC*

---

*Deposition of Michael D. Fruhbeis*
*Vol. I*
*June 20, 2023*

---

*Connelly Reporting & Video Services, Inc.*
*32 Gault Road*
*Bedford, NH 03110*
*(603) 472-5745*
*Contact: leslie@nhdepositions.com*

Original File Fruhbeis 6-20-23.txt
**Min-U-Script® with Word Index**

VOLUME: I
PAGES: 1-118

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW HAMPSHIRE

* * * * * * * * * * * * * * * * * * *

BETH ANNE M. COLLOPY

v.                                    Civil Action No.
                                      1:22-CV-00184-SE

MARQUIS MANAGEMENT, LLC

* * * * * * * * * * * * * * * * * *

DEPOSITION OF MICHAEL D. FRUHBEIS

This deposition was taken using Zoom remote

videoconferencing technology on Tuesday, June

20, 2023, commencing at 2 p.m.

Fruhbeis 6/20/23

15

1          department was currently operating efficiently?

2    A.    No.  They just told me that Dan Lieber is -- was

3          let -- was let go.

4    Q.    Do you recall the date on which you accepted the

5          offer?

6    A.    I don't recall the actual date.  I think it was in

7          January.

8    Q.    When did you actually start work?

9    A.    February 22, around that time; it was a Monday.

10   Q.    So during the period between when you accepted the

11         offer in January and when you actually started

12         work on, you said approximately February 22, did

13         you have any further communication with anybody at

14         Marquis?

15   A.    Yes.

16   Q.    Please describe that communication.

17              MS. ZACCARDELLI:  Objection to form.  Go

18         ahead.  Sorry.

19   A.    I was asked to -- it was four to six weeks before

20         my start date.  I was asked to be available to

21         consult if any items might have arisen that needed

22         my IT expertise.

23   Q.    Asked by whom?  Sir, asked by whom?

Fruhbeis 6/20/23

20

1  Q.  And do you recall who you made connections with?
2  A.  I don't really recall.  I have so many
3      connections.
4  Q.  Do you recall when you connected with the IT staff
5      or any members of the IT staff?
6  A.  No.
7  Q.  Do you recall whether it was before or after you
8      were hired?
9  A.  I would assume after I was hired because I didn't
10     know any of the names of the employees.
11 Q.  Do you know if it was before or after you started
12     work?
13          MS. ZACCARDELLI:  Objection to form.
14 A.  I don't know.  I don't recall.
15 Q.  Did you ever connect with Ms. Collopy?
16 A.  I do not -- I don't think so.
17 Q.  Sir, during the course of the hiring process, was
18     there ever any discussion about reorganizing the
19     IT department?
20 A.  No.
21 Q.  Prior to your actually starting work, were you
22     informed by Mr. Moore or Mr. Watkins or Mr. Santos
23     regarding any concerns about or by Beth Anne

**Fruhbeis 6/20/23**

21

1    Collopy?

2  A.   Before starting work?

3  Q.   Correct.

4  A.   No.

5  Q.   Sir, when you started at Marquis, what was the

6       nature of the staffing of the help desk?

7  A.   The staffing, I had one, two -- I probably had

8       seven people, I believe.

9  Q.   And did those people all have the same job titles?

10 A.   No.

11 Q.   Tell me how -- what were the different job titles

12      of the people who staffed the help desk?

13           MS. ZACCARDELLI:  Objection to form.

14 A.   So you might have to give me a definition of what

15      you feel the help desk is, but the help desk to me

16      was the whole entire department.  It was all one

17      group.

18           If a ticket came in, it was addressed by

19      someone that answered the phone or if someone

20      actually, via an e-mail through their -- through

21      the in box, and then it was addressed by the whole

22      entire IT team.

23 Q.   Well, I think -- I think -- I want to follow up on

**Fruhbeis 6/20/23**

23

```
1           specialist.  I can't remember the exact titles.
2    Q.     And in terms -- in terms of -- and, again, putting
3           aside necessarily the exact language,
4           Ms. Collopy's job duty was what; what was her
5           role?
6                  MS. ZACCARDELLI:  Objection to form.
7    A.     I had a difficult time understanding what Beth
8           Anne's role was.
9    Q.     Well, did you read her job description?
10   A.     I read her job description.  I asked everyone on
11          the team for their job descriptions.  But what
12          was -- what I thought was -- or what was being
13          done and what was on the job descriptions were not
14          always the same thing.
15   Q.     Well, in terms of Ms. Collopy, what was the
16          differences, if any, between what the job
17          description said versus what she actually did?
18   A.     My understanding with Beth Anne's was that she
19          worked a lot on the process and procedures.  She
20          manages -- she manages the licenses, and she
21          manages -- managed our vendors.  I also understood
22          that she would take new tickets in, but didn't
23          work on any of the tickets.  They were pushed off
```

**Fruhbeis 6/20/23**

24

1          to other -- other techs.

2     Q.   Now, when you said that she didn't work on any

3          tickets, where did you get -- where did that

4          conclusion -- or where did you -- where did you --

5          how did you secure that conclusion?

6     A.   Well, the conclusion was -- that came from talking

7          to the other staff members, as well as viewing the

8          tool that we used, the tool that kept all the

9          tickets in the piece of software that we used at

10         the time.

11    Q.   So the IT department maintained records by which

12         you could determine who responded to a particular

13         ticket; is that correct?

14              MS. ZACCARDELLI:  Objection to form.

15    A.   It was a tool that handled that -- that did that

16         for any ticket that came in.

17    Q.   Okay.  And what was the name of that tool?

18    A.   I believe it was Zendesk at the time.

19    Q.   Okay.  And did you review the Zendesk records?

20    A.   I reviewed some of them.

21    Q.   When you say "some of them," can you explain what

22         you mean by that?

23    A.   I randomly reviewed tickets that were in there and

**Fruhbeis 6/20/23**

| | | |
|---|---|---|
| 1 | A. | Oh, okay.  Yeah, I didn't know what you were |
| 2 | | referring to, a record.  So -- so, yeah, I asked |
| 3 | | for the job descriptions.  I looked at résumés of |
| 4 | | all the staff -- those documents -- and that's -- |
| 5 | | and I asked the team for documents of what they -- |
| 6 | | what they thought their job descriptions were. |
| 7 | Q. | Well, you say what they thought their job |
| 8 | | descriptions were.  You mean differences between |
| 9 | | what they were supposed to -- what their job |
| 10 | | descriptions said and what they were actually |
| 11 | | doing? |
| 12 | A. | Correct. |
| 13 | Q. | And what was the response to that inquiry? |
| 14 | A. | They provided me what they thought they were doing |
| 15 | | on a day-to-day basis. |
| 16 | Q. | And was that done in writing, by text message, by |
| 17 | | e-mail, or orally; how was that communicated to |
| 18 | | you? |
| 19 | | MS. ZACCARDELLI:  Objection to form. |
| 20 | A. | I believe I got documents from everyone.  I don't |
| 21 | | recall if they were a Teams message or an e-mail |
| 22 | | message, but they -- I got -- they sent me the |
| 23 | | information. |

**Fruhbeis 6/20/23**

1   Q.   Do you still have those documents?

2   A.   Probably.  I haven't deleted anything.

3            MR. MEYER:  Okay.  I'm going to make a

4        request for those records, please.

5            MS. ZACCARDELLI:  Well, you've got

6        everything.  So we would have produced -- I'll

7        check -- I'll check and see if there's something

8        that hasn't been produced that references that.

9        We'll take it under advisement.

10           MR. MEYER:  Okay.

11  Q.   During this time frame, did you consult with Chris

12       Moore about changing the IT department?

13           MS. ZACCARDELLI:  Objection to form.

14  A.   Yes.

15           MS. ZACCARDELLI:  Sorry, Mike.  Go ahead.

16  Q.   And when and where did you consult with him?

17  A.   I sent him an evaluation.  I sent him an e-mail.

18  Q.   To clarify, the e-mail is dated 3/8.  I'm now

19       asking you about any consultations you had prior

20       to that date.

21  A.   No, not to that -- not until that time.

22  Q.   Any consultation with Mr. Watkins?

23  A.   I believe I might have told Scott that I was

**Fruhbeis 6/20/23**

42

1   Q.   Now, did you make any observations about the help
2        desk functioning?
3   A.   I did an evaluation, yes.
4   Q.   Putting aside your evaluations -- and we'll
5        discuss that later -- just in terms of
6        observations, did you make any physical
7        observations about what was happening and what
8        wasn't happening?
9   A.   Yes.
10  Q.   Okay.  What were your physical observations?
11  A.   My physical observations?  You mean what I saw?
12  Q.   Yes.
13  A.   I saw that the team worked differently based off
14       of who was there.  I saw that many of the team
15       staff members worked extremely fast, some worked a
16       little bit slower.  I observed the times that they
17       came in, times that they left, whether they did
18       work in the -- in the physical -- in our office,
19       or if they had to go to another one of our
20       offices.
21  Q.   When you said "another one of our offices," what
22       are you referring to?
23  A.   I'm referring -- I'm referring to that our help

**Fruhbeis 6/20/23**

50

| | | |
|---|---|---|
| 1 | Q. | What did she say? |
| 2 | A. | She told me that she did not have those skills, |
| 3 | | and that Dan Lieber was -- wanted her to work with |
| 4 | | Irving and/or Matt to learn more. |
| 5 | Q. | Now, you said earlier that you had reviewed her |
| 6 | | résumé; is that correct? |
| 7 | A. | Yes. |
| 8 | Q. | And did you review it before or after your meeting |
| 9 | | with her? |
| 10 | A. | I believe I reviewed everyone's résumé before I |
| 11 | | met with them. |
| 12 | Q. | Did you ask her any questions about her résumé? |
| 13 | A. | No. |
| 14 | Q. | Are you aware that she had substantial IT |
| 15 | | experience before she went to work for IBM? |
| 16 | | MS. ZACCARDELLI: Objection to form. |
| 17 | A. | I knew she had IT experience before, not |
| 18 | | substantial. |
| 19 | Q. | Do you know how much IBM experience -- how much IT |
| 20 | | experience she had before she went to IBM? |
| 21 | A. | I don't recall. |
| 22 | Q. | Did Ms. Collopy tell you that she believed that |
| 23 | | she had been subject to discrimination based on |

**Fruhbeis 6/20/23**

51

1       gender or sex?

2   A.   Gender or?

3   Q.   Sex.

4   A.   No.

5   Q.   She never mentioned that she had been

6        discriminated against based on gender or sex?

7   A.   Gender or sex, no.

8   Q.   Did you refer her, at any point in your meeting

9        with her, to speak to Mr. Watkins?

10  A.   Yes.

11  Q.   Okay.  And why did you refer her to speak to

12       Watkins?

13  A.   Our discussions were about -- some of the

14       discussions were about the different

15       accessibility, ADA accessibility needs that she

16       had.  And Beth Anne had let me know that there was

17       a lot that Marquis had already done.  She said

18       that there was some -- that we had put a handrail

19       up, and there was some handicapped signs.  And I

20       had asked her if everything that she needed was

21       taken care of, if there was anything else that I

22       needed to address.  She said no, but she did -- I

23       recall -- I can't recall exactly what she brought

**Fruhbeis 6/20/23**

60

| | | |
|---|---|---|
| 1 | | you're kind of starting with a clean slate. |
| 2 | Q. | So Mr. Santos told you that the only information |
| 3 | | he deleted from Teams was testing information? |
| 4 | A. | That was my assumption. |
| 5 | Q. | Well, is that an improper thing for him to do? |
| 6 | A. | Yes. |
| 7 | Q. | You said that, as I recall, you have no |
| 8 | | recollection of actually having seen the warning |
| 9 | | itself? |
| 10 | A. | I have not. |
| 11 | Q. | Is there any reason why you did not request a |
| 12 | | chance to see it? |
| 13 | A. | During my evaluation of the team, I -- I've done |
| 14 | | this many times at other companies.  I'm looking |
| 15 | | to move forward.  My team was very open to me. |
| 16 | | They brought everything to me.  And I didn't feel |
| 17 | | that there was a reason for me to go through |
| 18 | | everyone's background, HR files.  It was, you |
| 19 | | know, a clean slate, and we started moving |
| 20 | | forward.  I needed to do my own evaluation and |
| 21 | | then determine of each person. |
| 22 | Q. | Do you know how long before you started this |
| 23 | | reprimand was issued? |

**Fruhbeis 6/20/23**

69

1       me that my understanding were prior to me coming

2       on and had already been addressed.

3   Q.  So your understanding -- just scroll down here --

4       is that all these items were items that she

5       brought to you as part of that meeting?

6           MS. ZACCARDELLI:  Objection to the form.

7       Objection to the form of the question.

8   A.  I don't recall if we spoke about all of these.

9   Q.  Well, did you talk about -- with her about team

10      integrity issues?

11  A.  We talked a lot.  I don't recall everything that

12      we spoke about.

13  Q.  I'm not asking about everything.  Did you talk to

14      her about team integrity issues?

15  A.  I don't recall if we did.

16  Q.  Did you talk to her about a hostile work

17      situation?

18  A.  Yes, we did that.

19  Q.  Did you talk to her about WAH, as in working from

20      home?

21  A.  We talked about working from home, yes.

22  Q.  Did you talk to her about intentional destruction

23      of data?

**Fruhbeis 6/20/23**

```
 1              MS. ZACCARDELLI:  Objection to form.
 2   A.   She let me know that Irving had removed stuff,
 3        yes.
 4   Q.   Did she talk to you about unauthorized data
 5        access?
 6   A.   I don't recall.
 7   Q.   Did she talk to you about uncooperative team
 8        members?
 9   A.   Yes.
10   Q.   Did she talk to you about reduction of access
11        rights?
12              MS. ZACCARDELLI:  Objection to the form.
13   A.   Yes.
14   Q.   Did she talk to you about reduction of building
15        access?
16   A.   I don't believe so.
17   Q.   But she did talk to you about accessibility issues
18        she had based on your prior testimony?
19              MS. ZACCARDELLI:  Objection to form.
20   A.   We spoke about the access in the building where
21        she needed a handrail or requested a handrail, and
22        that was put up.  She mentioned to me that there
23        was a handicapped parking spot that had -- the
```

**Fruhbeis 6/20/23**

73

| | | |
|---|---|---|
| 1 | | been addressed? |
| 2 | A. | You have to rephrase. |
| 3 | Q. | Is there anything in those notes that indicates |
| 4 | | that any of these problems had been addressed? |
| 5 | A. | I don't -- I don't -- I don't know.  Those weren't |
| 6 | | my notes. |
| 7 | Q. | Sir, didn't she tell you that the environment for |
| 8 | | her at that point was so hostile, that she |
| 9 | | preferred to work at home? |
| 10 | | MS. ZACCARDELLI:  Objection to form. |
| 11 | A. | Yes. |
| 12 | Q. | And when she said that, she was talking in the |
| 13 | | present tense, not the past tense, correct? |
| 14 | A. | Yes. |
| 15 | Q. | So there were certainly some things that had not |
| 16 | | been resolved, correct? |
| 17 | A. | My impression was the reason that she wanted to |
| 18 | | work at home was, one, because of the commute |
| 19 | | coming in when there was weather conditions, but |
| 20 | | also the fact that when Beth Anne would walk into |
| 21 | | that office, no one addressed her.  The whole -- |
| 22 | | everything kind of changed.  No one said hi.  Beth |
| 23 | | Anne didn't say hi.  The team didn't say hi.  She |

**Fruhbeis 6/20/23**

74

1      sat in her cube, and the team -- when I say team,

2      I'm talking about Beth Anne also -- my whole

3      entire team just did not communicate very well

4      together.  It was very dysfunctional.

5   Q.  She told you it was a hostile work environment,

6      correct?

7          MS. ZACCARDELLI:  Objection to form.  I

8      can't hear you.

9   Q.  She told you it was a hostile work environment,

10      correct?

11  A.  Yes, yes.

12  Q.  And you knew that problem had not yet been

13      addressed, correct?

14  A.  I was -- yes.

15  Q.  Now, that set of notes has a date of March 2.  How

16      many days between that meeting and the day you

17      made the decision to eliminate her position?

18  A.  I believe it was seven or -- six or seven.

19          MR. MEYER:  You can remove that from the

20      screen.  Thank you.

21  Q.  Sir, you indicated that, when she complained to

22      you about gender discrimination, that you asked

23      her to go to Mr. Watkins and expected him to look

**Fruhbeis 6/20/23**

89

| | | |
|---|---|---|
| 1 | Q. | Now, you said Mr. Javier is quality over quantity. |
| 2 | | Was that an indication that he was more concerned |
| 3 | | about the speed at which he was responding? |
| 4 | A. | I heard like two voices, so could you say that |
| 5 | | again? |
| 6 | Q. | Yes.  When Mr. -- you said in your notes, or |
| 7 | | whatever you want to refer to this document, that |
| 8 | | Mr. Javier had quality over quantity; were you |
| 9 | | referring to the number of tickets that he |
| 10 | | completed? |
| 11 | A. | Yes. |
| 12 | Q. | Now, under Ms. Collopy, you say, "Limited |
| 13 | | knowledge of existing help desk functionality." |
| 14 | | Can you give a specific example of that? |
| 15 | A. | The limited knowledge of existing help desk |
| 16 | | functionality?  Yes, I know Beth Anne didn't have |
| 17 | | a good -- to me, didn't have a very good |
| 18 | | understanding of how the help desk actually should |
| 19 | | run, how tickets should be divvied out or |
| 20 | | addressed.  It wasn't her responsibility, I |
| 21 | | believe, from my understanding, to actually answer |
| 22 | | the tickets, so she didn't have a very good |
| 23 | | understanding of how this all functioned. |

**Fruhbeis 6/20/23**

1   Q.   So any other basis for saying of her limited

2        knowledge of existing help desk functionality?

3             MS. ZACCARDELLI:   Objection to form.

4   A.   No.

5   Q.   Are you aware of anything in writing where she's

6        indicated that answering tickets was not part of

7        her job function?

8   A.   Can you just say that again?  I'm sorry.

9   Q.   Yes.  Are you aware of anything in writing in

10       which she states that answering tickets is not

11       part of her job function?

12  A.   I asked each team member to provide me a document

13       on what their day-to-day responsibilities were,

14       any projects that they are working on, as well as,

15       you know, any items that they had to address, and

16       there was -- in what she provided me there was no

17       reference of answering tickets, so that was

18       written.

19  Q.   Anything else?

20  A.   No.  The other parts were verbal.

21             MR. MEYER:  Megan, would you please put on

22       the screen Exhibit 15.

23             (Document screen-shared.)

**Fruhbeis 6/20/23**

94

1          MS. ZACCARDELLI:  Well, are you asking to

2     read it back now?  He's not finished.

3          MR. MEYER:  No.  I'm going to let him

4     finish, then I'm going to have the whole thing

5     read back.

6 Q.  Please continue, sir.

7 A.  Okay.  So I was saying that it was a technical

8     aspect of tickets that needed to be answered.  It

9     wasn't -- Beth Anne did not want to answer the

10    tickets.  I felt that she didn't have the

11    technical background to actually handle all the

12    tickets.  This also had to deal with asset

13    management, as well as managing all of our

14    positions -- I mean, all of our -- all of our

15    projects.  I thought -- my impression from Beth

16    Anne was that she could take on some of those

17    projects, but she didn't have the skill set to

18    handle the larger projects, which is what we were

19    kind of moving in the direction to.  And I also

20    needed someone to step up and become a leader and

21    have the team look up to her and respect her and

22    work for her and support her.  I didn't think she

23    had that ability to do all that.  Therefore, I

**Fruhbeis 6/20/23**

```
 1            head of the help desk.
 2    A.     Yes.  I needed somebody -- there's the echo again.
 3            So part of the role is understanding where our
 4            assets are, developing or looking for an asset
 5            management tool that would control the assets so
 6            that they could be tagged, documented, and we knew
 7            where they were at all times, we knew who they
 8            were assigned to.  She didn't have -- I was not
 9            aware that she had that experience.
10    Q.     Did you ask her?
11    A.     I don't recall if I asked.
12    Q.     You also said that she didn't have the skill set
13            to manage all the projects.  Now, she had provided
14            you with a list, a fairly lengthy list of projects
15            she was currently engaged in, correct?
16                   MS. ZACCARDELLI:  Objection to form.
17    A.     Yes.
18    Q.     Did she mismanage any of those projects?
19    A.     Well, when I read the whole entire document and
20            went through it, the majority of the projects were
21            either completed and she had nothing to do with
22            them, or they were projects that the team did as a
23            whole and she, again, had not much to do with it.
```

**Fruhbeis 6/20/23**

```
1   A.   Okay.  Sorry.  I'm having a very hard time.  It's

2        been breaking up.

3             These projects -- the skill set that I think

4        she lacks is that these projects need to be --

5        someone needs to take it and be able to handle all

6        aspects of it, not just the IT piece of it.  They

7        have all sorts of other areas that they have to

8        work with.  They have to be able to delegate, and

9        they have to be able to make sure that we hit

10       certain deadlines that are assigned.  They have to

11       be willing -- or they have to be able to work with

12       all sorts of different levels.  And I felt that

13       she did not have all those skill sets to do that.

14  Q.   Did she miss any deadlines, to your knowledge?

15            MS. ZACCARDELLI:  I cannot hear you.

16       Megan, can you read that question?

17  Q.   Did she miss any --

18            MS. ZACCARDELLI:  I don't know.  It's when

19       you're talking down or you're too close, but every

20       question now is not coming through.

21  Q.   Did she miss any deadlines?

22  A.   I don't recall if she missed any deadlines, but

23       all projects were put on hold until I got there,
```

**Fruhbeis 6/20/23**

104

1          working on some of our vendor management.

2    Q.    Aside from licensing and vendor management, was

3          she working on any other projects during your time

4          there?

5                MS. ZACCARDELLI:  Objection.  Objection to

6          the form of the question.

7                You can answer, Mr. Fruhbeis.

8    A.    They all rolled up into those two departments --

9          those pieces.  So they were either -- the ones

10         that were being worked on was licensing and vendor

11         management.

12   Q.    All right.  What, if anything, did she do

13         incorrectly in terms of the vendor management

14         project?

15   A.    Well, one, she brought -- she was recommending

16         TeamLogic.  It's a company that we currently use

17         that was brought in, I believe, by Dan Lieber;

18         that they -- she was managing them.  She had

19         convinced me that they were fantastic; that they

20         took care of any of our after-hours call -- any of

21         our after-hour calls; that she was managing that

22         piece and everything was taken care of.

23               I picked the phone up after hours, made a

105

1          phone call to the after-hours support.  No one
2          picked up.  I did it three or four times.  We
3          ended up having a meeting with the vendor.  And
4          the vendor just gave me all sorts of excuses on
5          why things were not able to be addressed, and
6          that's a project that Beth Anne was working on.
7          It was her responsibility.  And I felt that she
8          was not handling that vendor correctly.  And I,
9          ultimately, ended up getting rid of that vendor.
10   Q.    Did you have any other criticism of her in terms
11          of vendor management?
12   A.    Not that I can think of right now.
13   Q.    Do you have any criticism of her in terms of
14          licensing?
15   A.    She told me that she was responsible for all
16          licensing.  As a part of my role, I took on the
17          licensing part, or I dug into the licensing part
18          because licensing is one of the most -- or the
19          largest piece of our spend in IT.  And the
20          licensing through Microsoft, through our CDW
21          vendor was just all over the place.  We were
22          spending money that we shouldn't have.  Again, a
23          project that she was responsible for.

Fruhbeis 6/20/23

1   Q.   Any other criticism of her regarding licensing?

2   A.   Those are the ones off the top of my head, so not

3        that I can think of.

4   Q.   Why did you choose to eliminate her position and

5        not one of the other IT positions?

6   A.   After speaking to Beth Anne and actually going

7        through the document that she had provided me,

8        which we had also, when I spoke to all my team

9        members, we verbally went through all these

10       projects, so I had a good understanding of what

11       everyone was doing.  It just needed to be in

12       writing, so I had -- I had it for my records.  And

13       I went through what she did, and I basically said,

14       "Well, she doesn't do that, doesn't do that

15       anymore.  This is done.  This is done.  I took

16       this.  I took this."

17            And I went through the whole entire thing,

18       and I'm, like, "Well, okay.  Everything that she's

19       working on, someone else is doing it," and there

20       was nothing more that she was doing on that list.

21       So I felt that was -- and then I took her and

22       said, "Well, here's the other two positions I

23       think that I need."

1        I felt she was not qualified for either one

2    of them, and I decided that it was better off

3    taking -- to eliminate that position and that's

4    what I did.

5  Q.  Sir, we've already gone over the fact that the

6    document you just testified to was not given to

7    you by her, or even requested by you, until after

8    you already decided to fire her.  So how can you

9    rely on a document that you didn't receive until

10   after making the decision to fire as a basis for

11   the decision to fire her?

12       MS. ZACCARDELLI:  Objection to the form of

13   the question.

14 A.  So this -- so much of our -- as I had mentioned

15   before, much of our discussion was verbal.  We had

16   our one-on-one meetings.  We communicated on the

17   phone.  And there was information that I gathered,

18   so I already had a good idea of what people were

19   working on, and I needed them to respond to me and

20   actually provide that documentation.  Every other

21   person actually on my team provided me that

22   documentation, and I was waiting for Beth Anne's.

23   That's why hers came -- or why, when I had asked

**Fruhbeis 6/20/23**

108

1        her for it, that's why I followed up again, and

2        hers came in a little bit later.  I had a good

3        understanding of what everybody needed prior to

4        the actual document.

5  Q.   You didn't even ask her for that document until

6        after you decided to fire her, correct?

7        MS. ZACCARDELLI:  Objection to the form.

8  A.   I believe I asked her before that.  It was -- we

9        had verbally spoken to the team.  I'd asked them

10       for all that information.  This was a follow-up.

11       MR. MEYER:  Can you put on the screen

12       again, please, Exhibit 15.

13       (Document screen-shared.)

14  Q.   Sir, can you look at that e-mail halfway down the

15       page.

16  A.   Okay.  Where?

17  Q.   Starting under the term "Microsoft Teams."

18  A.   Okay.

19  Q.   Is there anywhere in there that says that request

20       is a follow-up?

21  A.   No, I didn't write "follow-up."

22  Q.   And is it fair to say, sir, that that request was

23       made after you had already decided to fire her?

| | | |
|---|---|---|
| 1 | | doing, what I wanted to do.  And they -- they were |
| 2 | | fine with it because it's my department.  I can do |
| 3 | | what I want with it.  And I was asked when did you |
| 4 | | want -- when did we want to do it. |
| 5 | Q. | Did they give you any other feedback? |
| 6 | A. | The feedback was -- the other feedback was that |
| 7 | | they had said, "Well, hey, you have two positions |
| 8 | | that you are interested in adding," did I have |
| 9 | | anyone in mind.  And I actually said, for one, I |
| 10 | | had -- for the IT management role, I had a |
| 11 | | colleague, Marcy, who actually worked for my old |
| 12 | | company up in Concord, New Hampshire, and I |
| 13 | | thought she would be fantastic for the job.  So |
| 14 | | they gave me -- "Mike, it's your department," so I |
| 15 | | went from there. |
| 16 | Q. | Did you make any actual efforts to fill either of |
| 17 | | those positions? |
| 18 | A. | Could you say that again?  Sorry. |
| 19 | Q. | Did you make any efforts to fill either of those |
| 20 | | positions? |
| 21 | | MS. ZACCARDELLI:  Objection to the form. |
| 22 | A. | Yes.  I made efforts -- |
| 23 | Q. | What did you do? |

**Fruhbeis 6/20/23**

```
 1   A.    -- on each position.

 2   Q.    You said you made calls on each position?

 3   A.    I made an effort.  The first one was for -- to the

 4         female that I had just mentioned to you, Marcy.  I

 5         had reached out to her.  I had communications with

 6         her.  I have -- and I thought it was something

 7         that she was interested in, and then she decided

 8         not to pursue it.

 9              As for the technical person, I had another

10         person named Chris, who was -- Chris Berg, who was

11         actually a person that worked for me at my old

12         company; that I started discussions with, for him

13         to come join our team and be a senior engineer to

14         actually help out with the more challenging data

15         center stuff that we needed.  Neither one of them

16         came on board.

17              And then I can probably elaborate a little

18         bit more after that.  I felt that the -- you know,

19         maybe this is not something that I need to --

20         maybe we could hold off a little bit.  And I ended

21         up bringing on one other person, which was an

22         intern, more because I believe in an intern

23         program just to help out some of the younger
```